```
 1              IN THE UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF ALABAMA

 3                     SOUTHERN DIVISION

 4   ------------------------------------
                                        ) CIVIL NO. CV17-00547
 5   BOXCAST, INC.,                     ) COURTROOM 4A
                                        ) U.S. FEDERAL COURTHOUSE
 6                   PLAINTIFF,         ) MOBILE, ALABAMA
                                        ) NOVEMBER 15, 2018
 7   VS.                                ) PAGES 1 TO 187, INCLUSIVE
                                        )
 8   YSL, L.L.C.,                       )
                     DEFENDANTS.        )
 9   ------------------------------------)
```

 10                   **CLAIMS CONSTRUCTION HEARING**
                BEFORE THE HONORABLE JEFFREY U. BEAVERSTOCK
 11                UNITED STATES DISTRICT COURT JUDGE

 12   <u>APPEARANCES</u>:

 13   FOR BOXCAST, INC.:

 14                   Calfee, Halter & Griswold LLP
                      By:  Mark W. McDougall, Esq.
 15                   By:  Joshua Friedman, Esq.
                      1405 East Sixth Street
 16                   Cleveland, Ohio  44114

 17                   AdamsIP, LLC
                      By:  J. Hunter Adams, Esq.
 18                   453 Dauphin Street, 2nd Floor
                      Mobile, Alabama  36602
 19
      FOR YSL, L.L.C.:
 20
                      Dickinson Wright PLLC
 21                   By:  Ross S. Garsson, Esq.
                      By:  Michael D. Saunders, Esq.
 22                   607 West 3rd Street, Suite 2500
                      Austin, Texas  78701
 23
      COURT REPORTER:  Melanie Wilkins, RMR, CRR
 24                   Federal Official Court Reporter
                      155 St. Joseph Street
 25                   Mobile, Alabama  36602

1          Proceedings reported by machine stenography.

2              Transcript produced by computer.

3        [November 15, 2018, 8:57 a.m. in open court.]

4              THE COURT:  Good morning.

5              THE CLERK:  Case set for claims construction hearing

6    in Civil Action 17-547, BoxCast, Incorporated, versus YSL,

7    L.L.C.

8              What says the plaintiff?

9              MR. MCDOUGAL:  Hi, Judge.  Mark McDougall on behalf

10   of the plaintiff.  With me today is Josh Friedman, counsel for

11   plaintiff; Gordon Daily, who is the founder and one of the

12   inventors on the patent, and Ron Hopper, founder and inventor

13   on one of the patents, as well and Hunter Adams, local counsel.

14             MR. ADAMS:  Good morning, Your Honor.

15             THE COURT:  Good morning.

16             Melanie, can you hear?

17             THE REPORTER:  Oh, yes.

18             THE COURT:  And, before we turn to the defendant,

19   this courtroom is great, works really well for a lot of things.

20   One thing it does not work very well for is counsel standing

21   and talking at the counsel table.  So, as we are going through,

22   I'm not going to be offended if you keep your seat when you are

23   speaking because it's going to make a much better record for

24   everyone.

25             If you do want to use the overhead, you need to use

```
1    the podium, of course.  And if you can't just shake it -- I
2    know a lot of lawyers, you've got to be who you are.  If you
3    have just got to stand, I'm perfectly fine with that, and you
4    are welcome to go to the podium.
5          In the old school here, it was always you spoke only
6    at the podium, and you never moved.  It doesn't bother me one
7    way or the other if you sit at your table and talk.  I just
8    want to make sure I can hear you and that Melanie can hear you
9    and take down what you are saying.
10         MR. GARSSON:  Thank you, Your Honor.  This is Ross
11   Garsson with Dickinson Wright for the defendant, YSL, LLC.  And
12   thank you.  When a judge says I can sit down, I'm going to sit
13   down.  I'm going to respect his order to do so.
14         With me on my left is Michael Saunders at my firm.
15   Further to my left is Rob Desilets, who is the CTO and our
16   client rep for YSL.  And then sitting back there behind is
17   Scott Gorman on the left and Michael Smith on the right.  And
18   you are seeing almost the entire company, Your Honor.
19         THE COURT:  Okay.  Okay.  Well, thank you, all, for
20   coming.  Like I said, when we spoke last week, I really look
21   forward to your argument and breathing some life into the
22   written materials.  I just think that it's important for
23   lawyers to be lawyers, and so I look forward to you helping me
24   understand just exactly what is going on.
25         And so, to that end, I think that I would like,
```

```
1   before we just break into your opening -- not to throw a monkey

2   wrench on you -- but I think it would be helpful to just kind

3   of do a technology overview before we get started so that we

4   are all in the same area of operation and, you know, we just

5   put a little bit of light on the technology on it before we

6   start parsing out the terms.  So if you would like to do that,

7   I would appreciate it.

8            MR. MCDOUGAL:  Okay.  I'm going to use the podium.

9   It would be easier for me.

10           THE COURT:  Sure.

11           MR. MCDOUGAL:  Thank you, Your Honor.  I appreciate

12  that.  We actually did prepare a little bit of technology

13  overview, so we have some slides on that that I'll go through

14  here at the beginning.

15           THE COURT:  Great.

16           MR. MCDOUGAL:  So, just to start off, I wanted to

17  introduce really briefly my client, BoxCast.  It's a company

18  that was founded in -- I'm sorry -- let me clear that.  It was

19  a company that was founded in Cleveland, Ohio in 2009.  It was

20  founded by four friends, two of which are sitting right here

21  today.

22           It's now grown to over 35 employees, and they have

23  thousands of customers nationwide.  These customers include

24  churches, schools, sports teams, any type of organization that

25  needs -- that wants to stream or broadcast their events for
```

1    some reason.

2            One thing that the founders did early on is that they

3    documented all their ideas and their technology in one patent

4    application, which is part of one of the patents that have

5    spawned from this patent application is one that are at issue

6    today.

7            That patent application has a lot of different ideas

8    in it.  There's been two patents stemming from that

9    application.  There's a third one that was just allowed, and

10   there's going to be a fourth one filed.

11           So there's more coming related to this application,

12   but they were smart.  They filed that back in 2010, early on

13   when they founded their company, and it actually became a core

14   and helped them build their company.

15           So a little bit about the technology.  I'll talk

16   briefly about what was kind of the prior systems at the time.

17   These prior systems-- now, this is a picture of a home

18   broadcasting system that we found, but, as you can see, they

19   were pretty expensive and complicated to use.  You really

20   needed some kind of expertise in IT and a lot of money in order

21   to broadcast your own event to a number of different viewers.

22           And the patent in the background section of the

23   patent -- so if you have a copy of the patent, there's a bunch

24   of figures, and then there's a whole description of the

25   invention.  And then there's claims at the back, which we'll be

1    talking about.

2            But there's a whole background section in there that

3    talks about what the prior systems did and what the issues were

4    with the prior systems and how the inventions in the patent

5    application solved those issues.

6            One of the issues that related to these prior systems

7    was the ability to remotely schedule a broadcast.  So what I

8    mean by that is if you wanted to, from anywhere basically,

9    schedule a broadcast that was going on at your church or at

10   school and you wanted to do it remotely, like logging in and

11   putting in the time to tell when to start broadcasting.  It was

12   difficult to do because of the router issue.

13           So the router -- you may be familiar with a router --

14   but they block traffic in and out of the network.  And so the

15   problem was when you tried to remotely tell the device to start

16   capturing images of the event and broadcasting them from a

17   remote location, the firewall would block you from doing that.

18           And so, in these prior systems, you had, really, two

19   options.  You had to either be at the actual site of the event

20   and telling it when to start capturing the video data and

21   broadcasting it or you had to have the ability to configure

22   that router in order to allow those outside transmissions to

23   come in.

24           So, to do that, you needed some type of technical

25   expertise, and a lot of these companies don't have the

1     resources for IT personnel.  Like, in your church, you don't

2     necessarily want to hire an IT person in order to just stream

3     your Sunday services.  And so that was one of the issues in the

4     prior -- that was one of the issues that my client's patent

5     application and devices solved.

6               So the solution to this -- and this is a video that's

7     actually on BoxCast's website, which was using what we call the

8     BoxCaster, and we have one right here.  There are a couple of

9     different versions sitting over here from early on.

10              But this was a device that you could sell to a client

11    or give it to, you know, the church, and all they needed to do

12    was, really, establish an Internet connection, hook it up to a

13    camera, and power it on.  And then you would have them log into

14    a scheduler website -- and we'll talk about the different

15    components of this broadcasting system.  And using that

16    scheduler at that website, you could control this BoxCasting

17    device in order to capture the video and stream it to your

18    parishioners.

19              And so this device was what's explained in this

20    patent, along with the other components of the system, and so

21    that was kind of what started BoxCast.  And so, now, they've

22    created a number of iterations from that device, which, by the

23    way, is made completely here in the United States and in

24    Cleveland.

25              So here's the patent application.  It's called

1    Autonomous Broadcasting System and Methods for Autonomous

2    Broadcasting.  You'll see that the inventors are the four guys

3    that started the company.  It's Gordon, Ron, sitting here, and

4    then Justin and Joe, who didn't come today.

5              And they filed -- they filed it back in 2010.  This

6    is the second patent stemming from that family, and it issued

7    last June.  So when you go and look at the patent, it explains

8    this system that I was talking about.  This is figure 4 from

9    the patent.

10             There's three major components to this autonomous

11   broadcasting system.  There's the scheduler website, which you

12   see in yellow there -- or green.  There's the broadcasting

13   device, which is this box in purple.  And then there's the

14   media servers, which are in yellow.

15             And so this picture kind of shows the three main

16   components, and figure 4 down there, the other two boxes, the

17   administrator, those are the administrator or content provider.

18   That's the person that logs into the scheduler website and says

19   I want you to broadcast -- I want the system to broadcast this

20   event on such-and-such date, such-and-such time; I want it to

21   last for so long.  So that's the person that kind of sets it

22   up.  And then, the last box, there is the viewers.  Those are

23   the people that will log into the media server and watch the

24   viewing.

25             This next figure -- and I apologize.  There was a lot

1   going on on this, but this is one that's in our briefs.  And it

2   was prepared by us, but we think it helps explain, not only the

3   system, but how the data and the content is traveling between

4   the different components, which is what these claims are all

5   about.  And so we felt it was a helpful guide for that purpose.

6          So you'll see I have the little content provider guy

7   there.  He's the one who provides the recording start and end

8   time into the scheduler website.  And then, from there, data

9   related to that schedule is sent through a router and to the

10  broadcasting device, which is in purple.

11         So you see that blue box there, that indicates that

12  the broadcasting device, which is this, and the router are the

13  components that are kind of at the site of the live event.

14         So, based on that data that it receives from the

15  scheduling website that's related to the schedule, this

16  broadcasting device will start transmitting the content that's

17  received from the camera through the router and to a media

18  server, and then you have all these users that actually log

19  into this media server in order to view that content.  And at a

20  high level -- and I know we are going to get into a lot more

21  detail about this -- but at a high level.  That's how that

22  system works.  And I'll refer back to this figure throughout

23  the presentations today.

24         So let's look and see what the patent says about the

25  scheduler website.  The patent talks about the scheduler

1   website being the central hub for all activity of the system,

2   otherwise the brain of the system.

3          It not only maintains a schedule of events, it

4   registers the broadcasting device. So if you buy one of these

5   and you have to plug it in, so you have to first register it,

6   the scheduler website is the one that will do the registering.

7          It also determines kind of which channels to use,

8   where is your broadcast going on the media servers, which

9   channels do the viewers have to log into. So it really

10  maintains more than the schedule. It kind of acts as the

11  central hub of the whole system, which is exactly what the

12  patent says.

13         It also provides the user interface for the users to

14  manage their broadcasting events. As you can see, this box, it

15  doesn't have a user interface, and so the only way to control

16  that system is through the scheduler website. So the scheduler

17  website controls the broadcasting device, tells it when to

18  broadcast, when to start transmitting the digital content to

19  users so they can view it.

20         And it also does that by sending data to the

21  broadcasting device. And, if you look in the spec in the

22  patent application, it will talk about various different types

23  of data. There's schedule information, which can include a

24  unique identifier, a start date, start time, a duration of a

25  live event. It also sends updates to the schedule information.

1  It even sends a confirmation when no updates are needed.  So it

2  will tell the broadcasting device, "Hey, no updates are needed,

3  go broadcast."

4           All of this type of data that's explained in the

5  patent application, all of it is used to control this

6  broadcasting device, which has no interface and can't be

7  controlled other than through the scheduler website.

8           So you might remember the router/firewall problem I

9  mentioned.  The patent addresses that problem with something

10  called a "request."  And this is really one of the keys to

11  BoxCast's invention.

12           So if you have a scheduler website and you are trying

13  to send data to control a broadcasting device that's behind a

14  firewall or router, you have to do something to that firewall

15  to get that message to the broadcasting device.  And that

16  required IT professionals, but if you have the broadcast

17  device, the first thing, a request, you can initiate a

18  conversation with the scheduler website.  It kind of -- it

19  makes a hole in the firewall or router that will allow that

20  data to come back in.

21           So when you look at all the claims in this patent,

22  there's always a request being sent from the broadcasting

23  device to the scheduler website, and what that does is that

24  initiates that conversation so that data can come in.  And what

25  that does is it now, all of a sudden, you don't need an IT

1    professional to configure your router or firewall in order to

2    allow a transmission in.  So anybody can, really, hook this up

3    and schedule their events and don't have to do anything to

4    their existing network.

5            Examples.  So there's a number of different requests

6    that are in the patent.  I just labeled a few of them there.

7    These are all requests sent from the broadcasting device to the

8    scheduler website.  Any of these requests create that

9    conversation or handshake, kind of, requirement in order to get

10   the transmissions back in.

11           So, when you look at this figure again, the

12   request -- you'll see the broadcasting device in purple.  It is

13   sending a request through the router and then to the scheduler

14   website.  And the scheduling logic on the schedule website is

15   the software that's running.  And so that software receives

16   that request and then data relating to the recording start or

17   end time of a live event is sent through the router to the

18   broadcasting device.  So it allows that communication or

19   conversation to happen.

20           So I mentioned this already, that the broadcasting

21   device kind of automatically sends this request to the

22   scheduler website, and it receives data in response.  So when

23   it receives that data, it will -- and this is in the patent,

24   and we are going to talk about the term "autonomous" here in a

25   second.  But it will autonomously perform actions based on that

1    data, and those actions are they will receive the content from

2    the camera and it will then transmit that content to the media

3    servers.

4            So you can think of this invention, as you log into

5    the scheduling website, set your time of when you want to --

6    you know, when you want it to stream and go.  So it's kind of

7    like a "set it and go" is kind of the thought that there was

8    really no user interaction needed once you put in your -- you

9    know, the time you wanted to go.  You could leave, and it will

10    do it on its own.

11            And the specification repeatedly describes these

12    actions as being performed without user intervention, and the

13    broadcasting device, which is this box, the patent describes --

14    talks about that.  It is specifically designed to work without

15    user intervention.  It doesn't have an interface.

16            The kind of -- talk about all three of them.  I'm

17    going to talk briefly about the media servers.  We talked about

18    the kind of clients or customers that use this box and might

19    not have the resources to have large media servers, which are

20    very complicated pieces of equipment.

21            And so this system allows you to use third-party

22    media servers in order to stream your content.  And so you'll

23    just -- you'll just pay for time on these servers, and so

24    you'll send the content from the broadcasting device to the

25    servers that will stream to all the users.  But it doesn't

1   require you now to own these media servers or to maintain them,

2   which can be a significant expense.

3          So when you look at the patent claim, this is claim 1

4   of the patent.  It's a method claim, and it's a method of

5   autonomous broadcasting.  There's a number of different steps

6   here.  The first one, situating an autonomous broadcast device

7   behind a router, that's the user putting that at the site of

8   the event and then establishes an Internet connection for the

9   ABD behind the router.

10          And then, from there, after the "wherein" clause, the

11  ABD, which is this box, will autonomously perform all these

12  actions without modifying the router.  So that was one of the

13  keys, is that you don't need the IT professional to modify the

14  router.

15          And you can see the first step the ABD does is it

16  issues the request to a first server, and that's the request --

17  the first server is the scheduler website.  And so it issues a

18  request to the first server, and, in response, it receives data

19  relating to the recording start time of the live event.  All

20  right?  So that's the first step -- the first and second step,

21  I guess.

22          The next step is that it receives the digital content

23  of the live event after the recording start time from a digital

24  recording device.  A digital recording device is really just a

25  camera.  That term is not at issue today.

1          So it receives the digital content.  And then, next,

2     it will transmit two things.  It will transmit streaming

3     information, which is -- that term is not at issue today

4     either, but it's information that's sent to the media servers

5     that will help it determine how to kind of broadcast the event

6     or stream the event or the content that's being sent.  And then

7     it will send the content, as well, to those media servers.  And

8     then it will receive data relating to an end time, and then it

9     will cease transmission like that.

10         So it's kind of a whole broadcasting method claim.

11    It's kind of exemplary.  And I'll go through the other

12    independent claims briefly to tell you kind of -- highlight

13    what the differences are from claim 1, but claim 1 has all the

14    steps in it.

15         So the other independent claim -- so there's four

16    independent claims of this patent.  Claim 6 is another claim.

17    It's a method claim, but there's two big differences.  One is

18    that it doesn't have that recording end time, and it doesn't

19    cease transmission.  It only requires that it just begin the

20    transmission.  It doesn't require that the broadcasting device

21    end the transmission.

22         And then it also says the digital content is

23    transmitted out of band from the streaming information.  That

24    term "out of band" is not one that's at issue today, and it

25    kind of just means that it's transmitted separately.

1        Claim 12 is directed to a system.  So that's

2   important to know that there's a method claim, that the method

3   of broadcasting, and then there's a system, which are directed

4   to the components that perform those same functions.  And that

5   claim, 12, you'll see later on was amended during prosecution

6   to mirror claim 1.  So it has all the same type of limitations

7   as claim 1, but it's just in the system claim format.

8        Now, claim 22, which is the last independent claim,

9   is also a method claim, but it's from the point of view of the

10  scheduler website media server instead of the point of view of

11  the broadcasting device.  So it's kind of -- it's the same data

12  and digital content being sent between the three components.

13  It's just the point of view that -- you can think of it as the

14  point of view from the other components and not the

15  broadcasting device.

16       So then we get into terms -- so that was kind of my

17  technology overview.  I'm just going to now start in with the

18  first term, if that's okay.

19       THE COURT:  Give me one second.

20       MR. GARSSON:  We would like to present our tutorial

21  Your Honor, before we get into it.

22       THE COURT:  I would rather just have it that way.

23       MR. MCDOUGAL:  Okay.  That's fine.

24       THE COURT:  And so, also, since only one of you is

25  local to here, if you would just identify yourselves before you

1   start speaking so that we make sure that Melanie and I are both

2   keeping up.  I would appreciate it.

3        MR. GARSSON:  Thank you, Your Honor.  This is Ross

4   Garsson for Defendant YSL.

5        We are going to go over briefly the tutorial that we

6   submitted to the Court under the Court's order on

7   October 5th.

8        Patent.  We are going to start with patent, Your

9   Honor, the '574 patent, which is the only patent at issue in

10  this case.  It is a system and method for autonomous

11  broadcasting.  And so the word "autonomous," Your Honor, right

12  at the beginning, is modifying the word "broadcasting."

13        And, in the abstract of the invention, it goes on to

14  explain in the abstract, Your Honor, is the summary of what

15  the -- or the -- the summary of what the invention is.  It says

16  it's computer-implemented systems to provide for the autonomous

17  broadcasting of video data.  So this was the very key thing in

18  the patent, not just that it was broadcasting but that it was

19  autonomously broadcasting.

20        Next slide, please.  Again, in the field of the '574

21  patent, again, they point out that the field is in scheduling

22  autonomous broadcasting of data.

23        In the background, they do talk about various systems

24  exist for broadcasting a live or prerecorded video stream over

25  the Internet.  These were known, and they showed the very

1    complicated format a moment ago in the tutorial.  But, Your

2    Honor, by the time of the invention in 2010, they had

3    simplified it greatly by that point.  And, again, the general

4    inventive concept has to do with carrying on autonomous

5    broadcasting.  This is a theme running throughout the patent

6    that it is autonomous broadcasting.

7            I want to back up and talk about how streaming over

8    the Internet -- just, in general, what is streaming over the

9    Internet?  And you have to go back -- the next slide, please --

10   to 1995 to 2004, which is really the beginning of the Internet

11   age.

12           Formats came out for streaming video content over the

13   Internet.  And, you know, if you go -- and this fascinated me

14   when I found out -- if you go to the next slide, they were

15   streaming baseball games that were taking place.  As early as

16   1995 that occurred.

17           So this has been going on for quite some time, and

18   just as was pointed out there, if you look quickly, if you see,

19   it had zero saves at that moment in time, Your Honor.  That's

20   how long ago it's been streaming over the Internet.

21           The next slide shows various streaming, things that

22   were being done.  Macromedia.  You may remember this, Shockwave

23   Player, things that we used to have on our computer, Windows

24   Media Player.  In 1999, Apple introduces a streaming feature,

25   QuickTime.  So we were used to receiving things by streaming.

```
 1              Now, you move onto the next time period, streaming

 2    over the Internet, 2005 to '10.  This is where we started

 3    getting Netflix and YouTube.  These are basically more

 4    mainstream, and these entities became very popular for online

 5    streaming.

 6              And if you go to the next slide, you can see all

 7    these things.  The Roku box, if you have one, that is basically

 8    a box in which you can stream video, Hulu, networks.  All of

 9    these were streaming over the Internet, and all of this was

10    happening prior to the time this patent was filed, which was in

11    '20.

12              If you go to the next slide, you can see the

13    streaming.  This is a very basic way to stream.  There's two

14    components that you'll see there.  Starting from left to right,

15    you'll see there's a camera, and then the next one is an

16    encoder.

17              What an encoder is, Your Honor, is basically

18    something that takes the digital content, and then it

19    compresses it, video compression, so that it can go over the

20    Internet.  And it's able to send it out in little packets of

21    information that go.  It goes over the Internet, and then it

22    gets to what's called a decoder, which basically works in

23    reverse.  It unencodes the encoded video stream, and then it

24    plays it on your display or your T.V.

25                   And just for way of example, the Roku box or the DVR
```

```
1    that you have, it's an encoder.  That's what it's doing there.

2    The video is coming in, and it's decompressing it and allowing

3    you to see it.  So all of us are very used to having decoders

4    in our lives.  But encoders were what was done to be able to

5    get the information out.  Okay?

6           And if you go to the next slide, you'll see that in

7    the background of it, they talk about broadcasting over the

8    Internet includes broadcasting software running on a

9    general-purpose computer to compress the video before

10   transmitting it.  In other words, Your Honor, it was known to

11   basically load encoder programs into your computer, and then

12   you could hook up a camera to it, and that was one of the ways

13   that you were able to send out video.  Okay?

14          And it also was, there were these dedicated boxes.

15   Okay?  So these little boxes, like the examples they've shown

16   there, which, you know, further developed, obviously, but

17   decoder boxes existed before this patent was filed.

18          And so, if you go to the next slide, Your Honor, this

19   is a prior art system.  This is a very important part of our

20   system, Your Honor.  This is the prior art system that YSL was

21   using in their business before, years before, the patent at

22   issue was filed.  The effective filing date of this patent,

23   Your Honor, goes back to 2010.  And, earlier than 2009, YSL was

24   doing the streaming.

25          It was formed by three gentlemen.  They formed a
```

1   company, and they basically would provide software for

2   computers that they could hook up their camera and then they

3   would stream to the Internet.  And it would go to the server.

4   And the server was a Wowza Streaming Engine, licensed by Wowza,

5   which is the same server that my client is using to this day.

6             And that, then, would then take the video content and

7   broadcast it out to various decoders and ways you could look

8   over it.  And this system by and large, Your Honor, is very

9   similar to the system that my clients still use to this day.

10             But at the time, in 2009, they were doing it by using

11   a computer.  They also had, which isn't shown in here, they had

12   a scheduler themselves.  So the scheduler was also a part of

13   our client's device and system well before this device's '574

14   patent and its family members were filed.

15             If you go to the next slide, you'll see that, again,

16   that there were prior art decoders -- encoders, excuse me, that

17   existed.  Included in that were Digicast.  Why is that

18   important, Your Honor?  Digicast is the prior art encoder that

19   YSL uses to this day.

20             So, again, very similar things existed.  The things

21   that existed in 2009 were similar to those being used by YSL.

22   But, going back to the prior art, all these things existed.  So

23   it wasn't that big complicated thing that you saw when this

24   patent was filed in 2010.  Things had clearly gotten much more

25   streamlined by that point in time.

```
 1          Now, if you go to the next slide, these were the
 2   drawbacks that were identified by the patentee in this.  And
 3   they were basically saying -- and I think I saw this in slides
 4   that Mr. McDougall showed a moment ago -- is that the broadcast
 5   devices cannot be controlled remotely when the devices are
 6   situated behind the user's firewall, and certain broadband
 7   fire -- routers, firewalls do not allow broadcast streaming.
 8   Okay?  They had problems, and people wouldn't know why they
 9   couldn't stream.  So there were problems going in and out of
10   the systems is what they were saying.
11          Which turns us to the next slide, this discussion
12   about routers and firewalls.  And I'm sure it's going to be
13   discussed today because there are issues in this case about
14   routers and firewalls.  Dr. Merat, who was BoxCast's expert,
15   gave definitions for what a "firewall" and a "router" were.
16   But, first, he made it clear, which is agreed to, which our
17   expert, Dr. Caramanis, they are different things.  The words
18   are not used interchangeably.
19          And so, as part of this tutorial, I want to make sure
20   we completely understand, just like they explained, what the
21   differences is and what routers do and what firewalls do.
22          And if you go to the next slide, you'll see the
23   definition by Dr. Merat, BoxCast's expert.  He basically said
24   it acts as a gateway into a network, routing traffic from
25   outside the network to a specific piece of hardware inside the
```

1   network.

2              And, if you turn to the next slide, Your Honor, it's

3   an illustration that we created that shows the traffic coming

4   in.  And I kind of think of it like you are coming to a fork in

5   the road.  You are coming and you get to a fork in the road.

6   You have to be -- you need to know which place you are going to

7   in order to proceed because, if you don't do that, you get

8   stuck at the fork in the road because you don't know where to

9   go.  And so that's what a router does.  It has to be able to

10  route it to the particular hardware device, and it needs to

11  have the information to do so.

12             Now, if you go to the next slide, this shows what

13  happens when traffic is going out.  Again, everything is coming

14  into the router, and then it's going out.  It's coming to a

15  fork in the road from the other direction.  You don't need to

16  be routed because there's only one direction out.  So a router

17  is really just interested in what's coming in, not what's going

18  out.

19             If you turn to the next slide, this is, again,

20  Dr. Merat, what he said was they pose a barrier for incoming

21  traffic.  And, you know, a router doesn't know what to do.

22  Unless you modify the router settings, it won't be able to

23  route unsolicited traffic.

24             Next, we'll turn to what a "firewall" is.  They pose

25  a barrier for both incoming and outgoing traffic.  I kind of

1    think of it, using the same analogy we are using, imagine

2    there's a security gate sitting there at the fork in the road,

3    and, now, there's a guard that sits there and basically

4    monitors people going in both directions.  And he's got a list

5    of what he allows to go through and what not to go through.

6    And he's monitoring it in both directions.  So that's -- so a

7    firewall is controlling both directions.

8            And, again, that's consistent with what Dr. Merat

9    says.  He came up with the definition, which, again, our expert

10   agreed with, and we think that that is a perfectly fine

11   definition to use in this -- for the purposes of the claims

12   construction hearing today, Your Honor, the definitions that

13   Dr. Merat provided.

14           And, in doing this illustration, if you move to the

15   next page, this shows the same thing I just said a moment ago

16   for the router.  Basically, the firewall will monitor things

17   coming in.  Go to the next slide.  But, unlike the router, it

18   will now monitor the traffic going out.  So the firewall is the

19   security guard.

20           Now that we have that, Your Honor, I would like to

21   turn to the asserted claims.  There's 26 claims of the 30 in

22   the '574 patent being served against YSL in this lawsuit of

23   which 1, 6, 12, and 22 are referred to as independent claims.

24           And just so the Court is aware, what an independent

25   claim means is it stands by itself.  It defines its own

```
1   invention.  The dependent claims are just -- if you'll think of
2   an independent claim as its own separate defense lines, so to
3   speak.  The dependent claims are just interior defenses inside
4   that land.  They just kind of restrict the land further and
5   further.
6           So a lot of times in most of the claims you'll see
7   that the disputes takes place primarily with regard to claims
8   in the independent claims because they generally are the focus
9   on doing it because they are the main things.  But the other
10  22 claims in these are dependent claims that fall beneath one
11  of the four independent claims.
12          And for -- yeah, if you go to the next slide, you'll
13  see that, as Mr. McDougall pointed out, that claims 1 and 6 and
14  22 are all method claims; whereas, claim 12 is a system claim.
15          So they define things a little bit different, and I
16  don't agree with Mr. McDougall's characterization that 22 is
17  coming from a different perspective than claims 1 and 6 because
18  1 and 6 are more from the user's regular autonomous device
19  itself, and the other one is from the perspective -- still
20  using the autonomous broadcasting device, but, really, from the
21  perspective of the streamer's perspective.
22          Move onto the next slide, please.  So, now, talking
23  about the asserted claims.  What's important to realize is that
24  each of the claims and methods and systems of the '574 patent
25  utilize what is referred to as an autonomous broadcast device,
```

1   which is abbreviated ABD.  And, in the independent claims

2   below, the term "ABD" is referred to, I believe, about

3   20 times.  So it is a very important word that is in each of

4   the independent -- each of the independent claims.

5           And if you look at the next thing, this is just the

6   general role of it, Your Honor.  I want to be very clear.  I'm

7   not saying this is the definition of it.  I'm just saying this

8   is what they describe the general role to be.  It basically

9   sets forth some things that the autonomous broadcast device

10  does.  It determines when the start and stop time for an event

11  from the scheduling data that it receives.

12          It, at the start time, powers on the video

13  acquisition device, which is also referred to as a camera or

14  digital recorder.  The ABD receives the video data

15  corresponding with the event from the camera.  It upleads the

16  video data to a server contemporaneously with the event.  And,

17  at the end, the ABD powers off the camera.  So these are all

18  things that they explained that this is the role, and it's the

19  thing that's doing it itself.

20          Turning to the next slide.  I'm going to be referring

21  to figure 5 of the patent, which is an illustrative of how the

22  system works.

23          If you'll go to the next slide.  This is figure 5.

24  It's as clear as I expected it to be, but you can see

25  everything there.  It shows all the components.

1    And if you flip two ahead, you will see I start to

2  put some boxes in.  What you'll see there is the ABD, which is

3  No. 208, which is the red box.  In the green box, you'll see

4  what's referred to as the router/firewall because in their

5  patent they sometimes -- the router had a firewall and

6  sometimes it didn't.  So that's the way that they placed it

7  there in the thing.

8    But if you flip two slides ahead, you'll see that

9  there's an Internet that's connected to the -- that's the ABD's

10  connection through the router, and it goes to the Internet.

11    If you move two slides ahead, you'll then see that

12  there's the standard camera, which is also referred to as video

13  acquisition device or the digital recording device.  So there's

14  the camera attached to the ABD.

15    And, now, if you go to the next slide.  Now, what

16  happens next?  If a person, a user, wants to schedule a

17  broadcast according to what the patent is saying, they

18  interface with what is known as a web page 1822, as shown in

19  figure 21.  There's a figure 21 in the patent, which basically

20  gives some prompts.  What does it ask for?  It asks for the

21  information, the name, the location of the device, the

22  description, the broadcast date, the start time, the duration

23  for the event.  That's what it's looking for.

24    And if you flip to the next slide, you'll see I kind

25  of tried to color code it, that these are the things that are

1    shown in figure 21, which are the same things that I just

2    mentioned.

3           And if you turn to the next slide, you can see it's

4    very difficult to see, which is why, if you'll look at that,

5    and it's hard to see but the box in red, that's the location of

6    the device.  The green one is the broadcast date.  The blue box

7    is the start time.  And the broadcast date, again, it's

8    difficult to see.  It's Thursday, February 11, 2010.  The start

9    time is 12:00 o'clock p.m.  And then the duration, although

10   it's hard to see it very clearly, it says the word

11   "indefinitely."  So, in other words, Your Honor, there is no

12   end time here.  It's infinite duration.

13          If you turn to the next slide, then what happens is

14   there's a flow diagram, figure 16B, which basically shows the

15   steps that the broadcast device, right, the ABD, does.  And,

16   again, I'll -- if you turn to the next slide, I'll show you the

17   boxes, and I will read to you what's in there because, again,

18   it's difficult to see.

19          But the red box, it's a request, the event schedule

20   from the scheduler.  Okay?  And the kind of brownish box,

21   that's No. 16-16, it then shows it stores a copy of the

22   schedule locally.  And in the green box that you see there is

23   from the schedule.  It determines whether it's time to start

24   broadcasting.  The blue box is, starts broadcasting the event

25   at the start time.  The purple box, from the schedule,

1    determines whether it's time to stop the broadcasting.  And

2    then the orange box starts -- stops broadcasting the event at

3    the end time.

4            Those are the steps that are being performed by the

5    ABD, according to the embodiment that's shown in figure 16B.

6    That's kind of a representative of what that -- what happens

7    and what steps it performs.

8            Now, if you'll go to the next slide.  Okay?  This is

9    turning back again.  We are going to talk about figure 5 again.

10   What's going on?  If you go to the next slide, you will see

11   I've got it circled there.  What happens next is that the ABD

12   then transmits the encoded video/audio stream to the Internet,

13   which then goes to the media server.  Okay?

14           And then it's the media server that then transmits to

15   the Internet to the green boxes on the right, which basically

16   are the encoded -- it's the encoded things that go to the

17   viewers, 2-18, that view it.  And, of course, Your Honor, they

18   would then have themselves decoders so that they can see it.

19   So that's the system that's basically disclosed in the patent,

20   and it's representative of what's happening, of what's being

21   done.

22           Now, if we go to the next claim.  What we did is look

23   at the -- kind of the summary of what's happening here is that

24   the ABD is a device that autonomously broadcasts the live

25   event.  What it does is gets a copy of the event schedule, and

```
1    then it transmits the broadcast under its own control using the

2    schedule that is obtained.  And it does all this without

3    modifying or circumventing any router or firewall.

4           Another function of what the ABD can do is upload at

5    a later time.  It records a higher-quality version.  So, while

6    it's streaming, it may not be able to stream at this

7    low-resolution one, but it can upload a higher-resolution one.

8           And, again, you know, these type of things are used,

9    and the fascinating thing from my client that happened for YSL

10   is they do things for a lot of churches.  Their product is

11   called ChurchStreamer.  That's the thing.

12          And it turned out that, in fact, the late Senator

13   McCain was a member of the church, one of the churches, that

14   they streamed, and they did end up streaming, not our client,

15   actually ABC actually took over the streaming from the church

16   when they did it.  But it was a worry from us in a very strange

17   way that our system was going to get overloaded in case the

18   church decided to use our streaming technology to do it, but

19   ABC got in there.

20          Our client was very proud of the type of technology

21   that they were using for people -- was to allow people to share

22   those type of events who wouldn't be able to attend these

23   services, and that's the way it worked.  That's really what

24   they got started many, many years ago before this patent was

25   filed.  Thank you, Your Honor.
```

```
 1              THE COURT:  Okay.  Thank you.

 2              Mr. McDougall.

 3              MR. MCDOUGAL:  Yes.  I'll mention real quick,

 4   Mr. Garsson touched on YSL's prior devices and technology.  I

 5   just want to point out the validity isn't a part of this

 6   hearing.

 7              If you look at page 2 of the patent, all those

 8   devices and all that information was already considered by the

 9   patent office.  The patent, on page 2, has a listing of

10   patents, websites, information about those prior systems that

11   were already considered, and the patent was allowed and issued.

12              Turning back to the claims -- this is just to show

13   you quickly.  We have 17 different -- I'm sorry -- 18 different

14   limitations -- claim terms, I'm sorry, at issue in this

15   hearing, 17 of which were proposed by YSL; one of which was

16   proposed by BoxCast.  And that was for the term "firewall."  In

17   one claim, claim 12, that was merely because it was a mistake.

18   It was a typo.  And we are going to go through that later.

19              We've grouped these A, B, C, D -- five different

20   groups, as you can see on the left side, and the first one

21   we'll talk about is the words "autonomous" and "autonomously,"

22   which I think will take the majority of the time, at least on

23   our part will be the term "autonomous."  It was the term that

24   most of the briefing was dedicated to.

25              So here are the proposed constructions for those
```

1    terms.  We'll talk about "autonomous" and "autonomously" first,

2    and then we'll talk about the "autonomous broadcast device,"

3    which is another term in the claim.

4            You can see for these terms, BoxCast's constructions

5    come directly from the patent.  It's without user intervention.

6    And YSL's construction, which comes not from the patent but

7    from what we call extrinsic evidence.  I'll go over briefly on

8    the differences between intrinsic and extrinsic evidence, but

9    it comes directly from dictionaries and the testimony of its

10   expert.  But their construction is self-governing and carrying

11   on without any outside control whatsoever.

12           So I mentioned intrinsic versus extrinsic evidence.

13   And so, just to back up, there's the _Phillips_ case is a federal

14   circuit decision in 2005 that came down, and it's basically

15   considered a guide to claim construction.  It's been cited

16   since then over 8,000 times for that purpose.

17           And, if you read the decision, it divides the type of

18   evidence into two categories -- intrinsic and extrinsic.

19   Intrinsic being the most reliable and significant evidence of

20   what a claim term would mean.  Extrinsic being less useful,

21   and, really, it's used to kind of show kind of what terms might

22   mean in the art outside of the patent.

23           But the Court for the federal circuit in _Phillips_

24   laid out a structure about how to go about determining what a

25   claim term means and kind of the steps that you should take.

```
1              And the first one is to look at that term in the

2    context of the claim.  It's not only how it's used in the

3    claims but how it's referred to in the other parts of the

4    claim, how it's referred to in various sections of the claims

5    and across all the claims.  That should be kind of step 1,

6    what's the term mean to you when you look at it, how it's used

7    in the claim.

8              Part of that is -- and I think Mr. Garsson might have

9    touched on this -- is claim differentiation.  So when you have

10   an independent claim and a dependent claim, that dependent

11   claim has to be narrower than an independent claim.

12             And so, let's say, we had an independent claim that I

13   had a car that had to be one of the colors of the rainbow, and

14   then I had a dependent claim that said the car is blue.  So all

15   the claims stand on their own.  If somebody were to infringe

16   the first claim, they could have a red car, they would infringe

17   it, a yellow car, it would infringe it because any of those

18   colors are colors of the rainbow.  In order to infringe the

19   dependent claim, your car would have to be blue.

20             So what claim differentiation does is that if you

21   look at a claim, independent claim, dependent claim, when you

22   know the car is blue, you know when you go back up to the

23   independent claim that that claim has to be broader than "that

24   car is blue."  So that's an interpretation that can be used to

25   determine the meaning of a claim term in an independent claim
```

1    because if the dependent claim says it has to be one thing, you

2    know the term in the independent claim has to be broader than

3    the dependent claim.

4              So I want to bring that up because that will come up

5    a couple times during this presentation, and I'll cover it

6    again if we get there.  But that's part of the claim

7    construction analysis.  It's kind of step 1 of the intrinsic

8    evidence.

9              Step 2 is the specification.  So that's the drawings

10   and the written description of the patent.  That's the -- what

11   the Court has termed a Single Best Guide to determine what a

12   term means.

13             Also, you know, the inventor or the people that, you

14   know, wrote the patent were involved -- it was their idea.  The

15   way they described it and how they defined terms and how they

16   used terms kind of governs because that's what their invention

17   is.  That's the way they've done it.

18             And so when you get to extrinsic evidence, like

19   dictionary definitions that contradict the specification of the

20   patent, that's a no-no.  That's not allowed.  You can't

21   contradict what the inventor meant.  So his lexicography

22   governs in the analysis.

23             The third intrinsic evidence -- and when you say

24   intrinsic, it's intrinsic to the patent.  It's a claims

25   specification.  It's what they call the prosecution history,

1    which is when you go to get a patent, you file the patent

2    application, and there's an examiner at the patent office that

3    looks at your application, looks at your claims, will look at

4    the prior art, and say, well, this guy has done this before, so

5    you've got to amend your claim or do something different.  And

6    there's a discussion, and there's a back and forth, what they

7    call an office action.  And you respond to the office action.

8          That whole history is a public document, and it's to

9    inform, kind of, what the claim terms mean.  So that's kind of

10    the third aspect of this or the third leg of the intrinsic

11    evidence that you might glean from that prosecution history for

12    what a term means.

13          Then, when you go to the extrinsic evidence, now,

14    that's, kind of, dictionaries, technical treatises, expert

15    testimony.  They find that that can be useful in some

16    circumstances, but it is kind of less significant and less

17    reliable than the intrinsic evidence for obvious reasons.  As I

18    mentioned, they cannot contradict any definition, you know,

19    gleaned by reading the patent documents.

20          And then expert testimony, like in most cases, it's

21    generated at the time for purposes of the litigation.  So it

22    can suffer from that bias just because of that.  So Phillips

23    recognizes that in its decision.

24          So, with that kind of overview, let's talk about the

25    term "autonomous."  I want to first start with the claims.  You

```
1   know, you'll see in my presentation, I will start with the

2   intrinsic record.  I'll start with the claims.  I'll go to the

3   spec.  And then we'll talk about the prosecution history, if

4   any, and then we'll talk about the extrinsic evidence.  So I

5   kind of use that word.

6              But if I look at the claims, what do we know about

7   the ABD?  Well, we know it follows instructions, right, because

8   it's receiving this data from the scheduler website, and, based

9   on that data, it will perform certain actions autonomously.

10  And so it receives that data, and then it does something based

11  on that data.  It's following the instructions given to it on

12  the scheduler website.

13             It also interacts with the other components.  It

14  interacts with the scheduler website.  It interacts with the

15  media servers so that you know that this device, at least, has

16  to be capable of doing that.  And you know it's part of the

17  set-it-and-go system, the autonomous system that we talked

18  about.  And it's not just -- the system is not just the

19  broadcasting device.  It's broader than that.  It's a system

20  and interacts with the other system components and follows

21  instruction.  And that's kind of what the claims tell us.

22             So then you go to the specification, and there's

23  really -- so this long specification talks about the

24  broadcasting device in general, and it mentions the term

25  "broadcasting device" over 200 times.  It mentions the term
```

1   "autonomous broadcasting device," or ABD, in one paragraph and

2   in the claims.

3        So this one paragraph, if you look at what it says,

4   it talks about the autonomous broadcasting device being

5   activated, and then it goes on through this paragraph to

6   perform a bunch of actions, many of which are kind of described

7   in the claims are similar to the actions in the claims.  But,

8   more importantly, it says that these actions are done

9   automatically, i.e., without any user intervention.

10       Now, I understand the term in the claim is

11  "autonomously," and we are going to talk about that, but when

12  you look at the patent and how the inventors wrote this patent,

13  they used the term "automatically" and "autonomously"

14  interchangeably.  There's a lot of instances of that, and we

15  are going to go through those.

16       But here's an interesting thing, the only time they

17  are talking about the autonomous broadcasting device, they are

18  saying that it performs these things without the user

19  intervention, which is exactly what BoxCast's construction for

20  the term "autonomous" is.

21       And I just note there that the inventor's

22  lexicography governs.  If you read Phillips, what the inventors

23  intended their patent to cover is what governs over any

24  extrinsic evidence.

25       Another example of this is the figure 16 registration

1    feature.  So I may have mentioned previously that the

2    broadcasting device needs to contact its website in order to

3    register itself.

4           That registration feature is talked about a couple of

5    times in the patent.  The first time it's talked about, it

6    talks about it being done automatically.  And then, later on,

7    in reference to, like, figure 16A and 16B, which is the flow

8    chart or the chart that kind of explains the steps of a

9    registration process, they talk about it being autonomous.  And

10   so you can see where "automatically" and "autonomously" are

11   used interchangeably, and this is just one example of that.

12          Now, the next slide is -- actually didn't make the

13   print deadline for the color print.  And so I apologize.  It's

14   in the binder, but it's in the pocket at the back.

15          But, during prosecution of a patent, BoxCast, or the

16   inventors, actually define the term "autonomously" in response

17   to one of those office action rejections talking about a prior

18   reference called the Mukerji.  It said there's no disclosure

19   that the STB, which stands for "set top box," which they are

20   referring to in Mukerji, can broadcast autonomously, i.e. begin

21   and end transmitting content at specified times without user

22   interaction.

23          So it defines "autonomously" as being without user

24   interaction.  So just to kind of summarize, we have the spec

25   talking about "automatically" being without user interaction.

1   We have the spec that interchangeably uses the term "automatic"

2   and "autonomous."  And, now, we have in the prosecution history

3   the inventor actually defining the term "autonomous."  And, if

4   you go on, at the bottom there, that is a description from the

5   patent office on some amendments that were made during the

6   prosecution.

7           And the amendment that was made is that we added the

8   term -- so, initially, all the claims had the term "ABD" in it,

9   or autonomous broadcasting device, except one, and the examiner

10  asked that we put "autonomous broadcasting device" into that

11  last claim, claim -- I think it was claim 12 -- so that it

12  could mirror claim 1.

13          And his reasoning for that -- so the other

14  independents do not mirror this same language regarding the

15  autonomous broadcasting device and the request could be issued

16  another way, such as via a user.

17          So without "autonomous," he said that a user could do

18  it, which means that he was equating user interaction with the

19  term "autonomous," and they understood that during the

20  prosecution.  So these are all evidence of any intrinsic

21  record, which is the patent and the prosecution history of what

22  the term "autonomous" means.  And it means without user

23  interaction.

24          So I mentioned that this is the second patent in this

25  family.  The first patent in this family has a prosecution

1    history as well, and there's further evidence in there, even in

2    the first patent, that the inventors meant "automatically" and

3    "autonomously" to be used interchangeably.

4            What we are seeing here is, we had claim 119, and 119

5    claims didn't issue this patent.  So this claim ended up

6    getting canceled later.  But the addition was they added the

7    word "automatically" to the claim.  But when they talked about

8    the amendment, they said that claim 119 is directed to a system

9    that uses a broadcasting device to autonomously broadcast, even

10   though they added "automatically" to the claim.  And so that is

11   evidence in the intrinsic record that the inventors meant those

12   two terms to be the same.  Uh-huh.

13           So something to point out is not just what the

14   specification and intrinsic record says but what it doesn't

15   say.  And YSL's construction is based on a definition that

16   requires no outside control whatsoever.

17           But, the specification, if you look, it never talks

18   about different levels of autonomy or automation.  It doesn't

19   describe this broadcasting device as having more autonomy than

20   one or another component.  It only describes it as being

21   controlled by the scheduler website or it describes a system

22   without any user intervention.

23           So, now, we'll move into the extrinsic evidence.

24   There's an article that was submitted.  It's called the Wood

25   article.  If you go to Wikipedia, actually the self-driving car

1    page, there's a whole section within this article.  But,

2    anyways, this is one of the articles that our expert identified

3    for us.  But it is a Law Review article that's been cited

4    numerous times.  It has to do with "autonomous" versus

5    "automatic" but in relation to self-driving cars.

6           And, right at the beginning, there's this statement

7    that says this article generally uses the word "autonomous"

8    instead of the word "automated."  It says we have chosen to use

9    this term, "autonomous," because it is a term that is currently

10   in more widespread use and more familiar with the general

11   public; however, the latter term is arguably more accurate.

12          And so, when I read this, uh-huh, it seems to me that

13   those terms are used interchangeably, but "automated" or

14   "automatically" might be more accurate.  And so it's

15   understandable, to me, that the inventors or the patentee in

16   this case would use those terms interchangeably in the patent

17   and in the claims.

18          To go on, Dr. Merat, who is -- was our expert in the

19   case, mentions that "autonomous" does not have a set being in

20   the yard.  That autonomous device had a different level of

21   autonomy.

22          And he points to these five categories of autonomy.

23   Now, this is in the Wood article.  What it is, is the National

24   Highway Traffic Safety Administration has a number of different

25   levels of autonomy for self-driving cars, and you either have a

```
1    level 1, level 2 self-driving car, and it all depends if you
2    look on the left, there's a human, and, on the right, there's a
3    computer.  And if you start at the left, if you are a level
4    zero, that's your 1968 Ford Mustang.  No computer control
5    whatsoever.  As you move on, the computer kind of takes more
6    and more control.
7           The point is, they defined these levels of autonomy
8    all based on the amount of human intervention or human
9    interaction.  They don't base them on any other kind of
10   control, whether it be control from another component or
11   another computer.  It's based on what the human level of
12   control is.
13          We deposed YSL's expert, and we asked him, uh-huh,
14   whether "autonomous" means that it's not under the control of a
15   human.  And his initial -- his answer was "that's right."  And
16   so, to me, I read this as him agreeing that "autonomous" really
17   means without user intervention and kind of agreeing with our
18   construction.
19          But then he goes onto say, it's contrasted with
20   automatic, which means -- which doesn't mean, which does not
21   specifically specify.  I don't really understand what he's
22   saying after that, but what I took from this is that he was
23   agreeing that "autonomous," at least, includes without any kind
24   of human interaction.
25          Now, I'll talk about the autonomous broadcast device,
```

1   which our definition of that is a device capable of

2   transmitting live video data to a server.  Excuse me.  And

3   YSL's construction is a device that transmits, sends out

4   digital content without any outside control at the end.  So

5   there isn't any outside control.

6           So I think Mr. Garsson pointed this out.  The patent

7   is directed to systems for autonomous broadcasting.  If you

8   look at the title, if you look at the summary, or even in the

9   abstract, which all kind of summarized what the patent felt.

10  They all talked about systems and methods for autonomous

11  broadcasting.

12          The broadcasting device, to us, is just part of that

13  system.  It's one component.  So the broadcasting device is

14  part of the autonomous broadcasting system.  And so when we

15  look at the specification as to what the patent says about the

16  broadcasting device, it says it's a device capable of

17  transmitting live video to a server.  That's exactly what we

18  say a broadcasting device is.

19          And, if you go on, there's no user interface for this

20  device.  It's actually designed to work without any direct user

21  interaction.  So that tells me that you can't have this box --

22  it doesn't do anything just sitting there.  It has to be part

23  of the system.  And so when you say this broadcasting device is

24  part of an autonomous broadcasting system, the word

25  "autonomous" is just saying it's part of that system.  It's

1    just a device in that system.

2              This is the same paragraph in the specification that

3    I pointed to earlier, and this is just to show that its own --

4    that broadcasting device, just the term, without the word

5    "autonomous" before it, appears over 200 times in that patent.

6    Uh-huh.  Whereas, "autonomous broadcasting device" appears four

7    times, and it's in this one paragraph outside the claim.

8              We don't think it was the inventor's intent to

9    exclude all those other 200 times it was talking about a

10   broadcasting device when it talked about autonomous

11   broadcasting device.  We think that autonomous broadcasting

12   device just means that it's a device that's a part of that

13   broadcasting system.

14             So autonomous broadcasting device, to us, is defined

15   by the claims and the actions it performs in those claims.

16   It's not a device that exists outside the patent, and it is

17   simply a device that's designed to perform the actions listed

18   in the claims.  It's not used outside the system.

19             If you look at the prosecution history, it doesn't

20   say anything else besides when ABD was added to claim 12 that

21   "autonomous" would be -- I'm sorry -- the examiner understands

22   that "autonomous" means not via a user.  We touched on that

23   already.

24             So let's talk about YSL's constructions.  So the

25   first thing is in their response brief -- you remember YSL's

1   construction had self-governing -- or I think it was carrying

2   on without any outside control.

3           So this is a statement in the response brief that

4   says YSL's constructions of "autonomous" and "autonomous

5   broadcasting device" do not foreclose any or all control of the

6   ABD.

7           So, to me, this is confusing because it conflicts

8   with what their proposed construction is, and it seems like

9   they are walking back.  There's got to be some amount of

10  control for the term "autonomous."

11          So I have to step back here a little bit.  I'm going

12  to talk briefly about where these constructions from YSL came

13  from and why they are asking to -- for this Court to construe

14  17 different terms.

15          As part of discovery in this case, YSL produced a

16  Skype chat between one of its engineers and a company overseas

17  that was developing its Digicast or its infringing broadcasting

18  device.  And that chat had a lot of information on how the

19  product was developed.  A lot of that -- and these statements

20  came from that chat.  That chat was filed under seal, but,

21  before this hearing, we worked with counsel to allow a couple

22  statements for the hearing without need for a motion.

23          There was other statements in there that we wanted to

24  add, but we didn't think it was worth the Court's time.  But

25  they were filed.  Excerpts from that chat, they were filed

```
 1    under seal with the response brief.

 2           This chat took place after our first patent and

 3    before our second one issued, but we had put them on notice of

 4    their infringement and potential infringement of the second

 5    patent.  And, in the chat, you can see where Rob, who is one of

 6    the people from YSL, says the whole reason we told them that we

 7    are not violating their patent is because we don't contend any

 8    time stamps from the server from the broadcasting; instead,

 9    it's zeros and ones.  You've seen that in the briefs.

10           Those 0/1s are based on the schedule, and they are

11    used to broadcast.  So, in the second part there, the only

12    reason our attorneys tell us we are okay with the patent is

13    because we don't send and receive time stamps.

14           So, in their response brief, YSL made the statement

15    that nothing in their construction mentions or requires time

16    stamps.  So that's true.  None of their constructions include

17    the word "time stamp," even though that was the position they

18    took early on as to why they don't infringe these patents, but

19    they didn't include them in their constructions, only they did,

20    because if you look at the last one, the '574, this is from

21    Dr. Caramanis, who is YSL's expert.  He says the '574 patent

22    uses the term "time stamp" because it is using a term to

23    reflect a clock time.

24           And if you look in their constructions -- and we are

25    going to talk about this later on -- there's data relating to a
```

```
 1   recording start time.  They are taking the position that that
 2   time has to be a clock time.  And so they are injecting this
 3   proposed alleged purported reason for not infringing on it,
 4   even though they admit a time stamp is required by the claim
 5   trying to inject it into the claims construction arguments for
 6   non-infringement purposes.
 7           So if you -- as we go through this and this includes
 8   the term "autonomous" and all of the terms that we are going to
 9   talk about today, they kind of all stem from this idea that the
10   data that's sent from the scheduling website to the
11   broadcasting device in order to start broadcasting has to be
12   some complex data.  It has to be so complex that the
13   broadcasting device can use it and be completely autonomous
14   without any outside control whatsoever.  They are trying to
15   create that distinction.  That distinction is not found in the
16   patent at all, Your Honor.
17           And the reason they are doing it is because the data
18   they sent is not complex, but it is based on the schedule.  And
19   so they are trying to make a distinction that you either have
20   simple data come in or complex data come in, and they are
21   trying to tie that all in together.  And you will see that, as
22   you walk through these constructions, why they are taking the
23   positions they are taking and why they are going and looking
24   outside the patent because that distinction is not in the
25   patent.
```

1          So let's talk about their main source of support for

2     the construction that "autonomous" means and it has to have

3     without any outside control.  It's actually a combination of

4     two dictionary definitions.  I'll point out that these are

5     general-purpose definitions.  They are not even technical

6     definitions.

7          The first one is the definition of the word

8     "autonomous."  It says, "Of or relating to a self-governing

9     entity."  And then they combine that with a definition that

10    says, "Undertaken or carried on without any outside control."

11    And that equals their construction.

12         So if you look at that first dictionary, that relates

13    to self-governing entity.  It relates to an autonomous

14    legislature, not an autonomous broadcasting, not even

15    self-driving vehicles, or any type of technical, technical

16    dictionary.  It has to relate to a legislature.

17         The next one, that's an autonomous school system we

18    are talking about there.  That's the example of undertaking or

19    carried on without any outside control.

20         So they tried to create a term for "autonomous" that

21    was so unworkable because there's really no device system,

22    vehicle in the world that I know of that would meet this

23    definition.  You don't have any outside control whatsoever by

24    mashing together these two general -- general dictionaries.

25    These are not meanings in the art.  They are not meanings in

1    the field at all.

2           And Phillips, if you go back to Phillips, it

3    specifically says a claim should not rise or fall based upon

4    the preferences of a particular dictionary editor.

5           So what else did they do?  Well, they found an expert

6    in Dr. Caramanis that would parrot these dictionary

7    definitions.  So when I talked to Dr. Caramanis, I asked him

8    about the dictionaries that he referenced in his declaration.

9    And if you see his answer, I asked if he had looked at them

10   prior to the lawsuit.  And you see his answer.  He didn't

11   remember.  He couldn't remember whether or not he had looked at

12   them in the past.  So he can't tell me if these were -- this is

13   an expert in autonomous vehicles, by the way.  He can't tell me

14   if he's looked at these dictionaries before he was engaged in

15   this case.

16          And then I asked him if he was aware of the use of

17   the term "autonomous" in relation to broadcasting other than in

18   the patent.  And, prior to being contacted, he had never heard

19   of it.

20          But if you asked him if there's a set meaning for the

21   word "autonomous," he's going to say yes, yes, outside --

22   anywhere you go, there's going to be a meaning.  So whether

23   it's in autonomous broadcasting, whether it's in self-driving

24   vehicles, whatever, it's going to be a set meaning that he's

25   provided.

1          So what's wrong with this construction besides where

2     it came from?  Well, first of all, it conflicts with the

3     claims, and the claims are pretty straightforward.  I mean,

4     very straightforward.  You receive data relating to a recording

5     start time.  So this is the broadcasting device receiving data

6     relating to the recording start time of a live event from the

7     first server, which is the scheduler website.

8          And then it transmits the digital content based on

9     that data.  To me, you can't -- I don't think you can say the

10    broadcasting device is doing that without any outside control

11    whatsoever.  So when he says the term "autonomous" requires

12    that, I don't understand how if you receive data and then,

13    based on that data, you do something that you are not being

14    controlled at all.  I don't understand how that's going to

15    control, and it conflicts with the claims.  And the extrinsic

16    evidence cannot conflict with the intrinsic record.

17         Then also their definition of "autonomous" conflicts

18    with the specification.  We mentioned that figure, 16E, I

19    think, it's either A or B.  It talks about the autonomous

20    registration process.  Well, I showed that -- or pointed YSL's

21    expert to that figure with those steps and asked him whether

22    that was an autonomous process or not under his definition.  He

23    said, well, he didn't think it was not autonomous after taking

24    a long time to look at it.  And when it describes that figure

25    in the spec, he talks about it being autonomous.  So he can't

 1   really apply his own definition.  This is the point I was

 2   making.

 3          This is a quote from Vitronics Corporation, which is

 4   heavily cited in the Phillips case that talks about extrinsic

 5   evidence and especially expert testimony cannot be used to vary

 6   or contradict the claim language nor may it contradict the

 7   import of other parts of the specification.  So that's what

 8   this construction is doing, in our opinion.

 9          You know, the distinction they are trying to make

10   with the term "autonomous" is also -- kind conflicts with the

11   specification anyway, even though that distinction is never

12   really talked about.  The specification talks about when that

13   data is coming from the scheduler website, it's what they call

14   cached.  And you might have heard that term with websites

15   before.

16          And when I asked Dr. Caramanis about what that term

17   meant, he meant that it's kind of a temporary storage for

18   constructions that the device will use often so it's readily

19   available.  So they don't kind of store it in a more permanent

20   storage.  They've given it a temporary one.  It's used for

21   instructions.  So you'll hear them talk about their ones and

22   zeros being instruction, but the patent talks about caching the

23   data that's comes in.  That data is an instruction.  It's not a

24   complex thing that needs to be stored.  So it's stored in a

25   more permanent storage.

1          So their definition even conflicts with the

2     specification even though it doesn't make that distinction with

3     respect to the complexity of the data that's being sent.

4          So I mentioned this statement in their response

5     brief, that their constructions do not foreclose any or other

6     control of the ABD.

7          And so my question is, Your Honor, how much control

8     is too much control?  And that's the issue, I think, that many

9     people in this industry grapple with.  But it's not any

10    control.  It can't be.

11         So Dr. Caramanis, during his deposition, was asked to

12    kind of apply his definition of "autonomous" to, first, a

13    hypothetical.  That's the top center one.  The hypothetical

14    being very simple.  It's a device that reports something or

15    transmits something every 60 seconds.  It was a hypothetical

16    directed at the request step I talked about where the box sends

17    that request to start that communication between the two.

18         He first said that that request step would not be

19    autonomous.  And then a little later on we talked -- we went to

20    the specification, that's the bottom left-hand part there, that

21    talks about that request step and that it's done every

22    5 seconds or it can be done every 30 or 60 seconds.

23         And I asked him, you know, the process described

24    here, would that be autonomous?  And his answer was in

25    isolation.  So in isolation in that step would be autonomous --

1   I'm sorry -- would not be autonomous.  So the hypothetical

2   the -- when I asked him about request step when it's described

3   in the spec, both of those are not autonomous.

4           Then I went to the claims and asked him about that

5   same step, issue a request via the Internet connection, and he

6   sees that.  "And is that an autonomous process?"

7           "Yes, in the context of all these steps, it's

8   autonomous."  For some reason, that step became autonomous when

9   it went to the claims.

10          It was -- if you read through that deposition, there

11  was a lot of in contexts and a lot of, you know, not being able

12  to really answer or consistently apply his definition.  This is

13  just one example.

14          YSL's argument also, admittedly, ignores a lot of the

15  specification.  The reason for that is because it doesn't

16  support their position.  So it admits that it ignores the

17  broadcasting device it lists 200 times.  It's trying to limit

18  it to this one paragraph that talks about an autonomous

19  broadcasting device.  That's because the spec clearly says the

20  broadcasting device is fully autonomous.

21          So let's go to that paragraph, paragraph 4, that

22  talks about the autonomous broadcasting device.  As we

23  mentioned, it talks about the steps that need to perform

24  automatically without user intervention.  Well, that doesn't

25  support our construction either.

```
 1          So then it starts -- and Mr. Garsson mentioned this

 2    in his technology overview -- is if they go to this figure, I

 3    think it's figure 16, that talks about a node and the

 4    broadcasting device being the node and then it performs all

 5    these steps.

 6          What they don't say is that the broadcasting node is

 7    node 208, and if you go back up to the top, broadcasting device

 8    208 is actually fully automated.  And so the node they were

 9    talking about is not called an autonomous broadcasting device

10    that is performing all these steps.  They are just finding

11    parts of the spec and narrowing in and trying to narrow in and

12    narrow the claims onto a certain embodiment.  Well, the scope

13    of the claims are not supposed to be limited to a specific

14    embodiment in this spec.  We'll talk about that a little later.

15          They also make a statement in their response brief

16    that whether or not BoxCast felt that the term "autonomous" was

17    important when it drafted its patent specification is

18    irrelevant.  Right there, they are saying that they are

19    ignoring the specification.

20          But if you look at Phillips, ultimately, the

21    interpretation to be given a term can only be determined and

22    confirmed with a full understanding of what the inventors

23    actually invented and intended to envelop with the claim.  They

24    are saying it doesn't matter what they say in the patent.  They

25    used the word "autonomous" in the claims.  It has to have this
```

1    meaning from two general dictionaries and parroted by their

2    expert.

3         And BoxCast has a right.  The patent clearly says

4    what "autonomous" means -- "without user intervention," and

5    YSL's construction comes from outside the patent and actually

6    conflicts with it.

7         MR. SAUNDERS:  Your Honor, we have two pads.  May I

8    approach your Court?

9         THE COURT:  Sure.  Does BoxCast have copies?

10         MR. SAUNDERS:  Yes, Your Honor.

11         Good morning, Your Honor.  This is Michael Saunders

12    for Defendant YSL.

13         If we'll go to the next slide.  Before I start into

14    the actual construction, I want to just talk about how we

15    understand what the primary difference is between the two

16    partys' constructions and where the rubber really meets the

17    road here.

18         And what our understanding -- and I haven't heard

19    anything different from Mr. McDougall in terms of his

20    presentation -- is that the question, does performing an

21    operation autonomously include that operation being controlled

22    by other machines.

23         There's a couple points I want to emphasize on there,

24    Your Honor.  First of all is the word "control."  The word

25    "control" is in our construction, and you saw in the briefs and

1  several times in Mr. McDougall's presentation, he refers to

2  "interaction."  And that's not in our construction.  We are not

3  foreclosing interaction with other devices.  Of course, the

4  claims say that the ABD interacts with other devices.  There's

5  no dispute about that.  But "interaction" is different from

6  "control."

7          The other aspect is, we are talking about autonomous

8  with respect to specific actions or operations, and that was

9  one of the points that Mr. McDougall brought up when he said,

10 well, I don't know -- what do you mean, not any control at all

11 or control of, you know, some level of control?  It's

12 ambiguous.

13         Your Honor, our position is, there's no ambiguity

14 here.  The control is control about a specific operation or

15 function.  For example, autonomous broadcasting.  That means

16 that the broadcasting has to be autonomous.  If the claim says

17 these actions are performed autonomously and then lists six

18 actions, those are the individual actions that have to be

19 autonomously.  Those are the actions that have to be performed

20 without control.

21         Now, that doesn't mean that the ABD can have control

22 from other things as long as it's not those actions being

23 controlled.  For example, we expressed in our briefs and

24 Dr. Caramanis provided an explanation, you can have control

25 over the scheduling by the scheduler software because the

```
 1   claims don't recite that the ABD autonomously schedules.  So
 2   that is the essence of the dispute as we see it.
 3           If we go to the next slide, please.  So in this
 4   slide, Your Honor, again, is counsel for the plaintiff's star
 5   witness's explanation on the law and focus on the Phillips
 6   decision.  And, respectfully, I believe that's a little bit of
 7   an oversimplification of the law.  And, certainly, there's been
 8   a lot of case law from the federal circuit on claims
 9   construction since the Phillips decision that provides more
10   explanation of how a court is supposed to apply the various
11   doctrines.
12           And, of course, the Phillips decision itself said
13   that there's no one formula.  There's no magic rule or
14   guideline to perform claims construction.  It's definitely
15   controlled by the specific facts of this case.  We submit that
16   this is an appropriate way of looking at the facts of this
17   case.
18           And one of the first questions that comes up -- it's
19   mentioned in both Phillips but also in other cases.  For
20   example, we are citing the Unwired Planet case here.  That's
21   829 F.3d at 1353.  We also cited the Hill-Rom case in our
22   brief.  -- is the question, is there an ordinary meaning to the
23   claim word "autonomous" before we got to the patent because the
24   expectation is that the inventors of a patent and the attorneys
25   drafting it are using the words based on the background,
```

1    knowledge, experience, and usage of a word of those in the

2    field.

3            And there's a key holding that.  Once there's a

4    decision as to whether this word "autonomous" has an

5    established ordinary meaning, if the Court finds there is one,

6    there's a very, very strong presumption that that ordinary

7    meaning applies.

8            The language that you see in <u>Unwired</u> and <u>Hill-Rom</u> and

9    similar cases requires there to be words of manifest exclusion

10   or disclaimer.  It has to be unambiguous that the patentee is

11   trying to redefine the word or disclaims the word in the

12   prosecution history by making arguments.

13           Now, if the answer is no, that the term doesn't have

14   an autonomous -- the term "autonomous" doesn't have an

15   established ordinary meaning.  We go into a second line of

16   cases, what I call the coined term type of cases.  That's

17   the -- <u>Indacon</u> is one example we cited in our briefs, 824 F.3d

18   352.  And what <u>Indacon</u> says is, if you have a coined term, then

19   really you cannot have it broader than what's in the

20   specification.  You have to actually look at the embodiments.

21           And we submit, Your Honor, that BoxCast is trying to

22   get the best of both words.  They are trying to say repeatedly

23   in their presentation and their brief that somehow we are

24   limiting it to preferred embodiments, but they themselves are

25   pointing to one part of the specification that they themself

1    described as an embodiment in support of their construction.

2         So we propose that this is the appropriate framework

3    for analyzing the issue, but, ultimately, the conclusion we

4    reach is whether we go down one road or the other, whether or

5    not the term has an ordinary meaning, and under either scenario

6    why less construction is the correct one.

7         The reason for that is if the Court determines that

8    there is an ordinary meaning to the term "autonomous" before we

9    came into this patent, then there's two questions:  One, has

10   there been a clear disclaimer or redefinition.  I'm going to

11   get into that and the facts that BoxCast relies on.  But I

12   submit to Your Honor that what they relied on falls far short

13   of what the cases require for a redefinition or a disclaimer of

14   the term "autonomous."

15        And, secondly, because YSL is the only party in this

16   case that has submitted evidence as to an ordinary meaning

17   before coming into patent -- well, if there's no redefinition,

18   the only evidence the Court can rely on as to the ordinary

19   meaning of the term is the evidence that supports YSL's

20   construction.

21        On the flip side, if the Court determines that the

22   term does not have an ordinary meaning going into the patent,

23   well, Indacon says it's limited to what's disclosed in the

24   specification.  And when we go through the briefs today, the

25   specification does not disclose having the claim autonomous

1    actions, the specific actions in the claims, like autonomous

2    broadcasting, as being controlled by any other machines.  They

3    are being controlled exclusively by the ABD under its own

4    action and control.

5            So, in effect, although this is a very important

6    point in the overall analysis and framework and _Phillips_ says

7    that the ordinary meaning in light of the specification is what

8    controls in most instances, ultimately either path of YSL's

9    construction is the one that's appropriate.

10           If we can go ahead to the next slide, please.  So I'm

11   just going to briefly explain why, in support of the fact, that

12   BoxCast has not submitted evidence for ordinary meaning.

13           So, first of all, BoxCast, there's no dispute that

14   they have not submitted any treatise or dictionary definition.

15           I just want to briefly address any criticisms that

16   BoxCast made by dictionaries during its presentation.  And it

17   is correct that _Phillips_ says that there were certain cases

18   that elevated the level of dictionary to an extreme level where

19   essentially every patent case that was following that case law,

20   _Texas Digital_, was a battle of the dictionaries.

21           And the _Phillips_ decision said that's not

22   appropriate.  We still have to look at the patent and not just

23   battle about which dictionary is better and whoever has, you

24   know, an arbitrarily chosen dictionary wins.

25           That's obviously not this case because they haven't

```
1    chosen a dictionary at all, and, really, they have no evidence

2    to dispute that there's any dictionary or technical treatise

3    that offers a different construction other than one Law Review

4    article that we mentioned in the briefs as not being a reliable

5    technical source.  And BoxCast's own expert himself

6    affirmatively opines that "autonomous" does not have a set

7    meaning in the art.

8           So the conclusion is that BoxCast has no ability to

9    argue that there is an established ordinary meaning going into

10   this patent.  So their only argument really relies on whether

11   the patent itself defines the term.

12          So go to the next slide.  By contrast, YSL has

13   submitted evidence as to the ordinary meaning of the term

14   "autonomous" in both experts' testimony, technical articles,

15   and dictionary evidence.  And I understand that counsel for

16   plaintiff disputes that.  But that's exactly the only kind of

17   evidence that you can have as to what the ordinary meaning is

18   coming into the patent.  Obviously, the patent itself is very

19   important, but the patent does not provide the ordinary

20   meaning.  The ordinary meaning is the one that the people

21   skilled in the art had at the time that the patent was filed.

22          So although, you know, the dictionaries, expert

23   testimony are not controlling, and, obviously, the patent is

24   very important to the determination of what the ordinary

25   meaning is, that is the only evidence that one can look at.
```

1          So if we'll go to the next slide, please.  And I

2     know, again, counsel criticized our dictionary because they are

3     general-purpose dictionaries.  Usually, a response to that is

4     that the other side has cited technical dictionaries that

5     purportedly provided a better different definition, and that is

6     not -- BoxCast has not submitted any dictionary as supposedly

7     having a different definition from these.  And our expert has

8     opined that these are the same kind of definitions that one

9     skilled in the art would understand and apply.

10          And, certainly, they do have examples of

11     self-government, but that's completely normal examples of how

12     words are used in technology.  You have an existing word, like

13     the word "autonomous" that people in technology know what that

14     existing word is, and then they use that existing word because

15     it is apt to describe the types of things they are working on.

16     That is exactly the example that happened here, Your Honor.

17          So if you go to the next slide, please.  Now, this is

18     an example that we did not hear from BoxCast.  This is another

19     piece of evidence that is not just a dictionary or our own

20     expert but is, in fact, a project that BoxCast's own expert

21     worked on.  It was an autonomous lawnmower project that he

22     worked on.  It was on his C.V., and we took his deposition.  We

23     found listed in his list of articles, articles about this

24     autonomous lawnmower.

25          And there's a few things to take away from that, Your

```
 1   Honor.  One thing is when BoxCast's own expert wrote articles

 2   about an autonomous lawnmower, he didn't have to give a

 3   definition of "autonomous."  He didn't have to say there's

 4   levels of autonomous, and it's not really clear what levels

 5   applied.  He just used the word "autonomous," and he used

 6   "autonomous" because people skilled in the field already knew

 7   what the word "autonomous" meant.

 8           And if there's any doubt about that, we can go ahead

 9   and look at the rules in this computation.  This is an article

10   that is actually previous patent.  So it's a prior art article

11   that is for the types of evidence that can be relied on.  It's

12   not intrinsic because it happened not to be cited by BoxCast

13   when they prosecuted this patent, but it is still relevant

14   evidence of the meaning of the term.

15           And in this deposition, as BoxCast's own expert

16   admitted, you could not have the autonomous device -- it was an

17   autonomous lawnmower, and its operation was autonomously lawn

18   mowing -- it could not be controlled by other machines when it

19   was autonomously lawn mowing.

20           We asked him why is that? because, under the rules,

21   that wouldn't be autonomous.  So that's an example of the use

22   of the word "autonomous" in a technical field showing that,

23   exactly that -- use, controlled by other machines is not

24   autonomous.  That was before the patent.  That was a basic

25   example of the ordinary meaning that those skilled in the art
```

1   would understand coming into this patent why BoxCast was using

2   that word throughout its patent.

3            Go to the next slide, please.  Now, this is,

4   obviously, an important portion of the specification.  You saw

5   BoxCast relied very heavily on this.  This is column 4 of the

6   '574 patent, lines 7 through 23.  One point, I think, that's

7   very important to note, Your Honor, is BoxCast at points

8   criticized YSL's position as incorporating limitations from

9   preferred embodiments.  So one thing to note, first of all, is

10  the section begins with the phrase "one exemplary embodiment."

11  So this is already saying this is an example and is not

12  necessarily coextensive of the scope of its invention.

13            But, really, the key here is that BoxCast takes its

14  definition verbatim from the "i.e." parenthetical that we are

15  highlighting here after the word "automatically."  And it's

16  important to understand what are the examples of the kinds of

17  things that can actually be an express redefinition of a term

18  because not everything that the patentee says in the

19  specification is him acting as his own lexicographer.  Not

20  everything that the patentee says is an express definition.  So

21  there's a few key signals that you can have as to whether the

22  patentee is redefining a term.

23            And it is true the parenthetical "i.e." there's case

24  law that says that is an intent to define a word, but the key

25  part of that is its intention to define the word to which it

```
1   refers.  An example of that is Edwards Lifesciences case,

2   582 F.3d 1322, and also Skinmedica, 727 F.3d 1187.  The key

3   here is the "which it refers" part.  What you can see is the

4   "i.e." parenthetical here comes after the word "automatically."

5           So that means that under that case law "i.e." is only

6   defining the word "automatically."  And that's not some

7   surprise or unusual statement.  The word "automatically" did

8   appear in the claims of the '275 patent.  So it makes sense for

9   the patentee to want to define the term "automatically," but

10  that is not the definition of the word "autonomous."

11          And can we go to the next slide.  One important thing

12  to note is that actually redefining "autonomous" and

13  "automatic" is actually inconsistent with the '275 patent in

14  its file history.  And I was quite surprised, you know, that

15  BoxCast is affirmatively relying on the same evidence as

16  evidence in support of the entreating the two terms as

17  synonymous.

18          And we'll see exactly why that's incorrect.  But here

19  is one example, and that is the doctrine of claim

20  differentiation that Mr. McDougall talked about.  We have a

21  '275 patent here, and we have two different claims.  The claim

22  for the '275 has the word "automatically" in the claim.

23  Claim 1 of the '275 uses the word "autonomously."

24          There's a presumption-- now, the presumption can vary

25  depending on the specific facts, and the presumption can
```

```
1    certainly be overcome.  But there's a presumption that

2    generally when a patentee is using different words, they are

3    intending to have a different meaning.

4            So this is one example where the presumption is, they

5    are using the word "autonomously" for one thing and the word

6    "automatically" for another.  That means when they are using

7    the word "automatically" there in claim 4, then, yes, for that

8    word "automatically," the definition that they have in the

9    specification automatically applies.  But that also means that

10   the presumption is that the term "autonomously" earlier does

11   not have the same meaning.

12           And, of course, there's also some cited cases that

13   there's a presumption when you have patents here that are

14   related like these are, the one with the same specification

15   continuation that the same term is going to be using the same

16   meaning.  So the presumption here that "automatically" and

17   "autonomously" mean different things, '275, carries over as

18   well to the '574 patent.

19           Can we go to the next slide, please.  And this is the

20   portion of the file history of the '275 patent, and what we can

21   see is that in the left, the big box there, that is the

22   amendments that BoxCast was making in their first -- trying to

23   make the claim say "automatic."

24           And I think one thing that's important to note is the

25   limitations here where it says "automatically," they are very
```

1   similar limitations to the limitations that ultimately ended up

2   in the '275 and '574 patent.

3           They are not identical, but, in both cases, we are

4   talking about transmitting video data.  And, similarly, in the

5   '574 patent, it recites "autonomously" transmitting instead of

6   "automatically."  The question is, what's the inference from

7   that.  Well, let's look at what happened.  The patent examiner

8   said Mukerji discloses automatically doing this.

9           And what was the response that BoxCast had?  BoxCast

10  canceled that claim.  And there's a presumption -- we cited it

11  in the briefs, Your Honor -- that when you cancel a claim after

12  the examiner rejects it, there's a presumption that you are

13  surrendering claim scope, the idea that you are not going to go

14  back and immediately get the same thing.

15          Now, that presumption can be overcome in some cases,

16  but they -- BoxCast has not provided an explanation for why the

17  presumption is overcome, that they surrender "automatic" as

18  opposed to "autonomous" transmitting video data in the claims

19  of the '275 patent, and they certainly didn't explain, when

20  they were filing the '574 patent, they were trying to recapture

21  that disclaimer.

22          Go to the next slide please.  So, again, this is now

23  turning to the, kind of, right branch of that flow chart that I

24  had where -- let's assume that the specification -- and, in

25  fact, the specifications are important in both branches.

1          In one branch, we are confirming that the ordinary

2   meaning is correct.  The other branch, the branch where we have

3   a coined term, the specification is very important because we

4   cannot construe the claims broader than what is the -- put into

5   the specification by BoxCast, the embodiments it discloses.

6          So if "autonomous" does not have an ordinary meaning,

7   we have to look very carefully in that language in <u>Phillips</u>

8   about importing limitations from preferred embodiments.

9   "Indacon" explains that when you have no ordinary meaning, that

10  that same level of deference to importing limitations doesn't

11  apply.

12         So what are the actions that are actually recited as

13  autonomous in the '574 patents?  That, Your Honor, focuses on

14  the specific action.  We are not saying everything that the ABD

15  has to do has to be autonomous in all operations, just the ones

16  in the claims.  So broadcasting, transmitting digital content

17  for video data, ceasing transmission of digital content,

18  issuing a request, receiving digital content, and data relating

19  to recording start time/end time, those are the things that the

20  claims recite as being autonomously performed.

21         And those, Your Honor, are the ones, we submit, that

22  have to be done by the ABD without outside control, and that

23  doesn't mean it's not without any interaction.  Control is

24  different from any interaction.  We're going to explain why and

25  show you examples.

```
 1          Go to the next slide.  So, again, Your Honor, this is

 2   figure 16B.  And I believe and, certainly, YSL's position in

 3   this figure is very important to understanding the ABD and what

 4   it does because this is a flow chart of actually how the ABD

 5   works and the specific decisions and processes the ABD goes

 6   through in deciding it.

 7          And counsel is correct that this example in this

 8   specification was not just specifically identified as an

 9   autonomous broadcasting device, but that does not actually take

10   away from this issue.  That just means that the -- even their

11   nonautonomous broadcasting device already has this bare minimum

12   level of operations that have to be performed with what's

13   clearly a high level of autonomy.  It has significance, as we

14   get into a later section, but this is a bare minimum.  And it's

15   talking about the node.

16          And one other point I want to address.  Counsel made

17   an argument that says this node is fully automated.  As

18   Dr. Caramanis explains, the word "automated" and the word

19   "autonomous" are not mutually exclusive.

20          So the fact this specification may say a feature is

21   automatic and a feature is autonomous is not a redefinition of

22   either of those terms.  It is stating two different things

23   that, although very similar and highly related, that

24   "automatic" and "automated" refer to not with a human, and, you

25   know, the machine is itself performing the task.  But, you
```

1  know, the autonomous operation is a different one.  There's an

2  explanation from Dr. Caramanis's declaration about that exact

3  issue.

4      And I will note on that point that counsel for

5  BoxCast had an opportunity to submit a supplemental declaration

6  he requested from the magistrate judge to respond to

7  Dr. Caramanis's declaration.  And they did submit and serve a

8  supplemental declaration on YSL, but, surprisingly, they don't

9  rely on that supplemental declaration in their briefs, which is

10  quite surprising.  And the reason for that is because they were

11  not able to rebut Dr. Caramanis's opinions about the

12  distinction between "autonomous" and "automated."

13      THE COURT:  Okay.  And I'm less interested in the

14  reasons why either side did whatever you did.  I'd just like to

15  hear, you know, your perspective on the evidence.

16      MR. SAUNDERS:  I understand, Your Honor.

17      THE COURT:  And, actually, I kind of have a question

18  because, I mean, obviously, you all sense that I'm a new

19  federal judge, but I also was never a patent lawyer.

20      And you've told me a lot about presumptions that I

21  have to take into consideration.  Is there a presumption that

22  the inventors understand the terms of art at the time that they

23  are doing this process?

24      MR. SAUNDERS:  Yes, Your Honor.  We submit that

25  that's what the Unwired case we talked about earlier, the

1    <u>Hill-Rom</u> case --

2              THE COURT:  Yeah.

3              MR. SAUNDERS:  -- why they were talking about the

4    importance of ordinary meaning is because that's -- the

5    understanding that when they are choosing to draft a patent,

6    you are using your words carefully, and you're using your words

7    carefully with the understanding of how those words are used

8    before.  And kind of going back to the specific slides that

9    counsel for BoxCast made some arguments, but one of the points

10   they made was, you know, about a lexicographer.

11             In fact, you can look at the '574 patent, column 7,

12   and see actual examples where the patentee is acting as a

13   lexicographer under the words "logic" and "software" and using

14   quotes "as used herein."  That's the kind of clear example

15   where BoxCast knew that they wanted to provide a definition.

16             They didn't for the word "autonomous."  So they are,

17   in the sense, relying on that background understanding of what

18   the word means.

19             THE COURT:  Okay.

20             MR. SAUNDERS:  And that's where there is no evidence

21   for BoxCast on that.

22             THE COURT:  But they have talked about intrinsic

23   evidence that they believe applies.  Is there any intrinsic

24   evidence that everything you're telling me, I'm perceiving as

25   being, is extrinsic?

 1            MR. SAUNDERS:  No, Your Honor.  Actually, this very

 2    slide we are on right now is intrinsic evidence.

 3            THE COURT:  Okay.

 4            MR. SAUNDERS:  And that's the figure, 16, and we are

 5    going to be going through more examples.  My purpose is, for

 6    all those claim limitations in the claims is autonomous.  I'm

 7    going to go to the specification and show you why those

 8    operations in the specification are being done in a way

 9    consistent with YSL's construction.

10            THE COURT:  Okay.

11            MR. SAUNDERS:  And so the example here is there's two

12    limitations, broadcasting and transmitting.  They both show up

13    in the claim.  An autonomous broadcast device.  And it says

14    there's autonomous transmitting.  Some of the claims say

15    "ceasing transmission" as well as "autonomous."

16            So what does the specification tell us about that?

17    Well, first of all, in column 19, it explains how the ABD

18    actually does this, and it stores an event schedule.  It

19    downloads from the schedule website locally, and it uses it to

20    determine when to begin and end each broadcasting.  And that's

21    how it actually is operating without outside control because it

22    itself is doing the determination of when to transmit, which is

23    different from just being told to transmit.

24            And we can see the same notion reflected in

25    figure 16B.  This is the broadcasting device doing its own

1    decision-making, and, in that flow chart, we see it ask the

2    question.  In 16-20, is it time to start broadcasting.

3            So the broadcasting device has its locally stored

4    schedule, and it can then look at that locally stored schedule

5    and go, hey, it's now time to start broadcasting because my

6    internal timer has now reached the time that I received

7    previously from the scheduler website, and I'm going to, it

8    says in 16-22, start broadcasting the specified event.  The

9    same thing in 16-24.  The ABD is making its own decision, time

10   to stop broadcasting, and then it states the node stops

11   broadcasting the current event, 16-32.

12           And this is exactly an example of the broadcasting

13   device, on its own control, making the decision whether to

14   start or stop broadcasting, which are limitations that the

15   claims say are performed autonomously.

16           And so that's exactly an example of where it's

17   consistent with YSL's definition, and we submit, under Indacon,

18   if the Court determines there is no ordinary meaning, these are

19   the types of things the claim should be limited to because that

20   is what is actually disclosed.  There is no disclosure of the

21   ABD being told to start broadcasting or being told to stop

22   broadcasting.

23           If I'll go to the next slide, please.  Now, this is

24   another limitation that the claims say they have to be

25   performed autonomously, and that's the receiving data relating

1    to a recording start time.  And what's really important about

2    this, this is correspondence to item 16-12, 16-14, and 16-16 in

3    figure 16D.  And I think what's really important is it serves

4    as a distinction between outside control and interaction

5    because it is the ABD, the broadcasting device.  That is the

6    one that starts the process of this receiving -- requesting an

7    event schedule and then receiving an event schedule.  It's the

8    scheduling website that responds to the ABD, and it explains,

9    in column 18, items 51 through 59, that the broadcasting device

10   keeps a local copy of the schedule of events.

11           So, obviously, if the broadcasting device was being

12   told to just respond right away and, here, start broadcasting,

13   it wouldn't have a local copy or need a local copy because it

14   would be told when to start and stop.  The local copy is what's

15   later used in the previous slides that we saw in 16-18 -- or

16   16-20, 16-24 to make the decision about whether to start or

17   stop broadcasting.

18           If we go to the next slide.  So another example of

19   what the claims require and what's disclosed in the

20   specification is the limitation on receiving digital content.

21   The claims require receiving digital content.  And when you

22   first read that, that may seem a little bit weird.  How do you

23   autonomously, you know, receive something?

24           And, in fact, the claims recite that there has to be,

25   in 1 and 6, an action performed autonomously that receives it.

1    And we'll get to that in a later claim limitation.  But what we

2    can see as to the autonomous issue here in this specification,

3    there's this disclosure that, in fact, it's a repeated

4    disclosure throughout all of these examples in the patent that

5    you have an ability to control power on or power off.

6              So what happens is the ABD says, Oh, I'm about to get

7    to my time of broadcasting.  I'm going to turn on these

8    devices.  And so, that way, I am going to start receiving the

9    digital content from the cameras.  So there's a specific action

10   taken by the ABD autonomously to cause it to receive digital

11   content.

12             And that action, again, is the same disclosure as

13   before.  We know that that is going to happen based on the ABD

14   with its locally stored copy schedule looking at its schedule

15   going, oh, time's up to start my transmitting session.  I know

16   I need to do two things.  First, I need to turn on the camera,

17   and then, two, after I start getting data from the camera, I

18   need to stream it or transmit or broadcast it to the media

19   servers.

20             And so just responding to one argument that BoxCast

21   has made repeatedly is that, you know, we are reading in a

22   limitation about performing this as a -- or reading in the

23   concept of it being turning on or turning off into the claims.

24   But, Your Honor, that's not correct.

25             Our claim limitation of claim constructions do not

1    refer in any way to powering on or powering off the device.  In

2    fact, in our brief, we gave various examples of other ways.

3    You can control the receiving of digital content autonomously

4    by performing a specific action.

5          For example, you could just turn off the port that

6    the camera itself is on.  You could turn off a buffer.  There

7    are many ways one could imagine.  The fact that BoxCast did not

8    give other examples of ways to control its camera doesn't mean

9    that that is what the examples are in the specification that

10   would inform one how the receiving digital content limitation

11   is performed autonomously, and it's performed autonomously

12   because the ABD is the one doing it.  It's causing that

13   receiving by performing an action.

14         Go to the next slide, please.  So the next section

15   I'll talk about is the autonomous broadcasting device, and

16   there's really a very simple dispute here, Your Honor.  In our

17   minds, this question is whether the autonomous broadcasting

18   device must broadcast autonomously, and you can see in the

19   constructions offered by the two parties, BoxCast's

20   construction literally takes a definition from the

21   specification as to a generic broadcasting device that is not

22   necessarily autonomous.  So they are reading out the word

23   "autonomous" from the phrase "autonomous broadcasting device."

24         Go to the next slide, please.  And, as I said, this

25   reading out of the autonomous limitation from the term

1    "autonomous broadcasting device" is legal error.  And here is

2    an example of a case that says that.  It's <u>Texas Instruments</u>

3    <u>versus the USITC</u>, 988 F.2d 1165.  To construe the claims in the

4    manner suggested by TI would read an express limitation out of

5    the claims.  This, we will not do because courts cannot either

6    broaden nor narrow claims to give the patentee something

7    different than what he has set forth.

8            So just taking a word and deleting it from the

9    claims, which is effectively what BoxCast's construction does,

10   not having any concept of autonomous.  Even their own

11   construction of the word "autonomous" is not reflected in their

12   construction of "autonomous broadcasting device."  That is a

13   clear example of just reading out a limitation claim.

14           And we submit, Your Honor, that whatever Your Honor

15   reaches a conclusion as to the word "autonomous," it's quite

16   clear that the "autonomous broadcasting device" has to reflect

17   being autonomous in some ways because, otherwise, it would be,

18   as the federal circuit said, just reading out an express

19   limitation from the claim, which is improper.

20           Go to the next slide, please.  And going to the

21   argument about why BoxCast is doing this, I'll explain why --

22   why that argument is not proper.  BoxCast's argument as to why

23   we can read out the word "autonomous" from "broadcasting

24   device" is that it really -- the patent is all about an

25   autonomous broadcasting system.  The ABD is nearly a

```
1    nonautonomous part of it.  We can see that in their briefs when

2    they say that the claims recite an autonomous broadcasting

3    system.  They say that actually in their briefs.

4           And they say that the patent is directed to

5    autonomous broadcasting system, and there's nothing in it to

6    suggest that the broadcasting device is some sort of

7    self-governing device on its own, and, therefore, they are

8    suggesting that the broadcasting device does not itself have to

9    be autonomous at all rather that the larger system is what has

10   to be autonomous.

11          And, Your Honor, that's clearly incorrect.  If we can

12   go to the next slide, please.  I just want to point out, their

13   expert rendered the same opinion and, actually, went into more

14   detail.  This is from his supplemental declaration, one that

15   wasn't submitted by BoxCast.  And he explains in here that the

16   autonomous broadcasting device is just one component, and you

17   shouldn't say that any one component has to actually be

18   autonomous and that we probably just call it that because the

19   device is part of an autonomous broadcasting system.

20          If we can go to the next slide, please.  The first

21   and key reason why that argument is wrong is simply the

22   language difference.  BoxCast was the one in front of the

23   patent office that shows the claim language that is in the

24   patents.  Obviously, it was a dialogue with the examiner and

25   the examiner not allowing claims, but they didn't choose to
```

1    recite an autonomous broadcasting system.

2            In fact, only one of the independent claims in this

3    case even recites a system.  Three of the independent claims

4    are methods that do not recite a system.  So BoxCast chose to

5    recite a specific device that was autonomous, an autonomous

6    broadcasting device.

7            We submit, Your Honor, that the fact that the

8    specification discusses both an autonomous broadcasting device

9    and an autonomous broadcasting system, one in the art would

10   understand that that should have a difference.  You chose one

11   phrase rather than the other, that that is not an invitation to

12   ignore that election later on and then pretend the claims later

13   actually cited an autonomous broadcasting system.  The other

14   important point is that the patent office refused to allow

15   claims reciting a nonautonomous broadcasting device.

16           So what you see in the middle excerpt is from a

17   summary of examiner interview that happened shortly before the

18   '574 patent issue and that summary was talking about proposed

19   amendments and one of the amendments says, Additional

20   amendments will be performed to claims 9 and 18 to mirror the

21   allowable subject matter of the claim.

22           So what happened was BoxCast, through a series of

23   amendments and arguments, finally got the examiner to agree

24   that claims 1 and 2 were allowable under the prior art.  What

25   the examiner pointed out in that interview, Hey, claim 9

1   doesn't have the same things in it as claims 1 and 2.  So I'm

2   not going to allow it, unless you fix it.

3         And then what happened next in the prosecution

4   history, what we see is that BoxCast amended claim 9.  And one

5   of the amendments they did to claim 9 was they actually

6   replaced -- added the word "autonomous" in because, before

7   that, claim 9 just recited "broadcasting device," and they

8   amended claim 9 to cite an "autonomous broadcasting device,"

9   among other amendments.  And that is an example of BoxCast

10  having to amend the claims to specifically recite a

11  broadcasting device that is autonomous and not just any

12  broadcasting device.

13        And we submit, Your Honor, that BoxCast's claim

14  construction removes the distinction that was established in

15  the prosecution history where the examiner required them to

16  have that limitation in the claim, and they put it in there.

17  They chose to put it in there.  They didn't choose to keep

18  arguing to the patent office that a nonautonomous broadcasting

19  device was compatible.  That's the box down there at the bottom

20  that shows the amendment.

21        At the top -- this was earlier on.  So the sequence

22  of events happened.  BoxCast made an argument about its claims

23  in the patent office, and, in response, the examiner said, hey,

24  the claims really don't have that all in them.  And then they

25  required BoxCast to amend the claims.

1            And what was that description by BoxCast earlier on

2   in the prosecution history?  Well, the explanation from BoxCast

3   was, once the schedule is set on a remote server, the ABD

4   autonomously begins a broadcast transmission of the data to the

5   media servers and autonomously ends the broadcast transmission

6   to media servers.

7            So BoxCast has told the patent office, we have an ABD

8   that is autonomously broadcasting.  And that's really the key

9   issue spec for the ABD limitation as opposed to autonomous

10  because that's the one that requires that the broadcasting be

11  autonomous.  And some of their claims don't recite any type of

12  broadcasting or transmitting other than the phrase "autonomous

13  broadcasting device."

14           So if the Court does not construe "autonomous

15  broadcasting device" to actually require something that

16  broadcasts autonomously, that statement to the patent office

17  when they said the ABD autonomously begins a broadcast

18  transmission, that statement would not longer hold true.  They

19  would not be held true to the promises they made to the patent

20  office.  That is clearly forbidden.

21           Go to the next slide.  Before I conclude, I just want

22  to respond to a few specific points from BoxCast's

23  presentation.

24           Could I switch to the document camera, please.

25           So this was just the slide earlier on that BoxCast

1   said that this example here is the inventor's lexicography.  As

2   I mentioned earlier on, that example certainly falls -- other

3   than, yes, there's a lexicography for the word "automatically,"

4   but that falls far below an example of lexicography as to the

5   word "autonomous."  And just to show you that BoxCast really

6   knew how to do lexicography when it thought it needed to have

7   terms defined -- this is column 7.

8          And we can see starting -- '574, starting at line 34,

9   we go through definition of exemplary terms, and there's the

10  definition.  There's logic, circuit, software, computer

11  processer.  Those are the terms that BoxCast really thought

12  needed to be defined.  And, certainly, if they thought they

13  were using a different meaning of "autonomous" than the one

14  that everyone was using in the field before, they could have

15  put the word "autonomous" in that list as well.  That's an

16  example of the lexicography.  It's clear and unambiguous that

17  BoxCast wants a specific definition of the terms.

18         The inference in this statement that has nothing

19  about what the word "autonomous" means and that we just use two

20  words in the specification at different times, that is not

21  rising to the level of an express disclaimer or, you know,

22  express redefinition of the doctrines of lexicography would be

23  invoked under the federal circuit case law.

24         Responding to another argument, Your Honor.  One of

25  the points that BoxCast made was that specification never

1  discusses different levels of autonomy or automation.  Your

2  Honor, we submit that, first of all, that is a red herring.

3  The levels of autonomy is not any part of YSL's construction.

4  YSL's construction just says the ordinary meaning that our

5  expert and the dictionaries, and it has not been rebutted by

6  any evidence from BoxCast.

7       BoxCast identifies an article from the <u>Society of</u>

8  <u>Automotive Engineers</u> as having levels of vehicles, but,

9  actually, that article did not use the word "autonomous."  It

10 was not about -- it certainly didn't use the words "autonomous"

11 and "automatic" in contrast with each other and said they were

12 the same thing.

13      The only other evidence that they had is the <u>Law</u>

14 <u>Review</u> article, which we submit is not what one should rely on

15 as a technical source -- and, certainly, our expert explained

16 in detail why that article was wrong, and that testimony was

17 not rebutted.

18      Another point I'd like to respond to is their

19 argument about testimony from our expert in his deposition.

20 Your Honor, there was a long line in the deposition where

21 counsel was submitting various hypotheticals to the witness.

22 Here's a hypothetical device.  And this is the example that

23 counsel relied on.  What you can notice is the description of

24 the hypothetical, the expert is repeating his understanding of

25 it, and the hypothetical they were talking about here is not in

```
 1   the patent.  There's no broadcasting device in the
 2   hypothetical.  It's just a generic device that does one thing.
 3            And what our, YSL's, expert explained is that when
 4   you are just talking about a level of device that's so simple
 5   and that does just -- we are talking about one extremely
 6   low-level operation of a device that is extremely simple, well,
 7   then, the meaning of the word "autonomous" and "automated," it
 8   kind of loses any sense of the meaning because, as he explained
 9   it, if you are talking about an autonomous driving car, at a
10   certain level, you can keep talking about, "Well, what does
11   'driving' mean"?  It means involving a wheel, moving brakes,
12   acceleration.
13            Well, what does "braking" mean?  "Braking" means
14   moving brake calipers.  How much do you need to move the brake
15   calipers?  You could eventually break down an operation to a
16   level that it would not make sense to use the word "autonomous"
17   before.  It would not make sense to have that distinction.
18            But, Your Honor, that's not in the claims.  The
19   autonomous operations of the claims are specific operations of
20   claims that the specifications show are being done without a --
21   without control by another machine.
22            And so when the experts say we need context, of
23   course, context is important.  Phillips and all these cases
24   talk about the important context of the claim, and reading the
25   claim is important.  Of course, it's important to have an
```

1  understanding of the context and that if you have an isolated

2  device in a hypothetical that doesn't involve any other

3  complicated parts of it that suddenly it loses a lot of meaning

4  and it's difficult to make that determination.

5          Another point, again, they relied on testimony from

6  our expert, and I just want to address it, is this discussion

7  of autonomous registration.  And, you know, again, Your Honor,

8  this -- the most important thing about this autonomous

9  registration issue is it is completely irrelevant because the

10  claims don't recite the autonomous registration process.  The

11  registration has already happened or is not part of the claim

12  at all.

13          There's been no contention from BoxCast that any of

14  these claim limitations involve anything to do with the

15  registration process.  The registration is kind of what you

16  need to do beforehand as part of their set-up for their device,

17  and then, once the device is registered, then you can do that.

18  So, first of all, this example of autonomous registration is

19  not relevant to the claim construction disputes in here.

20          And, really, what they are pointing to here is this

21  expert says he's looking at this section on its own, not the

22  entire specification.  It's a section of the specification that

23  he did not analyze in its report because it was not part of the

24  claims.

25          So they are trying to give an example of a "gotcha"

```
 1   question as to a point that's completely irrelevant as somehow

 2   identifying that YSL's construction is unworkable.  Again, this

 3   is an expert identifying isolated sections on their own without

 4   seeing the claim and the fact that the patent uses a different

 5   word because it's, again, not a limitation of the claim itself.

 6           This is a legal point that counsel for BoxCast

 7   mentioned is, you know, the intent of BoxCast.  And we submit,

 8   Your Honor, that the point that we were making in our brief is

 9   that the -- and there's many cases that we cited -- that the

10   ultimate importance of a patent is public notice.  It's the

11   public notice function of the patent.  The world needs to know

12   what the patent claims mean, what the specification means, and

13   be informed by them.

14           And if you have an intent that's not reflected in

15   those documents, that intent is irrelevant as a matter of law,

16   and that's the point that we are making.  And when Phillips is

17   talking about the importance of determining an inventor's --

18   you know, actually invented and intended to envelop, they are

19   talking about determining that, about how one is reading these

20   documents.  It is not about any form of intent of other than an

21   expression that is specifically in the documents.  And if

22   BoxCast had intended to say "autonomous includes control by

23   other devices," they could have put that into the patent's

24   claim or specification.

25           Responding briefly to an argument that was made by
```

1   the prosecution history by BoxCast.  So this is, again, an

2   example of an examiner interview that BoxCast is citing, and

3   BoxCast is creating a big inference from the phrase "via a

4   user."  So I think it's important to look at the whole phrase.

5           The examiner has noted that claim 1, I'm going to

6   allow or at least agree with you on this claim of claim 1,

7   however, there's problems with these other claims that they

8   don't have the same limitation regarding an autonomous device.

9   And he's giving the example of what could be included in that

10  claim if I don't make you amend them to give it up.

11          And what he says is that the request can be issued in

12  other ways such as via a user.  And we think the real

13  importance to that portion of the prosecution of BoxCast is not

14  citing the phrase "via a user."  That is just one example.  The

15  words "such as" indicates that the examiner knew there could be

16  other things other than user intervention that would render it

17  nonautonomous.

18          So, actually, this portion of the prosecution history

19  that BoxCast is relying on as supposedly saying that the

20  examiner understands "autonomous" means not via a user, that is

21  correctly incorrect.  The examiner understands that "via a

22  user" is one example of a device not being autonomous and that

23  the use of the phrase "such as" indicates that the examiner

24  contemplated there could be other ways that the device is

25  nonautonomous.  That is clearly inconsistent with BoxCast's

1    construction because BoxCast's construction identifies only one

2    way the device is autonomous, and that's if it is under control

3    of a user; whereas, YSL's construction reflects that "such as"

4    because it excludes any outside control, including control by

5    machines.

6          So this is another argument that BoxCast made during

7    its presentation.  It's referring to a text chat between YSL's

8    CTO and a supplier, an employee for a supplier, using decoding

9    boxes.  They are pointing to a couple of excerpts from a very

10   long text chat, and what their interpretation of this is that

11   really, you know, we should ignore all of YSL's claim

12   construction because, you know, they told this guy that

13   everything was about the time stamp.

14         And that's -- that's, again, Your Honor, clearly

15   incorrect.  And one thing, in fact, counsel for BoxCast noted,

16   that the timing of this presentation was before the '574 patent

17   had even issued.  So when he's talking about the BoxCast

18   patent, he cannot be talking about the '574 patent.  The '574

19   patent did not exist.  It was talking about the '275 patent

20   that had already issued.  That was the '275 patent that BoxCast

21   dropped from this case.

22         And, again, when we are talking about the only reason

23   our attorneys tell us -- again, this is not evidence that in

24   any of the cases say is relevant to plaintiff.  This is years

25   after the priority date of the '574 patent.  It is not public

 1    information because it is a private text chat.

 2            It is clearly irrelevant under the law of claim

 3    construction, and this is just one example of YSL's employee

 4    telling this person because they were intentionally trying to

 5    make sure they didn't infringe on a patent.  And this employee

 6    was saying, hey, I want to put in time stamps, and the -- Rob

 7    was saying no, we cannot put in time stamps.

 8            And that just shows that that is one example.  They

 9    are not saying that -- you know, that is the only

10    noninfringement argument that exists.  He's trying to explain

11    to an employee at a third-party company don't do this because

12    this is important, and we care about patents and

13    noninfringement.

14            A couple more small points, Your Honor, before I

15    conclude.  This is another portion.  I believe counsel said

16    that this portion of the deposition testimony, he thought that

17    our expert was agreeing with BoxCast's construction.

18            This is definitely a portion of the deposition

19    testimony that's very taken out of context.  I suggest Your

20    Honor read the larger context of this.  They are talking about

21    a specific portion of Dr. Caramanis's declaration where he

22    renders opinions about this <u>Law Review</u> article that BoxCast

23    relies on, the difference between "automated" and "autonomous."

24    They keep switching back and forth between "autonomous."

25            And, in context, this is not at all agreeing with the

```
1   construction.  Dr. Caramanis repeatedly made clear during his

2   deposition and in his declaration that he agrees with the

3   construction that YSL has adopted, and he's just focusing on

4   contrast for this specific Law Review article about autonomous

5   vehicles.  It's not a testimony as to what these terms mean in

6   general or the patent itself.

7          Sorry.  I believe I already hit that point.  So

8   counsel for BoxCast also made a point about cache inside the --

9   deposition testimony of Dr. Caramanis about cache.  And, again,

10  I suggest the Court review that testimony in context.

11         The witness was explaining a specific type of cache

12  as a cache that is inside a computer microprocesser.  That is a

13  completely different type of cache that they are talking about

14  in the specification.

15         They are talking about cache as in storing a copy of

16  a file.  And, in fact, Dr. Caramanis explained that is much

17  more similar to what you have with a web browser's cache, web

18  browser cache of websites.  So what it is doing is storing

19  copies of HDML files, copies of images it has downloaded.  And,

20  similarly, in the specification, when it's talking about the

21  ABD caching something, it is storing a copy of the event

22  schedule it gets from the scheduler website.

23         That has nothing to do with construction.  So that

24  example of the caching of a computer microprocesser has to do

25  with the construction because computers operate with
```

```
 1   instructions.  That's what a computer fundamentally is, is a

 2   device that goes through instructions and executes instruction.

 3            So suggesting that the word "cache" in the

 4   specification has anything to do with instructions is very

 5   misleading because it is not talking about a computer cache, a

 6   computer's cache instructions.  A cache outside of the computer

 7   does not necessarily cache instructions.

 8            I'm sorry.  Just one more point, Your Honor, because

 9   I forgot to mention this when I was putting this slide up.

10   This last part of this slide as the root of YSL's construction,

11   they have a quote here from Dr. Caramanis in his declaration.

12   What they've quoted is the '574 patent using the term "time

13   stamp" because it is using the term to reflect a clock time.

14            They actually have ended that quote early.  And if

15   you go into the declaration of Dr. Caramanis, the next phrase

16   before the end of the sentence is "any particular format."  So

17   that is very misleading because what Dr. Caramanis was opining

18   to is that "time" means "clock time" in this patent.  "Time

19   stamp" is a particular format of that clock time.

20            Dr. Caramanis was in no way saying that "time stamp"

21   means "clock time," and, by removing that end part of the

22   quote, that is misleading as to what Dr. Caramanis's opinions

23   are.

24            But if the Court has no questions, I have nothing

25   further on this term, Your Honor.
```

```
1              THE COURT:  I don't, at this point, have questions.

2    I do think this is probably a good point to talk about time,

3    not in the way you guys want to talk about time, because I know

4    that one is coming up.

5              So I think group A is the lion's share of argument is

6    my sense.  So what kind of time frame are we talking about?  I

7    don't want to artificially impose time on y'all, clock time,

8    time stamp, whatever.

9              But I want to -- you know, I don't know if any of you

10   are traveling this afternoon, planning to be -- I'm sure you

11   don't want to go into tomorrow.  That doesn't really work on my

12   end either.

13             So I want to give you the time that you need.  So you

14   tell me.  It's 11:30.  We've been going about two and a half

15   hours.  Would we be in lines to take a break?  We could take a

16   break, a short break or a longer early lunch break.  You tell

17   me what you -- what you want to do, how you think the time will

18   go for the rest of the process.

19             MR. GARSSON:  Your Honor, I think that when we get to

20   "recording start time," that's going to be a lengthy one.

21             THE COURT:  Okay.

22             MR. GARSSON:  I think the next one that's up, I don't

23   see that one going as long, but, you know, the other ones I

24   don't think are very long.  But "recording start time," while

25   it may not be as long as "autonomous," it's definitely going to
```

```
1   be a long one.  I certainly, while I love being here in

2   Alabama, hope that I can catch the flight out this evening to

3   go back.

4           THE COURT:  Sure, sure.

5           MR. GARSSON:  So I would say to try to do the next

6   one -- the "request" one, which I think we can get done

7   relatively quickly.

8           THE COURT:  Okay.

9           MR. GARSSON:  And then it might be a good time -- I

10  don't know how long the Court wants to take for lunch.  I know,

11  obviously, we want the court reporters and everyone to have

12  their break and then pick it up.  But I don't see this going

13  late into the afternoon, your Honor.

14          MR. MCDOUGAL:  I would agree to that.  I think if we

15  could do "request" first, pick up with "recording start time"

16  for the remainder.  Maybe a couple hours in the afternoon.

17          THE COURT:  Okay.  All right.

18          Melanie, you good to push on?

19          THE REPORTER:  Oh, sure.

20          THE COURT:  Let's move to "request."  How about that?

21  And then we'll take -- I don't know if you are going to go eat

22  somewhere.  You'll probably need to stop for about an hour, but

23  you don't have to take that long because I haven't eaten.  Do

24  you need to take a break, a short break right now?

25          MR. MCDOUGAL:  I could.
```

```
1              THE COURT:  Let's take a five-minute break.

2         [Recess.]

3              MR. GARSSON:  Your Honor.  Ross Garsson for YSL.

4              We are now moving to the next term, which is the

5    "request" terms.  If you'll go to the next slide.  There's four

6    claims, claim terms/phrases that we are asking the Court to

7    construe.  They are all grouped together because they all start

8    off -- they are all talking about issuing a request.

9              And, as you can see, Your Honor, the reason we group

10   them together is, if you go to the next slide, all of these,

11   the primary dispute of them, is request for what.  BoxCast is

12   saying it's a request for anything.  The issue of a request, it

13   can be for anything.  YSL is saying, no, it's requesting for a

14   recording start or end time.

15             Now, I'm not going to get into what a recording start

16   and end time means at this point.  It doesn't matter what it

17   means.  The question is, is it making a request for anything or

18   is it a request for a specific recording or end time.

19             And if you go to the next slide, claim 1, it's a

20   contextual issue here, not an interpretation issue.  A

21   contextual issue.  When it says in claim 1, as representative

22   of this, it says that the ABD autonomously performs the

23   following actions without any modification to or circumvention

24   of the router.  And first thing it says is issue a request via

25   the Internet connection to a first server situated outside the
```

95

1  router and receive data relating to a recording start time of a

2  live event from the first server in response to the request.

3          Now, Your Honor, in the context of that statement

4  right there, it's issuing a request and then receiving back

5  data relating to a recording start time in response to the

6  request.  Contextually.  If you make a request and get

7  something back in response to it, it's the thing you asked for.

8  And the example I think that we gave, you have a standing order

9  that said if somebody made the timing request, they will

10  automatically get a 30-day extension, they need to be making a

11  request for an extension.  They can't be making those requests

12  for an extra five pages.

13          Now, Your Honor, if you turn to the next thing,

14  BoxCast takes the position is the purpose of it was to initiate

15  the proper communication from the broadcasting device.  That

16  was the purpose of the request.

17          Well, the purpose is not the question.  And, by the

18  way, initiating a communication is not making a request.  If I

19  go up to somebody and say "hello," I may be initiating a

20  conversation with them, but I'm not making a request.

21          And then they say the specific content of the request

22  is not significant.  This is in their brief.  Well, Your Honor,

23  that's what they are saying in their brief, but that's not what

24  they said during prosecution.  This argument is entirely based

25  on the prosecution.  Intrinsic evidence only at this point.

1    Nothing other than that.

2          So we'll go to file.  On March 22nd, 2017, BoxCast

3    was arguing against why Brown was distinguishable, and they

4    were saying it didn't perform the step of issuing a request

5    limitation as set forth in claim 1.  And what they said was,

6    with regard to Brown, the proposed ABD, the camera manager in

7    Brown, never issued a request for scheduling information.

8          Now, at the time, Your Honor, the phrase, the one we

9    are talking about for claim 1, it said the same thing.  It

10   didn't use the word "recording start time."  It didn't use the

11   word here "recording start time."  They referred to a request

12   for scheduling information, but the recording start time is the

13   scheduling information they are talking about.  But it didn't

14   just limit it to any request in general.

15         Okay.  They specifically called out a request for

16   scheduling information.  That's the first hint, the first time

17   in the prosecution that they said this, but it wasn't the last.

18         Your Honor, about three weeks later, there was a

19   telephone call between BoxCast's attorney and the examiner.

20   Why do we know that? because it was applicant -- there's a

21   summary of what took place.  If you go to the -- yeah, on April

22   the 10th was an applicant-initiated interview with the

23   examiner.  Okay?

24         And what they specifically were talking about was

25   Brown and whether or not what were then independent claims 1,

1    2, 9, and 18, they were discussing it.  And those claims, 1, 2,

2    9, 18, eventually issued as claims 1, 6, 12, and 22, according

3    to their claims.  And, during this interview, BoxCast, again,

4    reiterated from the request recited in claim 1 was for a

5    request for a recording start time.

6              And, again, why do we know that?  Turn to the next

7    slide.  Okay?  In the description that was written, the

8    examiner noted applicant argued that Brown did not disclose

9    where in the autonomous broadcasting device would issue a

10   request for a recording start time data as recited in claim 1.

11             Your Honor, it can't be more clearly stated that that

12   is a limitation in claim 1.  It's absolutely there.  They

13   argued it, not the examiner.  They said it to the examiner.

14   The examiner recorded this argument that was being made by

15   them.

16             And what's important is, if you go down -- stay up

17   there.  Upon further review, the examiner agreed.  He actually

18   looked it over.  He said, you know what; you are right.  But

19   then he noted that the other independent claims, some of the

20   other independent claims, didn't have that concept, that

21   request for the recording start time in it.  So what did he do?

22   They reached an agreement on the telephone.

23             Now go to the next slide, please.  And the agreement

24   was reached that they would -- that they would make certain

25   amendments to overcome the rejections, which mirrored the

1    language that was in claim 1, which is exactly the language

2    that we looked at, at the very beginning, in claim 2, which is

3    in claim 6.  But they needed to add it to the other two claims,

4    which became ultimately claims 12 and 22.  And so they needed

5    to do that so it could add in the allowable subject matter of

6    claim 1.

7            Go to the next slide.  So what happens?  Three days

8    later, BoxCast faxes in claim amendments completely consistent

9    and changes claims 9 and 18 to add in the same similar

10   language.

11           And, now, on April 25th, so two weeks later, the

12   examiner sent out three things.  He sent out the summary of --

13   a reading of what happened on the 10th, but he actually sent

14   the summary out on the 25th.

15           He also entered the amendments that BoxCast asked

16   for, and then he issued a notice of allowability, which means

17   basically, Judge, I'm going to -- you know, you pay the fee,

18   you get a patent.  This is it.  You get the patent now because

19   of these -- with these final amendments in it.

20           Go to the next page.  Okay?  In the notice of

21   allowability, the examiner explained why he was going to issue

22   the patent, and he said all the claims are allowable because

23   the prior art fails to teach or disclose a broadcasting device

24   situated behind a router, which will autonomously issue a

25   request for a recording start time to a server without

1    modification to or circumvention of the router.

2              And the point is, Your Honor, clearly the examiner

3    was, again, iterating that he understood, they understood that

4    claim 1 and all the other claims had this requirement because,

5    Your Honor, the whole point is, in order for the patent to be

6    allowed, it has to be considered by the patent office to

7    determine if it's new and nonobvious.

8              And the reasons he said this is new and nonobvious is

9    because this particular element that the request -- that it

10   autonomously issue a request for a recording start time is

11   nowhere to be found in the prior art that has been cited in the

12   record.

13             Go to the next slide.  Not to be undone, the examiner

14   then repeated the same thing four more times about none of the

15   prior art having this feature.

16             Go to the next slide.  Brown doesn't have

17   autonomously issuing a request for a recording start time.

18   Mukerji, same thing.  It doesn't autonomously issue a request

19   for a recording start time.  Meijer, same thing.  Doesn't

20   autonomously issue a request for recording start time.

21   O'Connor.  Four times he points out that's what makes you

22   different.  Okay?

23             In other words, Your Honor, the claims are requiring

24   this.  It's not just a claim for anything.  It's clearly the

25   examiner based upon the arguments they made.  Everyone

1    understood, Your Honor, that the claim, when read in its

2    context, was requiring issuing a request for a recording start

3    time.

4            Go to the next slide.  What happens next is

5    incredibly important, Your Honor.  BoxCast files its statement

6    of substance of interview in response to reasons for allowance.

7            They had the opportunity -- just like when somebody

8    takes a deposition, they had an opportunity to review what the

9    examiner said, in particular the interview summary, and, if

10   they disagree with it, Your Honor, they are supposed to tell

11   the examiner that he mischaracterized what they said.  Okay?

12           But they sent a statement in.  They responded to the

13   reasons for allowance.  Nowhere in there did they say that that

14   wasn't the interpretation of the claims.  They didn't dispute

15   that they had made the argument that the request was for a

16   recording start time.

17           And, Your Honor, that limitation is clearly what is

18   out there for people to see because they can dispute it -- turn

19   to the next slide -- under the MPEP, it was the applicant's

20   duty to make sure the record was correct.  That's the

21   guidelines of the MPEP, the Manual Patent Examination

22   Procedure.  They set the rules.

23           And the rules are, it was BoxCast's and its

24   attorneys' obligation to make sure that the record was complete

25   because, Your Honor, my client wasn't in the patent office.

1    The public wasn't in the patent office.  It was a telephone

2    conversation that the substance had been recorded, and the

3    substance of the recording makes it extremely clear that the

4    request wasn't a request for anything.  It was a request for a

5    "recording start time," that they had to include that in all

6    the claims in order to get them overcut.

7              And, Your Honor, they can't just walk away from it

8    now here in claim construction and advocate a completely

9    opposite position than they took when they advocated to get the

10   patent out of the patent office.

11             And if you'll switch over to the -- this over here

12   real quick.  Your Honor, all this is intrinsic evidence.

13   Notice the third point here on what they have.  The prosecution

14   history provides evidence of how the PTO and the inventor

15   understood the patent.

16             Your Honor, it could not be stronger evidence of what

17   was understood by the examiner at the patent office and them at

18   the time that they got this patent allowed.

19             That's our argument, Your Honor.  If you have any

20   questions, I'll welcome any questions.

21             THE COURT:  Okay.  No.  I understand your argument.

22             MR. MCDOUGAL:  Before I start, Your Honor, I wanted

23   to answer the question that you asked about presumptions.  I

24   know Mr. Saunders answered it, but I think he answered it

25   incorrectly.

1            There is actually no presumption.  There is no legal

2     presumption that the plain and ordinary meaning applies.  It's

3     just an objective baseline.  If you read _Phillips_, there's no

4     legal presumption.  I want to make that clear.  You asked the

5     question, and I didn't have a chance to respond.

6            Starting with the "request" terms.  You heard counsel

7     for YSL talk about, you know, the disagreement here and what --

8     whether the "request" be for a specific type of data or it has

9     to be for a recording start time.

10           We agree that that is the issue.  Look at the area in

11    red there.  You'll notice on some of these terms, they actually

12    left out part of the construction.  I'm not sure why that was,

13    but I'd like to point that out.

14           I first want to -- for the request, you just kind of

15    have to read the claim.  So the claim says you issue a request

16    and you receive data relating to a recording start time of a

17    live event in response to that request.

18           So the request in the claim is not limited to any

19    type of request.  It doesn't say the "request for recording

20    start time."  The examiner didn't make him or didn't force

21    BoxCast to add any amendments, based on the prosecution

22    history.  We'll talk about that in a second.

23           So the request, in our opinion, is not limited to any

24    specific type of request.  That said, if it was limited to a

25    specific type of request, it would be a request for data

1   relating to a recording start time of a live event and not just

2   the recording start time because that's what you get in

3   response.

4           There are many kinds of requests in the

5   specification.  We talked about them, and the purpose of that

6   is what we talked about the -- to start that conversation, you

7   have this status request, event schedule request, channel

8   creation request.  I'm not going to walk through all of them.

9   If you look in the specification, there's a number of them.  So

10  all of these events solve that router issue.

11          And there's nothing saying that your request can't be

12  for something more than data relating for a recording start

13  time.  So the request shouldn't be limited in such a fashion.

14          These are a couple cites from <u>Phillips</u> that the

15  written description part of the specification does not limit

16  the right to exclude.  This is the function, the purpose to the

17  claim.  And there's no limitation on what the form or content

18  of that request is.  Instead, what YSL is trying to do here is

19  they are trying to read a limitation from the written

20  description into the claims.  For instance, it requires asking

21  for a recording start time, but, in the claim, you actually get

22  back data relating to start time.

23          Let's talk about the prosecution history for a

24  second.  The prosecution history has a very high bar and the

25  reason -- the reason for this is simple.  You know, if you are

1  going to limit the patentee's right to exclude people from

2  practicing their invention, you need to have a clear disavowed

3  disclaimer in the prosecution history of what the disclaimer or

4  disavowal is not a part of the invention.  It has to be clear,

5  and it has to be unmistakable and not amenable to any other

6  interpretation.

7          So the prior art that YSL is -- the part of the

8  prosecution history that YSL is relying on, BoxCast

9  distinguished that prior art from not issuing any request in

10  that network.  It wasn't limited to reform or content of that

11  request.  It was just limited to whether or not a request was

12  even issued.

13          So I'm going to put up what --

14          Can I have the Elmo here for a second?

15          So this is one of the sections in the prosecution

16  history YSL relies upon for saying that BoxCast disclaimed

17  clearly and unmistakably any other type of request for the

18  request for recording start time.

19          First of all, I point out that all the statements

20  that he's pointing to are the statements of the examiner

21  themselves.  They can't be cleared or disavowed of claim scope

22  by the examiner.  The actual applicant has to make that

23  disclaimer.  And this is a summary by the examiner, and it even

24  says, Issue a request for a recording start time data, as

25  recited in claim 1.  Well, what was recited in claim 1 was data

1    relating to a recording start time, not a recording start time.

2              Oh.  Again, this is the examiner's statement of

3    reasons of allowance.  The examiner's statements don't create

4    any kind of disavowal or disclaimer of claim scope, and so what

5    he's relying upon here with the four different statements is

6    just literally a copy-and-paste error that happened throughout

7    the examiner's reasons for allowance.  Again, copy-and-paste

8    error.  It's all the -- it's all the examiner's statements.

9    It's not statements by the applicant.

10             I can't find it right now, but he went on to say that

11   it was the applicant's duty to comment on those statements in

12   the notice of allowance.  The applicant can do that.  He's

13   right.  They do comment on the notice of allowance.  But the

14   failure to do that or the failure to say something is not a

15   clear disclaimer of claim scope.  It's not an agreement that

16   you agree with everything that the examiner said.

17             And so you can't rely upon all the examiner's

18   statements and what they believed and what they -- and how they

19   interpreted the claims or the errors they made to limit the

20   patentee's right to exclude.  It doesn't rise to the level of a

21   disclaimer.  Thank you, Your Honor.

22             THE COURT:  Thank you.  Well, gosh, by the speed with

23   which you moved through that group, I almost feel like we

24   should keep going, but I think group C is one you think will

25   take longer?

1          MR. GARSSON:  Yes, Your Honor.

2          THE COURT:  Okay.  Well, why don't we stop now for an

3   hour, and, I mean, you are welcome to -- unlike a lot of

4   federal courthouses, we don't have a food court or anything

5   here.  Just court courts.  We do have a vending machine

6   downstairs on the first floor, and there's a Subway, a

7   Chick-Fil-A, a few places within a couple of blocks.  If you

8   have any question about that, let us know.  But we'll see you

9   at 1:00 o'clock.

10      [Recess.]

11          THE COURT:  All right.  Mr. McDougall, are we back to

12  you.

13          MR. MCDOUGAL:  Yeah, yeah.  Thank you, Your Honor.

14          I think we are on group C now, "recording start and

15  end time."  So here are the different claims terms that are

16  included in this group.  We have "recording start time,"

17  "recording end time," the word "time," "data relating to

18  recording start time/end time," and then the word "record."

19          You can see BoxCast's constructions.  We construed

20  the phrase "recording start time" as a time a user enters into

21  the system that determines when the recording process for

22  broadcasting a live event will begin or cease depending on the

23  start/end time.

24          We don't believe the word "time" needs to be limited

25  to a clock time.

1    "Data relating to a recording start time," we believe

2    that's just data that's associated with the recording start

3    time, and we don't believe there's any special meaning.

4         The plain meaning should apply to "record."

5         So I think we'll start with claim 12 of the patent.

6    I think this kind of tells us exactly what a recording start

7    time or end time is.  You see the "wherein" clause in purple.

8    It tells us what the "recording start time" is.  It says,

9    Wherein, the scheduling logic.  So that's the software or the

10   source code on the scheduling website.  It interfaces with the

11   user to allow the user to set a recording start time for a live

12   event.

13        So that tells me that the recording start time has to

14   be capable of being entered into the scheduling website.  If

15   you go on -- so that's point 1.

16        Point 2 is, if you look at the red or pink at the

17   bottom, it says based on the data relating to the recording

18   start time, the ABD autonomously transmits video data of the

19   live event.

20        So that tells me that the recording start time has to

21   be capable of being used to transmit video data.  So looking at

22   this claim, you have kind of two requirements.  It has to be

23   capable of being entered into a website; and, two, it has to be

24   capable of being used to transmit digital content.

25        So when you look -- because claim terms are normally

1    used consistently throughout the patent, if you use the term a

2    specific way in one claim, it can illuminate, kind of, the

3    meaning in another claim.

4           So when you go to claim 1, the "recording start time"

5    is used consistently as it is with claim 12.  If you look at

6    the issue step, it says that, in response to the request, you

7    receive data relating to a recording start time of a live event

8    from the first server in response to the request.

9           The first server is the scheduling website.  And so

10   you look at claim 12, and the recording start time had to be

11   entered into the scheduler website.  Here, the data relating to

12   that recording start time is now being sent to the broadcasting

13   device.  So it's consistent.

14          The second point from claim 12 is that the recording

15   start time is used to transmit -- or I'm sorry -- data relating

16   to the recording start time is used to transmit digital

17   content.  If you look down here, the digital content is being

18   transmitted based on the data relating to the recorded start

19   time.  So, again, consistently used between claim 1 and

20   claim 12.

21          And, you know, to sum up, this is consistent with how

22   our claim term is -- how we propose our construction is that

23   the time at which the user enters into the system determines

24   when the recording process for the broadcasting live event will

25   begin.

1       We don't believe that there's a special meaning for

2   the word "time."  It doesn't need to be a specific kind of

3   time, in a specific format, such as hours, days, minutes,

4   seconds.  I'm sorry.  Date, hour, minute, second.  The patent

5   discusses different types of time, you know, date and duration

6   of time.  They have time stamps, which, I believe, is a

7   specific format of clock time.  And so it's not limited to just

8   a specific clock time.

9       Even when you look at the figure of the patent here,

10  it's a picture of the scheduler website, and this is what the

11  content provider will receive when they want to schedule an

12  event.  You can put the date in and the start time and the

13  duration, and the duration shown as indefinite.

14      So I think the point here is that time has a broad

15  range of meanings, and there's nothing in the specification

16  that limits it to this specific clock time format that YSL is

17  proposing.

18      We talked before the reasons they are proposing this

19  construction, and, even, there was a federal circuit decision.

20  And, granted, it was a different claim construction issue in a

21  different case, but the federal circuit relied on facts that

22  are very similar in this case to find that "time" is actually

23  not limited to a clock time.  The specification in that case

24  did not require a certain format, similar to here, and the

25  prosecution history did not disavow any other type of format,

1    similar as we have here.

2            In that case, there was a computer device at issue,

3    and the Court said that "time" doesn't necessarily need to be a

4    clock time because the device can determine the time in any

5    number of formats.  It is a computer.  And so we thought that

6    case was instructive on this point.

7            We also don't believe there needs to be a specific

8    meaning to the term "recording."  So when the data from the

9    scheduler website is sent to the broadcasting device, the

10   broadcasting device acts on that data to begin the recording

11   process for broadcasting.

12           There's a number of different processes that could

13   happen.  It could start receiving the digital content.  It

14   could control the camera.  That's one of the embodiments in the

15   spec, although it's not in the claims, but it's one of the

16   things that could happen.

17           It could start encoding the digital content.  We

18   talked earlier about encoding.  It could request a broadcast

19   channel for the media channels.  That's one of the things the

20   broadcasting device can do.  It can store the digital content

21   maybe for a later upload.  It can also transmit that digital

22   content to the media server.  Any of these processes can be the

23   recording processes for broadcasting depending on the

24   embodiment.  It was not the intent for us to limit it to any

25   one of these processes.

1            This is why the claims, when you read through the

2    claims, they say we are transmitting based on the recording

3    start time or we're receiving after the recording start time.

4    We are not receiving at recording start time.  And we'll get

5    into that later.  That's an issue with the "receive" and

6    "transmit" group terms.

7            But it's kind of pertinent here because, once you say

8    it happens at the recording start time, you start limiting, you

9    are trying to limit which processes happen exactly at the time

10   of the event.  And that's unduly narrowing the path.  That

11   wasn't anything that was anticipated or intended by the

12   inventors during the prosecution of that.

13           So why is "recording" in the claim?  Well, the reason

14   is pretty simple.  One of the prior art references mirror a

15   claim we talked about, recording at one time and then

16   broadcasting at a much later time, kind of like a delayed

17   broadcasting.

18           And the start time in the claim was distinguished

19   from a viewing start time or, just to kind of make clear, that

20   the start time was actually when the recording process started,

21   not that it was the viewing process later on.  So it didn't

22   have anything to do with what "recording" meant.  It just meant

23   that it distinguished it from a viewing time versus a recording

24   time.

25           The data relating to a limitation is, in our mind,

Case 2:17-cv-00547-JB-MU   Doc# 74   Filed 01/18/22   Page 112 of 187   PageID# 1850

112

1    simply data associated with a recording start time.  That's all

2    it means.  It's the term "data relating to," added to the

3    recording start time.

4           The recording start time.  The data relating to

5    "recording start time," that limitation is, by definition,

6    broader than just the term "recording start time."  For

7    example, it can include the different types of scheduling

8    information.  A unique identifier could be related, data

9    related to recording start time.  The start date that's sent.

10   You know, the start time itself.  A duration.  It could be any

11   updates that are done to the schedule that are related to

12   recording start time, or it could be a confirmation that no

13   updates are even needed.  So the data can be any of those

14   things, and it's not limited to just recording start time.

15   It's not as broad as that.

16          We talked about claim differentiation earlier, and

17   here's where it comes up with data relating to a recording

18   start time.  So, in claim 14, which depends on claim 12, it

19   talks about the scheduling logic storing the data relating to a

20   recording start time in a schedule associated with the ABD.

21          So the scheduling website is storing that data

22   relating to a recording start time in the schedule that's

23   stored on the scheduling website.  Because that depends on

24   claim 12, it must be narrower than claim 12, and, ergo,

25   claim 12 includes data relating to a recording start time that

1    is not stored in the schedule.

2                So it doesn't have to be the heart of the schedule

3    data, the data relating to a recording start time.  So the data

4    relating to the schedule doesn't have to be part of the

5    schedule.  A claim differentiation confirms that.

6                Also, the term "data relating to" is exactly what it

7    says.  It's for us.  It's data associated with something.  YSL

8    is saying that it's data from which the ABD can determine

9    something.

10               And the reason they are arguing that is because they

11   say that data relating to it is a coined term or a term that

12   BoxCast came up with when it wrote its patent.

13               Well, the truth is, that's a simple common phrase

14   that other courts have found don't meet construction.  So here

15   are a couple of examples.  There's others where there's --

16   district courts that have found the term "data relating to" as

17   not required in any construction.  So you have storing data

18   relating to a variable annuity account and is storing

19   information relating to a variable annuity account.

20               Dynamically receiving data relating to a portion of a

21   particular thoroughfare in a route means receiving in real time

22   data relating to a portion of a particular thoroughfare in a

23   route.

24               And so it's not a coined term.  It's a term that's

25   often used in patents, and the courts have found that it

```
 1   doesn't meet construction.

 2            Repeatedly in the prosecution history, the patentee

 3   of BoxCast here has distinguished the prior art as not

 4   disclosing any data that -- that data that is used to control

 5   the broadcasting device.  They said that multiple times.

 6            So, you know, when you are distinguishing prior art

 7   on the basis that it doesn't control the broadcasting device,

 8   that means that the data that is being sent from the scheduling

 9   website to the broadcasting device is used to control.

10            So, on this slide, it shows that YSL's construction

11   actually conflict with the claims, and the reason is because

12   their construction of "recording start time," which is a time

13   at which the ABD starts recording the digital content received

14   from the digital content provided is completely divorced from

15   the live event.

16            In the claim, claim 12, you'll see, first, the user

17   sets the recording start time for a live event and then

18   contemporaneously with the live event and, based on the data

19   relating to the recording start time, it transmits the digital

20   content.

21            When we asked YSL's expert about this, he said that

22   he didn't think the recording start time had anything to do

23   with what's happening on the other side of the lens.  And so

24   whether it's a live event or just a blank wall, he thinks it's

25   immaterial.  The claims actually required it to be tied to a
```

```
 1   live event, and their construction doesn't take that into

 2   account.

 3          Their construction of "recording start time" and

 4   "data relating to recording start time" also conflict with the

 5   specification.  It completely ignores the scheduler website,

 6   which is described as being kind of the brain of the autonomous

 7   broadcasting system.  They do this by, you know, chopping up

 8   the term and kind of shifting it away from the scheduler

 9   website to the broadcasting device, as requiring the first time

10   the broadcasting device starts to save content.

11          YSL also confuses the issue providing the special

12   meanings to "time" and "recording."  Day, hour, minute, second

13   is nowhere found in the patent, and there's no specialized

14   definition for "recording."

15          Again, this is -- and I know we've had this slide up

16   before, but any disclaimer or disavowal in the prosecution

17   history has to be very clear and unmistakable.  And, again,

18   they take the prosecution history out of context.

19          The prior art was distinguished as not as receiving

20   any data relating to a schedule.  It was distinguished on the

21   fact that they weren't receiving any data relating to a

22   schedule, not based on clock time or instruction or any kind of

23   format of the data that is being sent.  I think we've made that

24   point before.

25          This slide represents that for such a simple phrase
```

1    as "data relating to a recording start time," there is a lot of

2    limitations trying to be added if you start piling on all the

3    definitions that YSL wants to set forth.  You start finding a

4    definition for that simple phrase being fairly long and

5    complicated.

6            And the reason for that is, the more limitations they

7    can add in the claim, the more hopeful they can get out of

8    infringement.  That's not a purpose of claims construction.

9    The purpose of claims construction is to simplify things, not

10   confuse them.

11           So, as we talked earlier, the purposes of these

12   constructions that YSL is setting forth are to exclude the

13   sending of varied data that they are terming as "instruction"

14   and, instead, trying to require that the date that's sent is

15   "time stamps" or, I guess, a format of clock time.

16           And, to be sure about this, their construction is

17   divorcing "recording start time" really from the entire

18   broadcasting process.  If you look at their construction of

19   "recording start time," it's a time at which -- yeah, the time

20   at which the ABD recording of the digital content received --

21   the time at which the ABD starts recording the digital content

22   received from the digital recording device.  And so when I say

23   they are divorcing it from the broadcasting process, what I

24   mean is when you turn on a camera, it starts sending digital

25   content to a broadcasting device.

1    Even if that broadcasting device isn't transmitting

2    that content, it will start saving it in what's called a buffer

3    on the device temporarily.  So sometimes in digital video

4    content, there will be interruptions in the screen.  So the

5    buffer will compress it to avoid those interruptions.  But that

6    buffer is always happening.  It's a temporary storage.  The

7    same thing happens with VCRs.  And you'll even hear them talk

8    about VCRs.  But when you hook your cable box up to a VCR, it

9    starts recording, by their definition, or starts temporarily

10   saving that content in a buffer, and that has nothing to do

11   with the recording process.

12   So their construction reads on just plugging in a

13   camera or plugging in your cable box to a VCR.  To be sure

14   about that, you look above that, Caramanis's, Dr. Caramanis's

15   rebuttal declaration, he said YSL's ChurchStreamer begins

16   receiving and recording video and audio data to a temporary

17   storage on a device as soon as it is turned on, and such

18   receiving and recording has nothing to do with the one and zero

19   signal received from YSL's server.  So it has nothing to do

20   with the broadcasting process, only that their devices do it.

21   And so that's, kind of, one of the reasons they are proposing

22   these constructions.  That's all I have.

23   THE COURT:  Okay.  Thank you.

24   MR. GARSSON:  Your Honor, Ross Garsson for YSL.  Let

25   me go to slide 37.  Okay.  We'll talk about group C now, the

1    "recording start time and end time."  If you'll go to the next

2    slide.  I'm first going to address three of the four terms for

3    this.  We can leave off the "data relating to" that we just

4    focused on, what the "recording start time" means, and what the

5    word "time" and "recording" mean with respect to the phrases

6    "recording start time" and "recording end time."

7            THE COURT:  Okay.

8            MR. GARSSON:  And, if you go to the next slide, the

9    primary disputes that we see for those terms is, first of all,

10   what device is doing the recording.

11           The second issue is whether the start time or end

12   time is -- go back -- is a particular clock time.

13           And the last is what does the word "recording" mean?

14   Is it saving?

15           So going to this first point.  What device is doing

16   the recording?  The ABD?  Your Honor, there are a number of

17   different devices that are within there being used here, not

18   all of which are recording at the same time.

19           So go to the next slide.  Okay?  And what's important

20   to realize is both experts absolutely agreed that the device

21   performing the recording was the ABD, the autonomous

22   broadcasting device.

23           And, in fact, go to the next slide.  Dr. Merat, when

24   he gave his opening declaration, before we ever even talked to

25   him, had passages in there that made it clear that a person of

1    ordinary skill -- what he said, a person of ordinary skill

2    would understand, based upon a '574 patent that is used in the

3    claims, that the recording is performed by the broadcasting

4    device.  And he even went further to say that he reviewed the

5    prosecution history of the '574 patent, which his words

6    confirmed that the recording was performed by the broadcasting

7    device.

8             Go to the next slide.  Dr. Caramanis, our expert,

9    agreed with him on this point, that a person of ordinary skill

10   would understand it is the ABD that's doing the recording, when

11   they are in the claims and when they are using the recording

12   start and end time.

13            Go to the next slide.  During his deposition,

14   Dr. Merat was asked a very, very simple question.  Okay?  And

15   just to make it clear on the record, quote, "Recording start

16   time is the time that the ABD starts to record as you

17   understand that term 'recording'; correct?"

18            Answer:  "Yes."

19            Can't be any clearer.

20            While there's a debate about "recording" and "time,"

21   what they mean in the context of this, the experts are dead-set

22   on this point.

23            Move on to the next slide.  So that makes it clear,

24   then, that the device that is doing it is the ABD.

25            All right.  Now, go down to the next slide.  And, if

```
1    you look at the constructions of what the two parties are

2    saying here, you'll see the difference between them is the ABD

3    doing the recording is lost.  It's not there in BoxCast's

4    construction.

5          Go to the next slide.  If you look at what YSL

6    proposed, it's the time at which the ABD starts or ends

7    recording, the digital content received from the digital

8    recording device.  That's very similar to what Dr. Merat agreed

9    to.  It's the time at which the ABD starts or ends to record.

10         We are just adding in the lack -- with regard to the

11   digital content, that's the content that's coming in from the

12   digital recording device.

13         Go to the next slide.  The BoxCast construction

14   removes the recording by the ABD completely.  It's talking

15   about the time a user enters into the system that determines

16   when the recording process for broadcasting a live event will

17   begin or cease.  It doesn't talk about the fact that the

18   recording is even done by the ABD in there.  They've lost it,

19   which is something even their own expert agreed to.

20         Go to the next slide.  And all these other terms that

21   they've put in there, Your Honor, is to hide that they are

22   removing the recording away from the ABD.  They've got this

23   thing in their definitions that it's some unspecified users

24   entering the time and the time is being entered into an

25   undefined system.
```

1    There is no system defined in claim 1 at all, but

2    they are taking it from claim 12.  They are trying to take

3    claim 12 and move it into claim 1.  And then the undefined

4    system determines when an undefined recording process will

5    begin and end.  So, now, this system makes a determination

6    that's not even required in the claim.

7         It raises some questions as to -- in a recording

8    start time if these limitations aren't met.  For example, Your

9    Honor, if it's something other than the user enters the time.

10   If somebody, instead, and by way of example, if I turn on a

11   device and it begins to record when I turn it on, is that a

12   recording start time?  I would say it is.  It's recording.

13   It's started.  It's the time at which it does it.

14        Why does it have to be a person entering this into a

15   system?  If we were arguing this and trying to add these

16   limitations into the claims, they undoubtedly would argue we

17   are reading limitations from the specifications into the claim.

18        Now, Your Honor, in their presentation they took

19   claim 12, and they basically -- give me a second here -- were

20   using claim 12 as kind of the template for their definition.

21        Can you please switch over to that Elmo real quickly.

22        Okay.  Your Honor, this is required, in this blue

23   highlighted one, that the scheduling logic interfaces with the

24   first user to allow the first user to set a recording start

25   time for a live event.  That's what's required.

1          It's not defining what the recording start time is.

2   It's just telling in this particular situation, this is how the

3   recording start time has to be entered into the system.  It

4   doesn't mean, Your Honor, that the recording start time

5   couldn't still be a recording start time if it was in a

6   different claim entered in a different way.

7          And, in fact, if you look at claim -- and let me pull

8   it up real quick here.  If you look at claim 22, another

9   independent claim, it says receiving and storing on a schedule

10  server data from a first user, the scheduling data comprising

11  data relating to a recording start time.

12         Yet again, now, it's requiring that the actual data

13  relating to it be saved on the server, but the point being is

14  that it's not the same thing.  The key word here is "recording

15  start time" has its own meaning.  The manner in which it's put

16  in the system is not a limitation, and it's confusing.

17         Can we switch back to the thing.

18         So all these limitations that they've added into

19  theirs are just hiding the fact that they are taking away the

20  plain meaning of what the "recording start time," which is the

21  time that the ABD begins to record.  It doesn't matter how it

22  gets put onto the system.  It doesn't matter in this case that

23  it's -- what it's using the time for, making a determination of

24  what's making this determination, and what the, quote,

25  recording process is.  It's just the recording start time.

1          Move on to the next slide.  Okay?  The

2   turning-on-the-camera argument, Your Honor, is a complete

3   strawman.  If I have a device -- and I think that pointing to a

4   device of ours, just pointing and saying what our point was, I

5   want to make sure this point is clear since they've raised it.

6          Let me be very clear about this just so you

7   understand what's going on here.  The device that we have, when

8   we manually turn it on, it begins to record.  It starts to

9   record then.  It's hooked up to a camera.  It's not the camera

10  coming on that started it to record.  It's that some person

11  manually turned the device on.

12         And our thing is, that's the recording start time.

13  It has nothing to do with any signals coming in.  The only way

14  it starts to record, it starts receiving information -- it has

15  nothing to do with turning on and off the camera.  It has

16  actually to do, in our case, with turning on the device.

17         Now, the camera, of course, had to, itself, be on

18  because, Your Honor, for the camera to be on is a necessary

19  thing for a recording to occur, but it's not sufficient in and

20  of itself.  It has to be connected, it has to be on, and then

21  the other device.

22         But the fact of the matter is, Your Honor, that the

23  recording start time is when the device begins to record seems

24  very simple to us, and we've continuously said that.  And the

25  zero and one coming in had nothing to do with the recording of

1   our device.  And what you'll see, Your Honor, if we flip back

2   to the slide, is that what they are trying to do is move away

3   from "recording" and trying to change it into -- the word

4   "recording" into "broadcasting" or something else.

5           If we move to the next slide.  Okay?  And I'm going

6   to get to that in a moment, but, now, we are going go to the

7   second issue, which is whether the start time and end time is a

8   particular clock time.  Okay?  And go down.  They come out and

9   say it has a plain and ordinary meaning, and we are saying that

10  it's a clock time.

11          Go to the next slide.  Your Honor, every time -- and

12  in the patent, when they are talking about "start time," they

13  also refer to "start date."  This repeats on and on throughout

14  the specification.  "Start time."  "Start date."  And start

15  time and a duration or an end date.

16          Go to the next slide.  Start time and start date.

17          Move on to the next slide.  More examples.  A

18  broadcast date and a start time.  A broadcast date and a start

19  time.

20          When you read the patent and it's coupled with a

21  date, the start time is a clock time because that's the only

22  thing natural.  If somebody asks you for the start time of this

23  hearing and you said November 15th at 9:00 o'clock, that's a

24  start time.

25          And, especially when you say there's a date with a

```
1    start time, that's the way the word "start time" was used

2    within this patent.  That's the way -- move down.  Then you

3    have -- and this is one similar to the one I showed earlier.

4    It shows that it's got a broadcast date and a start time.  It

5    also has a duration, which is indefinite, which, in my view,

6    Your Honor, means there's no end time.  It never stops;

7    therefore, there is no end time.

8            But, again, this is the date and time.  This is what

9    they disclosed repeatedly in the patent.  And that's the reason

10   why and that's what makes it different from the cases, the

11   federal circuit case that they pointed to.  This is how the

12   term is used in the patent.

13           Move down.  Okay?  And it's consistent with what the

14   definition of "time" is, just an ordinary everyday language.

15   Okay?  It's what we measure in minutes, hours, days, and years.

16           Move down.  Dr. Caramanis basically said that the

17   word "recording start time" is used just the way we've all used

18   it in different things, in VCRs.  We think that is very telling

19   because a VCR and a DVR -- a DVR is an encoder.  VCR, we all

20   knew what recording start time was.  When somebody said, do

21   that.  What's the recording start time entered into on a DVR.

22   Okay?  And we put in times.  We put in dates and times.  That's

23   what a recording start time is, and that's the word that they

24   chose.  They chose to put the word "recording start time" into

25   it.  The "time" they are talking about is an actual time.
```

1          Move down.  Now, this is a little confusing, and

2     we've asked them whether this is a typographical error.  And

3     they didn't change this, so it's confusing to us because, if

4     you read the highlighted portion over here, it says for

5     avoidance of doubt, BoxCast does believe the plain and ordinary

6     meaning of the term "time" is limited to a clock time.

7          We asked them whether they meant that or not, and

8     they said nothing back when we asked them if this was wrong.  I

9     think they disagree with it, but I want to point it out to the

10    Court that it's a bit confusing to us because I'm still trying

11    to figure out from the construction that they provided that a

12    person enters the time onto the system, what are they expecting

13    the person to be putting into the system if it's not a time, a

14    clock time?  Do they expect the person to type in "fall?"  I

15    don't understand what a person would be entering into.

16         So to say they are not -- so I'm not clear.  I think,

17    from their arguments they are making, that this is a typo.  But

18    I want to point out to the Court that it's a bit confusing

19    because it hasn't been changed.  We think it's wrong, but we

20    just want to point it out.

21         The next thing.  The time stamp argument is another

22    strawman.  We are not asking the Court to construe the term

23    "time" as a time stamp.  That is a form.  That could be a time

24    stamp.  It can be a clock time, but not all clock times will

25    always be in a time stamp.  It's an example of a clock time.

1   That doesn't mean that it's the only clock time we are talking

2   about.

3            And then the word "duration" is also kind of a red

4   herring because "duration" is not a time.  It's not giving you

5   a start time or an end time.  Okay?  On the other hand, Your

6   Honor, it is an example of data relating to a start time and

7   end time.  If you told us that the hearing was beginning at

8   9:00 o'clock and it was going to be over in three hours with no

9   breaks, it's over at twelve o'clock.  I can calculate that.

10  Okay?

11           And they do, if you read the patent, and they always

12  do it in the alternative.  "Start time" and "duration" or "end

13  time."  So they always kind of do it that way.

14           Moving on.  Okay?  And this definition of "time," how

15  it's used in the patent, is consistent with our proposed

16  construction.

17           Go down.  And so that's why we believe, Your Honor,

18  that it's when the word "start time" in this phrase is used,

19  it's a particular clock time because that's what they did.

20  And, as you'll hear later, Your Honor, they have -- that's the

21  reason why the term "data relating to" is there because that

22  expands it into something more than just a clock time.  It's

23  like another level of abstraction away.  It gives them some

24  wider things.

25           And so you have to first figure out what the

1    "recording start time" is, and then you can get to "data

2    relating to."  But if you make the "recording start time" the

3    broad thing, then it becomes impossible to begin to understand

4    what the "data relating to" is.  They themselves gave different

5    degrees of abstraction here.  That's the reason we are saying

6    that the "time" is a clock time, and then they get more because

7    of it, which, again, it distinguishes it over other things.

8            And, again, if you are looking at the context of just

9    normal people's use in the field, "recording start time" is

10   always something that people understood to be an actual time

11   from a watch when you were entering it.

12           Now, the last thing is, what does the word

13   "recording" mean?  And, Your Honor, I thought this should be a

14   fairly simple one because the act of recording is not

15   broadcasting.  It's saving something.

16           Okay.  So go to the next slide.  Okay.  They are

17   saying it has a plain and ordinary meaning.  So they are not

18   really giving a definition here.  We are just saying it's the

19   saving of digital content, just so we wouldn't be charged with

20   we're trying to say it's permanently recording or it's being

21   saved, you know, long-term.

22           We are basically saying the time at which it's being

23   saved is irrelevant.  The question is, when is it being -- is

24   it saving.  Okay?  Because if they want to make it permanent or

25   something else, that could change it, but it's not what the

1    word "recording" is.  "Recording" is being saved onto some

2    tangible medium for whatever period of time.

3           Go to the next slide.  You have to give a meaning to

4    the word "recording" in the term "recording start and end

5    time."  That was a term added during prosecution to overcome

6    some prior art rejections.  They are saying that the reason

7    why, what their intent was, all we are saying is, the important

8    thing is, it added the term in.  So it isn't just any start

9    time of anything.  It's the start time for recording, and you

10   have to give some meaning to that.

11          And if you don't give a meaning to the word

12   "recording," we are going to end up in a battle of the experts,

13   Your Honor, because what's going to happen is we are going to

14   get into a discussion of what the word "recording" means, and

15   you are going have experts get on the stand and do that.  And

16   that is the same thing that happened for a term that -- another

17   term that seems like it should be relatively straightforward,

18   "replacement telephone number," in the NobelBiz case, Your

19   Honor, in which the argument was the "replacement telephone

20   number" needs to be the telephone number that replaces the

21   original telephone number.

22          Okay?  The Court refused to give a construction and

23   just said it has its plain ordinary meaning.  Went through the

24   whole trial, went up to the federal circuit.  And the federal

25   circuit reversed, and it went all the way back down and said

1    you didn't give a construction.  And what happened is, both

2    sets of experts came in and gave a <u>Markman</u> hearing to the jury

3    to argue what the word "replacement telephone number" was, and

4    that goes all the way back to the <u>Markman</u> case, to begin with,

5    Your Honor.

6           The whole point of <u>Markman</u> was the jury has to be

7    informed, and it's the scope of it.  And this is exactly the

8    problem we are having here.  If replacement gets -- excuse

9    me -- not replacement -- but "recording," if we don't explain

10   what the scope of "recording" is and "recording start time,"

11   "recording end time," you are going to have the battle of the

12   experts.  You are going to have debate in front of the jury as

13   to what it means to be "recording" in front of the jury.

14          Go to the next slide.  You can even see BoxCast

15   morphing it in their brief.  Okay?  This is their definition.

16   This is what they said in their brief when they were doing

17   this.  The "recording start and end time" is simply the time

18   the user enters into the system that determines when the

19   broadcasting process happens for a live event.  They've already

20   changed the word to "broadcasting."  They are already starting

21   to try to move it away from "recording."  Okay?  And

22   "recording" is not the same as "broadcasting."

23          Next slide.  Okay?  They also in their expert -- he

24   was -- Dr. Merat was giving definitions of the word "recording"

25   as "capture."  It was capturing.  Then it was more like, oh,

```
 1   but it really starts to capture when it is streamed out.  So
 2   they are trying to move "recording" into something else than
 3   just that.  They are trying to move past "recording" into
 4   "transmitting."
 5          They chose the word "recording" to put in there.
 6   Again, we weren't there.  Again, they put the word "recording"
 7   in there.  It seems like a very straightforward thing.  Today
 8   is not the day to rewrite the claims to change it to
 9   "broadcasting," to change it.  It needs to be what we all
10   understand it is, we are recording.
11          Next slide.  If you turn to the patent, they use the
12   word "record" and "recording" exactly the way we -- exactly in
13   the context of saving, and they pointed out that the
14   broadcasting device can record the event at a higher quality
15   while streaming.  It's recording.
16          In fact, if you go to the next slide, it talks,
17   again, about it may record at a higher quality.  And that
18   higher quality that it records is later uploaded at a later
19   time after the streaming is done.
20          Again, "recording" is being used in its ordinary and
21   customary meaning, not to be broadcasting and not to be that,
22   and they are trying to change it away.
23          Move down.  Okay?  And that's consistent with what
24   the word "record" means.  Just the plain ordinary meaning of
25   the word "record."  Okay?  To cause sound, visual images, data,
```

1   et cetera, to be registered, i.e., saved, on something.  It's

2   the Merriam-Webster Dictionary, and they used it exactly that

3   way in the past.

4           Move down.  And, as we pointed out before, VCR

5   manuals "record" is something, again, Your Honor, that even the

6   DVR and VCR, they are on the other side.  We are still talking

7   about things that basically are saving digital content.  And so

8   when you are talking about "recording," it's a straightforward

9   term to think about.

10          Move on to the next slide.  Okay?  Dr. Caramanis, our

11  expert, basically came out and said it has the ordinary and

12  customary meaning, that it's basically saving, whether

13  temporarily or permanently.  He reads that in the context of

14  the '574 patent.  That was the context that was used.

15          Move down.  So, now, we have this.  All these things,

16  the ABD doing a recording, clock time, and then doing the

17  savings, all ends up into what our definition is.

18          Now, I'll move down to the data associated with --

19  excuse me -- "data relating to the recording start time."  Here

20  are the two constructions.  We'll move down to what the issue

21  on this is.  What does it mean to be "data relating to"?  Okay.

22          And we are trying to get some semblance as to what

23  "data relating to" is.  And, again, it's the next level of

24  abstraction.  Now, it's the easy set.  The actual clock time,

25  the time is, of course, data relating to.  So the question is,

```
1   what else is it?  You know, are we going to broaden it out?  We
2   don't disagree that it's broader.
3        Go to the next slide.  Okay?  The phrase "data
4   relating to" is not defined in the '574 patent.  They have
5   given us no guidance as to what it means to relate to it.  And
6   BoxCast's position says that the phrase is clean, clear on its
7   face.  And then what it does is it substitutes "associated
8   with" for "related to" in its construction.
9        If you go to the next slide, you'll see it.  This is
10  the definition.  Literally, they have swapped -- or changed,
11  swapped the words and moved "associated with" to it.  That
12  substitution isn't giving it -- that's not a definition, Your
13  Honor.  That's just changing one set of words for another that
14  are both very loose, and there's no guidance as to the scope as
15  to what this means.  I mean, they have distinguished between
16  the "recording start time" and the "data relating to."  We need
17  to have some guidance as to what this additional level of
18  abstraction is.
19       Now, Dr. Caramanis was basically saying that it's not
20  a phrase that one of ordinary skill would understand in this
21  field.  It's just too vague and practical.  So it's not a
22  coined term, Your Honor.  It's not something understood, which
23  means we need to look to the patent to get some guidance as to
24  what they mean by that.
25       Go to the next slide.  There are some disclosures in
```

1    the '574 patent that give us guidance as to what it is.  Okay.

2    And, although the word "data relating to" isn't there, what

3    this does make clear, throughout this specification, is that

4    the ABD determines the start time and the end time for an event

5    from the scheduling date.  So that's what the ABD does.  It

6    gets sent the scheduling data, and it then determines the start

7    time and end time.  And, as claim 22 showed, the scheduling

8    data includes the recording start time under that claim.

9         Move down, please.  Okay?  And the patent does

10   disclose one way that the ABD makes this determination, and

11   that's to take the start time and the duration and calculate an

12   end time by it.  I would say, Your Honor, that giving a

13   duration and a start time, that is relating to the end time

14   because you can calculate the end time frame.  And that's what

15   we are doing.

16        And again, remember, this is a device that is doing

17   stuff based upon this, based upon the data related to the

18   recording start time.  It needs to be able to figure out what

19   the clock time is.  It needs to know.  And so it's basing

20   things on this "data relating to" and making actions for it.

21   So that's why the ABD needs to be doing this.

22        Move to the next slide.  Okay.  Dr. Merat admitted

23   that those are the whole embodiment.  There are no other

24   embodiments that showed "data relating to," other than

25   "recording start time," "recording end time," and/or

1    "duration."  That's it when it comes to that.  So that's the

2    example they have of "data relating to" that we can identify

3    within the patent.

4            Move to the next slide.  Okay?  Now, this is a point

5    that's important here is that data relating to a recording

6    start time is not an instruction.  Telling something to do it

7    now is not -- because that's a point of distinction they raised

8    during prosecution.  They pointed at the <u>Brown</u> reference and

9    basically were saying that that doesn't -- that that is doing

10   an instruction.  Okay?  And they were -- they were responding

11   to the thing about the issuing the request to get the data

12   relating to a recording start time limitation.

13           The point being is, an instruction is not "data

14   relating to."  Now, we are not asking for a definition that

15   uses that word.  But the point is, Your Honor, if somebody has

16   a fence and there's something outside the fence and that's

17   where, you know, there's a bench that's located on the outside

18   of the fence and they basically say, "Oh, that bench is on the

19   outside of that fence."  Okay.  Fine.  But if we go back to

20   defining where the fence line is, we need to make sure that the

21   fence line doesn't now cover the bench.

22           And the problem -- next slide -- is their

23   construction leaves it open enough to get an instruction -- to

24   have instruction to the device to start streaming, to start

25   recording, whatever the instruction is.  But the instruction to

1    it is to begin recording.  It's broad enough to cover that.

2         And so the "associated with" doesn't address this

3    issue of an instruction not being a recording -- data relating

4    to a recording start and end time.  On the other hand, YSL's

5    construction does because it does require the ABD to make a

6    determination from that information.

7         And, again, this thing about attacking where the

8    camera is, that's just the strawman.  We are not requiring the

9    attachment of the camera.  That's, again, not anything to do

10   with this issue at all.

11        The next slide.  And, like I said, it provides some

12   differentiation between what a "recording start/end time" is

13   and what "data relating to" is because they used both phrases.

14   We need to know, first, what "recording start time" is and how

15   much broader it becomes.  And it's just hard for us to

16   understand BoxCast's constructions where that expansion is

17   because they are trying to make it as broad as possible.

18        And I think the thing also is, if the ABD can't

19   determine the recording start/end time, is it really data

20   related to it?  I mean, the computer is getting data relating

21   to it.  If it can't then determine what the recording start

22   time/end time is, how is it truly getting data relating to it?

23   This is a box.  That's a computer.  It's not a person.  It's

24   getting data related to it.  It must be data it can ascertain

25   what the recording start and end time is.

```
 1              Next slide.  So, from this, we basically get to the

 2    point of this -- that the data from which the ABD can determine

 3    recording start time.

 4              And just a couple last points to this, although I did

 5    cover most of them in my discussions.

 6              Can we switch over to the Elmo.  Thank you.

 7              They are coming out saying that our construction

 8    requires time stamps.  Your Honor, the word "time stamps" is

 9    nowhere to be found in ours and doesn't require time stamps.

10    But we don't disagree.  A time stamp is a time.  But it's not

11    the only form of time, but it can be.  But it's not the only

12    thing that it is.

13              Okay.  And, you know, they are saying that we are

14    excluding sending instructions because we assert they are

15    sending instructions.  Your Honor, that is a point of why we

16    think it's important.  If we are sitting on the bench that's

17    outside the boundary line and we can show that the bench is

18    outside of it, we think that's a pretty important thing.  So

19    yes, Your Honor, but that doesn't mean, though, that you

20    shouldn't interpret the claims consistent with the prosecution

21    history to keep the bench on the outside of the fence line.  So

22    that is what makes it a relevant question.

23              And this issue they have for a live event,

24    contemporaneous with a live event.  Your Honor, that's an

25    additional limitation.  It's a recording start time for a live
```

1   event.  It's not defining what the recording start time is.

2   That's an additional limitation.  They are trying to somehow

3   read something more into this thing.  It's the set or recording

4   start time for a live event.

5          We are going to get into a lot of discussions if we

6   start arguing when a live event starts because -- you know,

7   does that mean if we start recording 20 minutes before the

8   live -- quote, live event starts that that is not infringing at

9   this point because at the time we are beginning to record is

10  before the live event actually started?  So is that a recording

11  time?  It opens up a whole myriad of questions.  It's a rabbit

12  trail if we try to sit there and try to bring the live event

13  into the definition.  That really opens up a lot of things that

14  make this incredibly vague.

15         But the meaning of the word "recording start time" is

16  independent of the words "live event," and that's why they put

17  it in the claim in additional places.  So they shouldn't be

18  trying to move the definition of "live event" into "recording

19  start time."

20         Okay.  Then they talk about the "data relating to"

21  issue.  They pointed to claim 14.  This claim is basically

22  saying the scheduling logic stores the data relating to the

23  recording start time in a schedule associated with the ABD.

24         Apparently, you can claim differentiation.  Okay.

25  You can store the data relating to the start time in a schedule

```
 1   that's not associated with the ABD.  I mean, there's a lot of
 2   things that could be excluded from this.  This is requiring a
 3   specific thing, but it has -- it's not defining what the
 4   "recording start time" is.  It's defining how -- you know, how
 5   the storing is taking place of this thing, this recording start
 6   time.
 7            But, the claim differentiation, there's ways that you
 8   could practice claim 12 that isn't claim 14.  That's what claim
 9   differentiation is.  And, again, it doesn't necessarily mean,
10   Your Honor, that that is somehow changing the definition of
11   "recording start time" by claim differentiation.  This claim is
12   just directing when the recording start time is being saved or
13   how it's being associated with the ABD.  So that whole argument
14   is not really relevant to the issue of what "recording start
15   time" is.
16            And I think I mentioned this.  I just want to be
17   sure.  They are saying that the "recording" added to "start
18   time" is added to clarify the start time, clarifies the
19   recording process.  It was added.  No question about it.
20            And having added it, that's the word they chose.  And
21   what we want to say is, it shouldn't be morphed into something
22   other than "recording."  It shouldn't be morphed into
23   "broadcasting."  It shouldn't be morphed into "capturing."  It
24   needs to be kept into what it was saying.  Your Honor, there
25   are multiple devices that are happening here, and they are all
```

1    not beginning to record at the same time, and the streaming

2    that's taking place is not tied to the recording.  They are

3    trying to now move the word "recording" so that it ties to

4    "streaming."  And that's just not what "recording" means.

5    Thank you, Your Honor.

6              THE COURT:  All right.  Thank you.

7              MR. SAUNDERS:  Can I go to the presentation, please.

8              Thank you, Your Honor.  Michael Saunders for YSL.

9    I'm going to address the ABD receiving digital content terms

10   claims 1 through 6.

11             Give me the next slide, please.  So these are the

12   partys' constructions, again.  And, essentially, BoxCast's

13   construction is that this grammar of this phrase doesn't need

14   any construction other than the words that they are

15   independently addressing either, and YSL's construction is that

16   the "recording start time," it's then that the ABD autonomously

17   begins to receive digital content.

18             Next slide, please.  And so this is, really, the

19   primary dispute.  There's one of two ways of reading this, this

20   grammar and context of this claim.  And the first is whether

21   the claim includes an ABD that can just sit there and passively

22   receive digital content for an indefinite period of time.  And,

23   really, we are talking about quite a long period of time, as

24   Mr. Garsson noted.  We are talking about a device that may have

25   been turned on by a user and then receiving data for a long

1    period of time into its buffers, over days, weeks.

2            So whether the claim can include a device that just

3    sits there and then happens to passively receive that content

4    for an indefinite period of time, as long as it happens to keep

5    receiving it after the recording start time.  And, really, in

6    essence, Your Honor, we see this as a construction that has no

7    true action.  And that, in essence, is what we believe is the

8    implication of what happens when BoxCast's construction is

9    adopted.

10           The alternative is, if the claim requires an action

11   on or around the recording start time that actually causes the

12   ABD to begin receiving digital content, which is the position

13   that YSL is advocating.

14           Next slide.  And BoxCast has repeatedly criticized

15   YSL as to this claim construction dispute that YSL is somehow

16   rewriting the claims.  And we dispute that, Your Honor, because

17   this construction is not just about the word "receive."  And

18   that's why the charts that were filed with the Court, it is not

19   just the word "received" that is in our charts.  It's this

20   large highlighted language that we have here in claims 1 and 6

21   because it's a grammar issue and a context issue when you have

22   this initial phrase that says the ABD autonomously performs

23   these following actions and then one of those actions is

24   receiving digital content of the live event after the recording

25   start time.

1     And then there's really -- the issue is -- there's a

2     contention that if you interpret this in a way that allows a

3     device to basically keep -- stay on for an indefinite period of

4     time, you are rewriting the claim by removing the word "action"

5     from the claim, especially an action that has to be performed

6     autonomously.  And that's the basis of YSL's construction.

7     It's not rewriting the claims.

8           Next slide, please.  And, in here, what's really

9     notable is that both experts agree about this issue.  And

10    Dr. Caramanis, in his report, paragraph 87, he explains his

11    position.  He explained that he agreed with YSL's construction.

12    And he explained in paragraph 92 of his report, in declaration

13    of that, it was based on his understanding of this fact that

14    you have these actions here and that if you don't reflect the

15    action as actually causing something to occur, then you are

16    taking the action out of the claim.

17          So if you go to the next slide, what was really

18    surprising is that at the deposition of BoxCast's expert,

19    Dr. Merat, we asked him -- because he had a supplemental

20    declaration that said that I think you have a surplusage that

21    you are adding to this limitation that begins there.  We asked

22    him at his deposition, at paragraph 87 that I just showed on

23    the slide, where Dr. Caramanis says that he agrees with YSL's

24    construction.  I asked him at his deposition, how is that, in

25    your view, unduly limiting the scope of the claims?  How is

```
1   adding the word "begins" unduly adding to the scope of the
2   claims.  And, after a very long time, he says, I guess I'm not
3   seeing the difference because I view "receiving" as
4   "beginning."
5           So BoxCast's own expert had no problem with that.  In
6   fact, I asked him later on in his deposition, you can't think
7   of anything that's within the scope of the claims and is not
8   encompassed by Dr. Caramanis's opinions?  So there's nothing
9   that would fall within the claims as BoxCast's expert
10  interpreted versus how Dr. Caramanis interpreted it.
11          And what did BoxCast's expert say?  I don't think it
12  says anything -- when he says "anything," he is referring to
13  Dr. Caramanis's opinion -- that isn't in the definition of
14  "receiving."
15          And then, just to make it perfectly clear, I asked
16  him, So basically having the word "begins" in Dr. Caramanis's
17  construction doesn't hurt anything?
18          And he says, I would agree with that.
19          So this is a case where clearly both experts agree
20  that this structure and grammar of these claims requires that
21  it begins.  And then, really, their expert's only complaint is
22  he thought we didn't even need it because it was already what
23  he implicitly understood the claim already had in it.
24          Next slide, please.  And this is not just both
25  experts supporting this.  This is also how the specification
```

1   describes the bias.  I'm referring again to this as the

2   power-on issue.  This is not an issue where YSL is attempting

3   to inject a limitation into the claim, into the construction.

4   First of all, "power on" is not in the construction at all.  We

5   don't mention "power" at all in YSL's proposed construction.

6          But what the "power on" is illustrative of is that

7   time and time again in the specification of the '574 patent,

8   BoxCast described the patent as saying that the broadcasting

9   device powers on the camera or video acquisition device before

10  it starts transmitting.  And, when I say it's "transmitting," I

11  mean before the ABD or broadcasting device starts transmitting.

12         Of course, it makes sense.  If you are going to have

13  a camera that isn't always on, you need to have the camera turn

14  on before the broadcasting device can start receiving data from

15  the camera and encoding that data and then transmitting that

16  data.  It's just a required part.

17         And what was particularly novel is, they are talking

18  about doing this over and over again as "turning on," as a

19  point of distinction.  And that's -- that is instructive for

20  how you should interpret the grammar of the phrase that you

21  have an autonomously performed action because this is an

22  example of what the patentees thought when they talked about

23  performing an action causing it to receive.  It wasn't

24  receiving all the time.  It was receiving after performing an

25  action of turning on the ABD.

1      Could there be other ways of performing an action to

2  cause the claim -- to cause the ABD to start receiving from the

3  camera?  Of course.  There could be many others ways.  That is

4  the one they disclosed, though, and the fact that they didn't

5  disclose other ways certainly doesn't change the outcome.

6      The next slide, please.  Another important point on

7  this issue is -- actually, before I continue with that, I do

8  want to address one point that was in BoxCast's responsive

9  brief.

10     If I can get the Elmo, please.

11     So one argument that BoxCast made in its brief, he

12 said that the '574 patent discloses an always-live camera.  And

13 what's notable is the phrase "always live" does not appear in

14 the '574 patent at all.  It appears in the prosecution history

15 when they are distinguishing the prior art.  It doesn't appear

16 in the '574 patent.

17     So what they are talking about is the disclosure in

18 column 9 of the '574 patent.  What it says is there's an

19 exemplary embodiment where the video acquisition device is a

20 digital camera capable of capturing audio and video data.  This

21 says that the video acquisition device interfaces with the

22 broadcasting device to transfer data acquired by the video

23 acquisition device to the broadcasting device.

24     It seems like common sense.  That seems exactly

25 what's in the patent.  So what they are really focused is the

1    next sentence there at column 9, starting at line 62.  It says

2    in one exemplary embodiment, a USB cable is used to connect the

3    video acquisition device, 210, and the broadcasting device,

4    208, so the data can be transferred from the video acquisition

5    device to the broadcasting device.

6              Again, that is not a disclosure, one way or another,

7    of an always-live camera.  That is saying a USB cable could be

8    connected between the two things.  It does not say that the

9    broadcasting device cannot no longer control a camera because

10   it's entirely possible and consistent with these disclosures

11   that the functionality of controlling the camera, turning it on

12   and off, it could be inside or outside of the ABD.  In fact,

13   the patent does say in sections that the ABD's functionality

14   for controlling the power can be within or without the patent.

15             So there's nothing in the specification anywhere that

16   talks about or discloses an always-live camera where the ABD is

17   always receiving content from the camera.

18             Go back to the picture, please.  So, next, I'll turn

19   to the prosecution history.  Now, we submit that this is pretty

20   clear, that there was a disclosure of a web cam.  It seems

21   incredibly apparent to us that a web cam, in a prior art

22   reference, is going to be the same thing as the camera that is

23   in the -- for the video acquisition device that's in the claims

24   here.

25             And what the patentee said to the patent office in

1  distinguishing Mukerji is that Mukerji recognizes that the web

2  cam is always a live device, i.e., one that transmits from the

3  moment the subscriber turns it on, in response to any remote

4  scheduling logic.

5          I just want to briefly address that BoxCast has made

6  the point that this really isn't about receiving the receiving

7  limitation.  They made a couple of points about that.  One of

8  which they said, well, at the time that this claim was pending,

9  that the then-pending claim was focusing on transmitting.  I

10 think that that is ignoring, really, the full argument they are

11 making here.

12         So I just want to put up the actual larger section

13 from the file.

14         If I could have the Elmo again.

15         So this is Docket No. 58-24.  It's the prosecution

16 history on page YSL100-232.  You see in this section they are

17 beginning -- sorry.  Let me turn to a different page.

18         Let's go to page 230.  And they are having a

19 discussion here about the Mukerji reference.  And it talks

20 about Mukerji discloses provisioning of personal television

21 channels, which are used to distribute media content to the

22 subscriber.  They argue that Mukerji fails to disclose or

23 suggest that a first user schedules a start time for a live

24 event such that a remote broadcasting device, autonomously

25 broadcasts a live video stream of the event.

1           And they go on to say that the -- they are describing

2    in Mukerji, the media content represents live feeds as noted on

3    part 4 of the office action are not acquired by a video

4    acquisition device at an event as of a start time specified by

5    a first user.

6           So, again, they are equating "video acquisition

7    device" with the web cam they go on to talk about.  So they

8    say, for example, the live web cam feed disclosed in

9    paragraph 58 of Mukerji.  So the disclosure is linking the

10   video acquisition device to the live web cam feed.  And that's

11   significant because the claim recites that the ABD is receiving

12   from the camera or video acquisition device and then the ABD is

13   transmitting out to either media servers or some servers.

14          And so what they are distinguishing Mukerji as always

15   having a live device.  They are distinguishing that, you know,

16   the live web cam feed disclosed in paragraph 58 of Mukerji is a

17   local device that is directly controlled by the subscriber and,

18   as such, does not require any remote scheduling logic.  It

19   says, to the contrary, Mukerji recognizes that the web cam is

20   an always-live device, i.e., one that transmits from the moment

21   the subscriber turns it on versus in response to any remote

22   scheduling logic.

23          So we know they can't be talking about the limitation

24   that a broadcast device is transmitting because we see earlier

25   on, they are talking about a video acquisition device and then

1    saying, "for example."  So, clearly, this is a discussion the

2    prosecution is talking about, the web cam device.

3           So the argument is that the web cam device of Mukerji

4    is always on; and, therefore, it's both not having a receiving

5    or transmitting happening in Mukerji.  Neither of those are

6    happening in Mukerji because, of course, you can't transmit

7    unless you've already -- the ABD cannot transmit to servers

8    until you've received it from a camera.

9           So when they are distinguishing Mukerji, they are

10   distinguishing Mukerji because this always-live device is

11   relevant to both limitations.  They are saying, yes, okay, our

12   claims say ABD transmitting, and this video acquisition device,

13   the web cam, is always transmitting to the ABD.

14          Well, that doesn't match up unless you understand

15   they are saying both times are happening at the same time and

16   that because both those times happen at the same time in

17   Mukerji, it's always in how they determine -- Mukerji's

18   always-live device doesn't satisfy either.

19          So the fact that it is talking about a video

20   acquisition device and giving the web cam as an example is

21   relevant to both.  The fact that the claim at the time that it

22   was pending is relevant.

23          The key focus here is what is the public notice

24   function of the prosecution history here.  The public

25   understood that they were disclaiming always-live web cams.

```
1   That means you cannot have a web cam keep sending to an ABD all
2   the time.  How it gets reflected in the claims is a secondary
3   issue.  Once the term has been disclaimed, that is the key
4   focus, and then the disclaimer has to be clear -- or clearly
5   rescinded in later prosecution to change that statement that
6   they are distinguishing a video acquisition device being always
7   live.
8           If I could go to the slide again.  Next slide,
9   please.  Another point that BoxCast tries to distinguish the
10  prosecution history.  They are pointing out that the claims are
11  different, and they are invoking case law about the difference
12  in claims.  So I just want to put up these are the two claims.
13  This smaller box that starts on the left is the section of the
14  claim then pending in the prosecution history of the '275
15  patent and the bottom right are the relevant claim 1 of the
16  '574.
17          What I submit to, Your Honor, is that these do not
18  have the same wording in that they are not identically worded,
19  but they clearly relate to the same subject matter.
20          And if we go to the next slide, what I can tell you,
21  Your Honor, is that that has been found sufficient by the
22  federal circuit in a number of cases where they have held that
23  you do not have to have identical language to have a
24  prosecution disclaimer from an earlier patent, like the '275
25  patent, extend to a later patent, like the '574.
```

1          In fact, there can be quite significant differences.

2     In the Hakim case we cite here, 479 F.3d 1313, a disclaimer

3     regarding to the word "slit" was extended to the word "opening"

4     in a later patent.  Really, what the Hakim said was that the

5     key question identified is whether the prosecution history was

6     sufficiently clear to inform the examiner that the previous

7     disclaimer, and the prior art was made to avoid, may need to be

8     revisited.

9          So BoxCast didn't go back in the '574 patent

10    prosecution to say we are rescinding our disclaimer about

11    always-live devices.  That was a working understanding that the

12    examiner had when the continuation -- because the continuation

13    issued the '574 came later, and the understanding and

14    presumption is going to be that all of those things that you

15    said before are going to be the same, unless it's really clear

16    to me that they are not.

17         Now, sometimes it can be really clear because the

18    limitation, as a whole, there's nothing colorably like it.

19    That's not the case here before the Court.  We are still

20    relating to "transmitting."  Yes, before, it had

21    "automatically," and it changed it to "autonomously."

22    Certainly, their position, that's the same thing.  And the

23    other subject matters are mainly issues of wording.

24         Last thing, the Ormco case, 498 F.3d 1307.  It says

25    instead of having identical language, they key is it was the

```
1   same subject matter being in the earlier patent extends a

2   disclaimer into the later patent's prosecution history.

3           And what's notable there is they had a disclaimer for

4   the phrase "deriving with the computer tooth finish positions."

5   And they apply that disclaimer to innumerous other patents with

6   numerous other claim terms, including the claim term that said

7   "determining treatment positions of the teeth," and they said

8   that that had to be automatic, despite the fact that the word

9   "computer" wasn't in there.

10          So they are literally taking a phrase in a disclaimer

11  based on a computer and applying it to a term that didn't have

12  the word "computer" in it.  So that's an example.  When the

13  federal circuit says that that has to be the same limitation,

14  there is no requirement that the language be identical.

15          Next slide, please.  And that's all I have on the

16  receiving limitations, Your Honor.  If you have any questions.

17          THE COURT:  Okay.

18          MR. MCDOUGAL:  Your Honor, I was going to do both the

19  next two groups kind of together.

20          THE COURT:  Then you go first for the next one.

21          MR. MCDOUGAL:  Yeah.

22          THE COURT:  I thought they just go together.  Okay.

23          MR. MCDOUGAL:  There is one clarification.

24  Mr. Garsson made a point that we had a typo, and I just want to

25  confirm that is a typo.  We do not agree with your
```

1    construction.  I thought that was obvious.

2            THE COURT:  I was just going out on a limb and

3    guessing that maybe you didn't agree.

4            MR. GARSSON:  Yeah.  I just wanted -- it is strange

5    because it is their contention that they are submitting, and we

6    thought that the record should be clear.

7            MR. MCDOUGAL:  Yeah.

8            THE COURT:  Okay.  I appreciate it.

9            MR. MCDOUGAL:  All right.  So the terms "receive" and

10   "transmit," there's a number of them here.  There's seven

11   different terms.  And we think that the dispute with these

12   terms really boils down to three different ways in which they

13   are trying to change the claim language.  The claim language

14   says throughout the seven different limitations or claim terms

15   that you receive something after the recording start time.

16           And then if you go over and look at YSL's

17   construction, they are trying to say whatever you are

18   receiving, which would be digital content from the camera, that

19   digital content will begin to receive that digital content at

20   the start time.  So changing the word "after" to "begins to

21   receive at."

22           There are also in the claims the media servers are

23   receiving the digital content from the broadcasting device

24   based on the "recording start time," and they are changing that

25   to "receiving that at the recording start time."

1          The same with the transmission of digital content

2   from the broadcasting device based on the recording start time.

3   Then they are trying to say it has to be transmitted at the

4   recording start time.  So you see a pattern.  They are trying

5   to say a lot of things have to happen at the recording start

6   time.  And they are trying to say that you have to begin to

7   receive at the recording start time the digital content from

8   the camera, which brings in this whole turning-on-the-camera

9   issue, which we will talk about.

10         We have a position that these changes don't need to

11  occur, and these limitations don't really need to be construed

12  because, when you look at the limitations and you look at all

13  the terms that we have already talked about, it's a lot of

14  these limitations.

15         So we've already talked about "autonomous," "ABD,"

16  "recording start time," "time," "recording," "data relating to

17  start time."  And, when you look at these limitations, what

18  else is left to construe?  Well, it comes down to that they are

19  trying to change when the receiving or transmission is

20  occurring.

21         So go back to that figure I showed at the beginning

22  of the day.  I tried to indicate for the Court here why --

23  what's kind of going on.  So in red is YSL's construction, and

24  in green is what the claim language says.

25         So you see the broadcasting device is receiving

```
 1  digital content from the camera, and that little temporary
 2  storage, the buffer that everybody has been talking about, and
 3  the term in the claim says that the broadcasting device
 4  receives that digital content after the recording start time.
 5          And, instead of after, they are trying to say that it
 6  needs to begin receiving the -- receiving the digital content
 7  at the recording start time.
 8          He also says that the broadcasting device transmits
 9  digital content to the media servers at the recording start
10  time instead of based on the recording start time and then also
11  that the media servers receive the transmission of digital
12  content at the recording start time, rather than based on it.
13          What this does is it makes kind of a physical
14  impossibility where the broadcasting device and the media
15  servers -- there's a bunch of things happening all at once.
16  This is a process.  It starts with the recording device -- or
17  I'm sorry.  It starts with the camera, and then that content is
18  to be processed by the broadcasting device and then sent to the
19  media servers.  So all this stuff cannot happen at the same
20  time.  So if you look at all their constructions in total, it
21  creates a physical impossibility that cannot happen.  So, ergo,
22  nobody can infringe the claim.
23          So we talked a little bit about turning on the
24  camera.  If you look at Dr. Caramanis in his construction, it
25  talks about -- he talks about the recording starts when the
```

1   ABD's internal clock reaches the recording start time stored on

2   the ABD.  So this is the ABD is what starts the recording

3   process, the recording start time.

4           But, if you go to his deposition, he says pretty

5   explicitly that "My definition of 'recording start time' is

6   when the data first starts going from the camera to the ABD."

7   So, if we go back to the figure, if the ABD is the one that

8   starts the recording process at the recording start time but

9   also, at the recording start time, the content is coming from

10  the camera to the buffer that that means that the broadcasting

11  device actually has to be the one that turns on the camera in

12  order to send the content to the buffer so the content begins

13  receiving -- or the ABD begins receiving the digital content at

14  the recording start time.

15          I know this can be confusing, but they are trying to

16  limit this to an always -- or trying to exclude an always-live

17  camera that might be on.  We'll talk a little bit about the

18  always-live camera.

19          So we questioned Dr. Caramanis on his reasoning here

20  quite a bit during his deposition.  And, after 25 minutes, he

21  could not think of any way to make that construction work

22  without adding a limitation that requires turning on a camera

23  at the recording start time.

24          We talked about the specification of the patent.  It

25  involves or includes two different camera embodiments, and

1    Mr. Saunders talked a little bit about his USB always-live

2    camera.  What he forgot to mention is that the USB actually

3    provides power to the camera so it can be always on.  That's

4    how a USB camera works.  And so, even though it doesn't use the

5    term "always live," it is an always-live camera.

6            The second one is the automatic power controller

7    camera, which is an embodiment where the ABD can't turn on the

8    camera.  That limitation is not in the claims.  It's not

9    limited to turning on the camera, and our patent and our claims

10   cover the embodiment where there is an always-live camera.

11           So YSL recognized that having all these things happen

12   at the same time with the construction doesn't work.  In fact,

13   it said in its response brief that YSL would not object to

14   including in the construction an express statement that

15   momentary delays inherent to the network transmission are not

16   outside of the scope of the claims.  Meaning, that the

17   receiving and the transmitting steps could happen -- there

18   could be minor delays that are inherent in the system.

19           The problem is that that fix that they are going to

20   require that the camera is going to be turned on by the ABD

21   when it explicitly hadn't been included in their claim.  It's

22   never been included in the claim since the beginning of

23   prosecution.

24           In fact, the prosecution history that Mr. Saunders

25   went through was talking about a different claim and a

```
 1    different patent, and that patent actually included a
 2    limitation that required a video acquisition device to
 3    automatically begin acquiring video data of the event.  So that
 4    video acquisition device automatically begins acquiring video
 5    data.  That limitation is not found in any of the claims of the
 6    '574 patent.  He's admitted that during his thing, and it's not
 7    even the same subject matter.  There's nothing about the video
 8    acquisition device providing any kind of data content in the
 9    '574 patent -- in the claims of the '574 patent.
10           And so this statement in YSL's brief that we are
11    distinguishing, "always transmitting web cam," was, in fact, a
12    disavowal of the ABD was always receiving.  That statement,
13    he's referring to a statement that was made in the first patent
14    relating to a different claim and talking about a limitation
15    that is not the same subject matter as the '574 patent.  So
16    it's kind of disingenuous that you would try to argue that.
17           So I'm not sure how you get a disavowal from that,
18    and if we are, in fact, disavowed anything, I guess, that's an
19    admission that it was in our patent to begin with.  So the USB
20    camera would be an always-live camera.  That said, this is --
21    this prosecution history is way out of context, and it's not
22    relevant.
23           THE COURT:  Okay.
24           MR. SAUNDERS:  Your Honor, Mike Saunders for YSL.
25           I'll address the ABD transmitting digital content
```

1    terms now.  And, Your Honor, I actually think this is a much

2    simpler -- although it's very related to the ABD receiving

3    digital content terms, in a sense, this is much simpler.

4            Can I go to the next slide, please.  So, again,

5    there's a large number of terms here that we are asking to be

6    construed, but there is the common language to all of them that

7    there's this transmission that is based on data relating to

8    recording start time.  And you can see a number of them.  It's

9    talking about it's being autonomously performed in an action,

10   although not all of them.

11           Can we go to the next slide, please.  The key

12   dispute, really, here is whether the ABD must actually start

13   and stop transmitting at the recording start or end time for

14   the live event.  And that -- and I think it may have gotten

15   skipped over in the briefing.  It's a simple concept.

16           Can we go to the next slide, please.  Again, all the

17   arguments about ABD receiving apply, but this is just common

18   sense.  The claims recite that the recording start and end time

19   is of or for the live event.  So, yes, this still has to be

20   about we have an event that is both getting recorded and

21   getting transmitted.

22           And the whole purpose of the patent is to be

23   broadcasting audio and video of this live event.  So why would

24   there be transmitting at any time before the live event or

25   after the live event?  That start time is what is defining

1    that.  So the fact that that basic concept should be reflected

2    in the claims is because it's the whole purpose of this patent.

3    It's transmitting while the live event is ongoing.  And there

4    is absolutely no disclosure in the specification of an ABD

5    transmitting based on a live event other than the recording

6    start times and end times of that event.

7              Could we go to the next slide, please.  And if it

8    wasn't clear from just common sense, figure 16B of the patent,

9    again, makes this perfectly clear.  In block 16-20, the node,

10   which we've already established is the broadcasting device, it

11   asks is this time to start a broadcast.  And then, if the

12   answer is yes, it proceeds down to 16-22 and says the node

13   starts broadcasting the specified event.  This is unambiguous

14   saying that the ABD is broadcasting at -- it's starting the

15   broadcast, starting the transmission at the start time.

16             And then, similarly, for the claims that recite

17   stopping or ceasing the transmission, again, 16-24 and 16-32

18   are absolutely clear.  The ABD is asking itself is this time to

19   stop the broadcast.  And, if it is, it stops the broadcast.

20             So figure 16B is absolutely clear.  The starting and

21   stopping of the broadcast happens at the start time, and the

22   stopping happens at the end time.  There's no dispute about

23   that and it's consistent, as I said, with the whole goal of the

24   patent.

25             If we can go to the next slide, please.  And if there

```
 1    was any doubt about that, the prosecution history, as it's
 2    termed, made it absolutely crystal clear.  What's notable is we
 3    cited this portion of the prosecution history in our opening
 4    briefs on the ABD transmitting terms, and I don't believe
 5    BoxCast responded to it at all.  This is when a portion of the
 6    prosecution history was where BoxCast was just explaining what
 7    its invention is.
 8              And it says, in unambiguous terms, that the ABD will
 9    autonomously begin and end the transmission at the scheduled
10    recording time.  That means at the scheduled recording start
11    time, it's going to begin and, at the scheduled recording end
12    time, it's going to end.  There is absolutely no ambiguity here
13    that's even arguable.  They said that they have not put that in
14    any argument that this is not a clear disclaimer that requires
15    that the ABD has to begin broadcast transmission at the
16    recording start time and end broadcasting transmission at the
17    end time.
18              Go to the next slide, please.  I just want to address
19    a couple of points that counsel raised in his argument.  If we
20    could go to the next one, please.  So this is a figure that --
21    obviously, BoxCast created this figure.  It's not in the patent
22    at all, and BoxCast put it in its opening claim construction
23    brief for this hearing.
24              And the argument is that these constructions are
25    physically impossible.  And, Your Honor, we submit, again, this
```

1    is another strawman.  In YSL's noninfringement constructions,

2    there's never an argument that infringement is impossible

3    because these claims require all these things to happen at the

4    same time.  This is an issue that's been wholly created by

5    BoxCast.  And, really, they haven't submitted anything that

6    actually shows that these things were physically impossible.

7          For example, we have a camera that is beginning

8    receiving digital content and an ABD that begins transmitting

9    content.  What is impossible about that happening at the same

10   time?  They are, in essence, saying that a few microseconds or

11   nanoseconds of the data traveling from one place to the other

12   is the basis of the claims, of our claim construction being

13   incorrect.

14         And, similarly, here, their argument is that we have

15   a transmission from the Internet, and this really is only about

16   one term.  It's claim 22, where it's worded in a different way,

17   so it's worded in the perspective of receiving the digital

18   content.  Their point is, well, you know, maybe less than a

19   second of time, as is stated, is traveling over the Internet,

20   that that makes this claim physically impossible.

21         So, again, this is an issue that was wholly created

22   by BoxCast, and that's why we said in our briefs, you know, if

23   there's any -- if there's any ambiguity here, that's not what

24   we are arguing.  We are not requiring that those events happen

25   with the level of precision of less than a second.  That's

1    never been something that YSL has argued.

2              And they put this up on the presentation.  They

3    quoted this position, and, apparently, there's -- there hasn't

4    been any response to say why this is inadequate for resolving

5    their concern.  Putting in the claim construction that an

6    express statement that the momentary delays inherent to the

7    network transmission are not outside the scope of the claim.

8              So there's no dispute that this actually fixes the

9    impossibility issue that they raise.  Counsel's only point in

10   response was this argument, once again, about turning on a

11   camera.  And I've addressed it with the receiving claim --

12   receiving claim limitation, but that has absolutely nothing to

13   do with the transmission.

14             The transmission happens already after the ABD has

15   gotten the data from the camera.  That is impossible for the

16   ABD to transmit to the servers unless it has already received

17   it from the camera.

18             So this issue that they have created about turning on

19   a camera and whether they are narrowing the claims to the

20   preferred embodiment, we disagree with it as to the ABD

21   receiving it, but it is completely irrelevant to the ABD

22   transmitting.  By necessity, it is impossible for the

23   broadcasting device to start transmitting something that it

24   has not yet received.

25             And, for that reason, since this argument has no

```
1    applicability and the fact that BoxCast doesn't have any

2    dispute that this is -- that our proposal to having an express

3    statement fixes the issue as to physical impossibility, well

4    then, there's nothing that's wrong with YSL's construction for

5    these transmission terms if that is added to address the

6    concern that BoxCast has; and, therefore, it's entirely

7    appropriate to adopt YSL's construction.

8              THE COURT:  Just on the issue of network lags.  Is

9    that, I don't know, a matter of general understanding?  That

10   some servers, especially, you know, maybe if you have one that

11   has more resources or more going on is maybe going to establish

12   or experience a lag?

13             MR. SAUNDERS:  I would say, Your Honor, that the idea

14   that it takes time to transmit something over the Internet

15   certainly -- which is what -- I mean, really, that's the one

16   they focused on the most, which only comes up in claim 22,

17   which is worded, as you know, the server is receiving it based

18   on the start time.  That's when it comes in the most.

19             Okay.  Yeah, there's no dispute.  It takes time to

20   send things over the Internet.  That's obviously not a focus of

21   their patent at all, and that's why it's not reflected in their

22   own language of their specification.

23             The same thing is, you know, technically, if you are

24   talking about from a camera to the ABD, yeah, I mean, you have

25   a USB cable, and, you know, those electrons take some nonzero
```

1    amount of time to get over there.  That's a very short amount

2    of time.  And I say it has no relevance at all to this case,

3    and they certainly didn't think it has any relevance in the

4    patent because they didn't talk about it.

5            But, if that's a concern, you know, certainly this,

6    you know, momentary delay is inherent to the network

7    transmission or the transmission between the camera and the ABD

8    is the same issue.  There's no dispute.  There's just a lot of

9    physics that takes time to transmit information.

10           THE COURT:  Okay.

11           MR. SAUNDERS:  Thank you, Your Honor.

12           THE COURT:  Yes.  Thank you.

13           MR. GARSSON:  Your Honor, Ross Garsson for YSL.

14           Home stretch.  Final term that we are up to, Your

15   Honor.  Last term has to do with the term "firewall" in

16   claim 12.

17           And, if you turn to the next slide, this is the

18   partys' constructions.  And YSL's construction is that the

19   claim is indefinite, and BoxCast is coming out and saying,

20   well, the fact that the term "firewall," as referenced earlier

21   in the claim, does not render it indefinite, but to the fact

22   that it is not ascertainable.  This Court should exercise its

23   power to change one of the terms from "firewall" to "router" in

24   the claim.  So we are going to be talking about yet another

25   typo, which seems to be the theme for today's discussion.

1           The next slide, please.  The two primary issues,

2    then, that we are going -- or disputes we are going to be

3    talking about is whether the claim is indefinite if not

4    connected correctly.  And the second issue is whether the term

5    is amenable to judicial correction because, as you'll hear and

6    as the briefing has explained, not all mistakes in patents can

7    be corrected in the courts.  Some have to go back to the USPTO

8    to be corrected, and that's the question that is before the

9    Court.

10          Can we switch over to the Elmo very quickly.

11          Now, Your Honor, this is kind of a strange thing.

12   Let me see if I can bring this in.  I want to point out first

13   what this -- what the dispute is just from looking at the

14   language of the claims because it's a quirky thing of patent

15   lawyers.  They have a certain nomenclature.  And, when they

16   draft a claim, the first time something appears, it either

17   doesn't have an article in front of it or it has the article

18   "a" or "an."

19          For example, if you look at claim 12, when it talks

20   about an autonomous broadcasting device, the article is "an,"

21   but, from then on, the article used is "the."  So when you see

22   "the" in front of a word, it's referring back to something that

23   has been called out before.

24          The reason that's important is, if you take a look at

25   claim 12, the first limitation is an autonomous broadcasting

1    device situated behind a router.  So we are talking about a

2    router.  Nothing is talking about a router or a firewall

3    anywhere until you get to claim 12 -- not claim 12 but the

4    "wherein" cause, the wrong one in claim 12.  Wherein, in

5    response to a request to initiate autonomously by the ABD, the

6    scheduling logic transmits data relating to the recording start

7    time to the ABD over the network without modification or

8    circumvention of the firewall.

9         And then it goes on to say, Wherein, based on the

10   data relating to the recording start time, the ABD autonomously

11   transmits video data of the live event without modification or

12   circumvention of the firewall.

13        So what happens is the term "the firewall" -- which

14   we can now switch back to this.  Yes, go to the next slide.

15   The term "the firewall" -- go to the next one -- is the issue

16   that happens here is this word "the firewall" all of a sudden

17   appears.  It's not defined before.  And so nobody disputes, at

18   least the way it's written right now, there's no what we call

19   antecedent basis for the word "firewall."  Just it by itself, a

20   failure to have an antecedent basis is not in and of itself

21   enough to do it.

22        But the question is, is there now a problem because

23   this firewall kind of arising in the claims that makes the

24   claims, the scope of these claims now questionable as to what

25   they are covering.  And what's strange is, again, their expert

1    came out, right off the shoot, to say this is an obvious typo,

2    and it should have been "router" instead.

3          So that's what he's saying with a person of ordinary

4    skill would understand this is not a typo.  It needs to be

5    changed.  Okay?  And he basically says that, you know -- and

6    that was BoxCast's position, and Dr. Merat said it was a

7    mistake, that "firewall" should have been a "router."

8          So this is the position that they took, which seems

9    to say, go to the next slide, that firewalls and routers, we

10   talked about them earlier today during the tutorial, they are

11   not the same thing.  And so replacing one for the other, you

12   are changing the claim.

13         So, as it's written right now, it's not a mistake in

14   it.  So their own position is, right off the bat, is that this

15   a mistake.  And so the question is, if it's not corrected, not

16   corrected, does it mean it's indefinite because you don't know

17   what the scope is?

18         Go to the next slide.  Okay?  And, again, this is the

19   definition that Dr. Merat came up with.  Okay?  The router acts

20   as a gateway into a network routing traffic from outside to a

21   specific piece of hardware; whereas, the firewall is basically

22   the traffic cop.  It monitors traffic going in and out of the

23   network to prevent unwanted communication.  They are not the

24   same thing.

25         Go to the next slide.  Okay?  And this is the problem

```
1    as is.  We don't change the claim -- with the claim.  And these

2    are four things that, you know, I'm not gonna -- we are going

3    to talk about them.  But what happens when there's no firewall?

4    Where is this firewall located?  It's just kind of hanging out

5    in space because it's not the router.  If it's not correct,

6    it's not the router, it's something else.  It could be the

7    router, but it doesn't require it to be the router.

8            And, in one of the later claims, in claim 21, it

9    actually requires that the router is a firewall, and, by claim

10   differentiation, that would mean that in claim 12 that that

11   would include firewalls that aren't part of the firewall.

12   That's a perfect example of claim differentiation.  Okay?  And

13   then the question is, does communication have to go through the

14   router at all?  What's even more strange is can they get a

15   claim of scope other than what they are now saying the claim

16   actually said.

17           So if you go to the next slide, this is figure 7,

18   similar to figure 5 that we talked about earlier today.  Okay?

19   And I've circled some very important things and labeled them.

20   In red, you'll see the ABD.  There in green is what's referred

21   to as an on-site router, which can be a firewall.  There's also

22   an off-site router, which can be a firewall.  There is a

23   viewer's or home router firewall.  That's actually coming in

24   when the broadcast is going out.  It's going to the people who

25   are watching.  And then, like I said, the Internet is in
```

1    purple.  And then the media server is kind of in a black color.

2    And then the website server, which is the one that the user

3    would interface with, enter in the times, that that's also

4    there.

5         So this is all the components sitting there, but

6    you'll see that there's three components here that could be

7    routers or firewalls in this thing.

8         Go to the next slide.  What happens when all of these

9    are routers?  There's no firewalls at all in the system?  Okay?

10   If you take claim 12, as it's written right now, there's no

11   infringement because there's no firewall at all, but if they

12   are claiming that a person of ordinary skill would understand

13   that there's a mistake in it and that it would be corrected,

14   that means that the public -- do they know, for sure, whether

15   or not having only routers would be infringement?  It could be

16   infringement now.  It's no longer a clear question because what

17   they are saying is it needs to be corrected because it's an

18   obvious change that needs to be made.  The scope of this claim

19   could all of a sudden be, well, maybe it is infringement and

20   the public doesn't know.  Okay?  It doesn't know about what

21   they are claiming this obvious typo is.

22        Next slide.  What happens when an on-site router is

23   only a router but the other two are firewalls?  Okay?  Go back

24   to the slide real quick that shows the thing.  You see here,

25   Your Honor, that green one, which is on-site router, that's the

```
 1   only one that the ABD is going through to get to the Internet.

 2   So all the communications between the website server and the

 3   media server are going through the on-site router.  Okay.

 4   That's a router.  But what happens if the other two are

 5   firewalls?  You do have a firewall in the system right now.

 6            And, Your Honor, what's really strange is, the

 7   communications back and forth between the ABD can occur without

 8   any circumvention of those firewalls because they are not even

 9   in the line of communication anymore.  So, technically, this

10   could meet that element, even though these devices are not even

11   connected to the ABD in the communication line.

12            Can you go back to the slide we were on before.

13   Okay.  So, again, that seems kind of strange that that would

14   cause you to infringe because you have a firewall sitting to

15   the side that has nothing to do with the activity that's taking

16   place, and you have this firewall that is literally hanging out

17   in space that happens to be part of the system.

18            And, again, this could include a firewall that's at

19   theoretically the customers's house now.  It's not even one

20   that nobody even knows, but -- so it's strange.  So this raises

21   a whole myriad of questions of where this firewall is.  Okay?

22   And does it require that if only one exists, or do we need

23   every one to be a firewall?  There's just too many questions,

24   and that's why, the way it's written right now, is going to

25   cause some concerns as to what is and isn't infringing
```

1    depending on the claim.

2            Go to the next slide.  Okay?  And BoxCast also argues

3    in its briefing and stuff that that is not what they intended,

4    the way it's written night now.  And, in the H-W Technology

5    case, 758 F.3d 1329, you can't go assert a claim that's not the

6    scope of the claim that you intended.  There's problems with

7    doing that, Your Honor.

8            So all of this, using this claim, there's problems

9    with this claim, as written, and because the scope is now -- go

10   to the next slide -- is not -- it's uncertain.  Okay?  It needs

11   to be corrected.  Okay?  And what it does point-blank, it fails

12   to inform persons of ordinary skill with reasonable certainty

13   what the scope of the claims are.

14           And claim 12 is held indefinite that we also would

15   have to lose claims 13 through 21 because they depend on it.

16   So these are the claims.  So this is not a complete -- this is

17   just a problem with some of the claims.  I'm not trying to

18   suggest that it's all of the claims.

19           So, now, if you move to the next slide.  We are going

20   to hit the next issue, is whether or not it's amenable to

21   judicial correction.  And I am always sheepish to stand in

22   front of a federal judge and to tell him he doesn't have the

23   authority to do something, but that is what I'm doing here

24   today.

25           If you go to the next slide.  The federal circuit in

1   the Novo Industries case had a very interesting issue that

2   happened.  It was a Supreme Court case which basically made it

3   clear that federal judges have the authority to make changes to

4   mistakes in a patent.

5          But then what happens, Congress implemented

6   35 USC 254, 54, and 55, which basically said that the

7   corrections had to be done in the patent office, and there were

8   corrections that were the mistakes of the patent office and

9   corrections that were the mistakes caused by the applicant.

10  Okay?

11         And they had rules as to what to do.  Well, that

12  raised the issue in the Novo Industries case, does that statute

13  now completely take away the authority for a federal judge to

14  correct patents, and the federal circuit said no.  But what

15  they did do, next slide, is they came up with a two-prong test,

16  and they basically said, under this situation, if both of these

17  things are there, the Court has authority.  They understood

18  there were certain changes that the Court could do, but they

19  had to meet both of these threshold things.

20         But what's important to understand, Your Honor, is

21  this test, the two-prong test, shows that the mistake or

22  whatever it is, the error, can't be corrected here.  That

23  doesn't mean it can't be corrected.  It just means it can't be

24  corrected here.

25         So we are not trying to take away the opportunity to

```
 1    make the correction.  The question just is, is this something
 2    the patent office should be hearing instead of a federal court.
 3    And, as we are about to discuss, we believe that both of these
 4    prongs are not present here, and, therefore, for both reasons,
 5    this needs to go back to the U.S. Patent Office for correction.
 6            Go to the next slide.  Okay.  Now, this is a blow-up
 7    of the portion here that has to do with the language that has
 8    the firewall in it.  What you'll see is it shows up twice, and
 9    what is important to realize is, there's two parts of this
10    claim that talk about "without modification or circumvention of
11    the firewall."  The first one is, information that is basically
12    a response to a request from the ABD.  Okay?  So this is
13    information that's coming in.  The scheduling logic transmits
14    the data to the ABD.  So this is information coming in.
15            But the second half of it talks about, okay, the ABD
16    autonomously transmitting video data of a live event without
17    modification of the firewall or modification or circumvention
18    of a firewall contemporaneously with the live event from the
19    video acquisition device to the server.  So this is the ABD to
20    the server.
21            So we've got the top part in yellow is information
22    coming in, going to the ABD, and the bottom, in the orange, is
23    information that's going out.  And the reason why that's
24    important is, as we discussed earlier today, as we were talking
25    about firewalls and routers, there is a difference between them
```

1   as to their abilities when they are having to be modified or

2   circumvented.  Okay?

3            And so go to the next slide.  Okay.  The debate

4   becomes which is it?  Do you change "firewall" to "router" or

5   do you change "router" to "firewall" in this claim?  Judge, I

6   would say they are both equally plausible, but, more fairly,

7   there's problems with both of them.  That's kind of funny.

8   Neither of them are a good solution because there's problems

9   with both.

10            If you change everything to "firewall" -- so you

11   change situating it behind a firewall in the beginning of the

12   claim.  Later, as we talked about, claim 21 talks about where

13   the router is a firewall, you've now taken that out, and so,

14   all of a sudden, 21 becomes meaningless because it's -- you've

15   changed the router to a firewall and, now, you've got claim 21,

16   which is doing that.  So that is kind of strange, and we'll

17   admit that's strange.  But that's one way it could be changed.

18            But when you change it the other way, when you change

19   it from "router" -- excuse me -- from "firewall" to "router,"

20   so, in it the passage I just showed you in yellow and orange,

21   it becomes "router."  The second half of it -- and if you go

22   back to that slide, Mr. Saunders, the second half of it is

23   talking about an ABD autonomously sending something out without

24   having to modify or circumvent the router.  The problem is,

25   Your Honor, you don't have to modify or circumvent to get past

1    the router.  It becomes a meaningless limitation because you

2    are now having to get past something that doesn't mean

3    anything.

4            Now, in our brief, and our expert talked about it, he

5    said, typically, you don't have to do this.  The word

6    "typically" was used, Your Honor, because there may be some

7    exotic router out there that we don't know about, but that's

8    not the routers they were talking about.  They were talking

9    about the routers that were both defined by Mr. Caramanis and

10   Dr. Merat where they basically say this is what a router does.

11   So, yes, it was typically because we don't know.  There could

12   be something exotic.  That's not the type of thing they thought

13   about.

14           The problem is, if you change this to "router," you

15   have brought in this claim and made the second half of it

16   irrelevant, and that's a problem because there's some issues

17   there.

18           So, now, to get back on track to where we are.  So

19   yeah.  And so all of this is, though, there's problems with

20   both.  But the problem is that both of them are plausible.

21           And so let's be very clear about the first half of

22   this test.  You are not allowed to look at all the prosecution

23   history.  It's only based upon the patent.  Now, it is true

24   that in all the other claims, they talk about router.  They do.

25   But, also, this is the only claim, claim 12, that actually

1    separates them into two halves like this.  The other ones, they

2    put them together so you don't run into the same problem when

3    you put one -- when you combine it in and out through the

4    router.  It's still there, but this one had the decision to

5    separate the in/the out into two separate passages.  And that's

6    why the second passage now becomes irrelevant.

7            So we have a problem with the first prong, and,

8    again, we are not trying to give a solution which is the right

9    way to do it.  We are just pointing out there's two ways.

10           Now, go to the next one.  Now, we get to take a look

11   at the second prong.  We get to look what happened in the

12   patent.  Okay?  It is completely correct.  In the original

13   patent that was filed, the claims originally had the word

14   "firewall," and then, I believe in December of 2016, the claims

15   were changed to remove the word "firewall" and to put the word

16   "router" into all the claims that were pending.  They switched

17   them, which they had every right to do.

18           And then there were several more interactions between

19   them.  And then we talked about earlier today the examiners --

20   it was when they faxed in the changes to the examiner's

21   amendment that this "firewall" thing showed up for the first

22   time or showed up.

23           So it wasn't a remnant of what had been put in

24   before.  They had clearly taken all the "firewalls" and changed

25   them to "routers," and the claims had stayed that way through

1   at least one office action where they did it.  But, all of a

2   sudden, when they faxed in the changes, that's when this issue

3   came.

4            And what's important to realize is that that means

5   that this was the very limitations that were being put in that

6   the examiner was saying, okay, now, I'm going to allow these

7   claims.

8            Well, Your Honor, if this was the claims that were

9   done to the modification to get these claims allowed, these

10  were not trivial changes to the claim.

11           And, while we can debate what the rationale was and

12  all that, it was substantial, which is why it fails the second

13  prong because it was not a trivial thing.  We don't know what

14  was done, and that's why it needs to go back to the patent

15  office.

16           This is similar to the situation in <u>Novo Industries</u>

17  because in <u>Novo Industries</u> a modification was made at the very

18  end to get the claims allowed, and the language made no sense.

19  I mean, it made no sense.  And the judge basically said I think

20  I know what they intended to put here; I'm going to go ahead

21  and do that.

22           Now, the federal circuit reversed and basically said,

23  wait, no, you can't make this change.  But the reason was, is

24  because it's -- there's more than one way it could be changed,

25  but this also is a pretty important thing because it shows in

1    the prosecution that this was a change that was put in, and,

2    while it might be unclear what they meant, we need to go to the

3    patent office to get it sorted out.  Okay?  So I would say

4    that, for very similar reasons, the amendments were not

5    insubstantial here, which is why the second prong fails.

6            Okay.  And moving on.  So the net result at the end

7    is, Your Honor, it's indefinite as it is.  We don't know what

8    the true scope of the claim is.  And, if we are going to

9    correct it, it has to go back to the USPTO.

10           And what is important here for this case, then, is if

11   it has to go back to the USPTO, under the plain language of 254

12   and 255.  The change is only effective to new cases brought

13   after the correction is made.  This case, the claims stay the

14   way they are, which is why I believe they don't want to go back

15   to the patent office.  They want you to make the change because

16   that is a huge difference.

17           For you, okay, if you believe you can change the

18   claims, you can.  But, if you don't, you have to view the

19   claims as indefinite based on the way they are.  So that's just

20   what the statute is.  And, like I said, in this case, 255

21   applies because this is -- this error that's in the claim that

22   they -- the typo that they are talking about was imposed by the

23   applicant when they faxed in the thing.

24           Next slide.  And so the answer to whether or not it

25   could be judicially corrected we believe is no.  It needs to go

1    back to the USPTO.  Thank you, Your Honor.  Thank you very

2    much.

3             THE COURT:  Thank you.

4             MR. MCDOUGAL:  All right.  Last one of the day.  So I

5    think Mr. Garsson addressed the partys' positions.  We believe

6    that the term "firewall" in claim 12 was a typographical error,

7    and it should have been "router."  And we'll explain exactly

8    why that is.

9             And YSL believes the claim is indefinite because

10   there's no antecedent basis for the word "firewall."  It goes

11   on to admit that the antecedent basis is a patent drafting

12   error in the patent office, and it's not -- a lack of

13   antecedent basis is not a basis for indefiniteness.

14            Be that as it may, we'll talk about fixing the

15   statement that's in the claim.  Mr. Garsson did mention the

16   Supreme Court case in Essex.  That case talked about three

17   different requirements to correct a mistake.  One, that mistake

18   was inadvertent and unnoticed.  That applies here.  That

19   mistake was not uncovered until this case.

20            The limitation, the router/firewall limitation that

21   we are talking about, was never discussed during prosecution,

22   and we'll go through it and talk about it.  And there was never

23   any explanation in the prosecution history or otherwise

24   regarding the claims.  So, under the Essex test, it should be

25   corrected, and we'll go through why.  And Mr. Garsson was

1    correct, <u>Essex</u> is still good law.

2         The federal circuit in this <u>Flint Partners</u> case did

3    clarify the test and did have this two-prong approach that the

4    mistake was not subject to reasonable debate, and the

5    prosecution does not suggest otherwise.  We'll address those

6    two prongs.

7         So, first, we'll talk about the prosecution history.

8    If you look at the claims, they all have "without circumvention

9    of a router" in there, except claim 12.  All the independent

10   claims, I should say.  So you have claim 1, 6, 22 all have

11   "router," and claim 12 has "firewall."  And we'll talk about

12   the amendments that were made during prosecution, but if you

13   look at the dependent claims from each one of those independent

14   claims, that would be claims 3, 8, 21, and 30, they all say the

15   "router and firewall," including claim 21, which kind of

16   depends on claim 12.

17        So, when all these claims were changed from

18   "firewall" to "router," these dependent claims were added to

19   say that the router contains a firewall, including claim 21.

20   So claim 12 is, obviously, the odd man out here.  And there's

21   no reasoning given as to why claim 12 would be different from

22   any of these others.

23        There's also no distinction ever made between

24   "routers" and "firewalls" in the specification.  Mr. Garsson

25   talks about the differences between the two, but the

1  specification in the patent treats them as one.  This statement

2  is just an example that they refer to the term "routers" and

3  "firewalls" as "routers/firewalls" do not allow broadcast

4  streaming and so on and so forth.  But, when they refer to

5  them, they refer to them both at the same time.  And there's no

6  reason given in the specification, whether to claim 1 or the

7  other.  So when we look at the prosecution history here, that

8  step 1 was this wholesale amendment of all the claims.

9          Claim 9 here, that you are looking at, eventually

10 became claim 12 during the prosecution.  When you add new

11 claims, you have to put them at the end, and then, when the

12 patent issues, all the claims get renumbered.  So claim 9 here

13 is issue -- became an issue of claim 12.  And claim 32 there at

14 the bottom became issue dependent claim 21.

15         But you can see, when we first amended here, that

16 first amendment did change "firewall" to "router" in claim 12

17 in all instances and then added the dependent claim wherein the

18 router comprises a firewall.  So at this point in prosecution,

19 all the claims had the term "firewall" in them.

20         Step 2 is an amendment that was just made to claim 12

21 and not the other claims, and that's what we are calling the

22 mirror amendment.  We referred to it earlier in the discussions

23 today.

24         The examiner basically wanted claim 12, which was the

25 system claim, to mirror claim 1, and, when we did that, we

1    added the language down in the "wherein" clause, which says

2    "without modification or circumvention of the firewall."

3    "Without modification or circumvention of a firewall."

4            You can see that it still had the "router" in it.

5    The first line says, "An autonomous broadcasting device

6    situated behind a router."  It's just when we added that

7    additional language, we added the "firewall" back in, even

8    though we had changed it and taken "firewall" out in a previous

9    amendment.  It was a typo.  It was a mistake.

10           So to be sure with the prosecution history, the

11   amendments and -- this was an examiner amendment.  The

12   statement said the amendments made to claim 9 were to mirrored

13   to allow the subject matter of claim 1.

14           So let's compare claim 1 to claim 12.  So let's look

15   at a map here.  So claim 1 has the limitation that I'm marking

16   "A" as the limitation in blue.  That's the limitation that the

17   ABD performed certain actions without modification to or

18   circumvention of the router.  And that modifies all the steps

19   below it.

20           So step B there is to issue a request and receive

21   data relating to recording start time of a live event from the

22   first server upon that request.  So it has to do that without

23   modification or circumvention of the router.

24           It also has to do C, at the bottom, which is transmit

25   the digital content to the media servers based on the data

1    relating to the recording start time.  It has to do that

2    without any modification or circumvention of the router.  So

3    A modifies both B and C.

4            And, when you look at claim 12, the green part is the

5    limitation that is mirrored as part B in claim 1, and the

6    scheduling logic transmits data relating to recording start

7    time in response.  So that that blue, which is the language

8    that adds back in the firewall, was adding back in the "A"

9    portion of claim 1 to add in the "without modification or

10   circumvention of the firewall."

11           Same with the second addition of the firewall, which

12   transmits video data of the live event without modification or

13   circumvention of the firewall.

14           So to make these claims fully mirror each other, just

15   as the examiner intended and what the patentee intended, well,

16   you just need to change those two instances of "firewall" to

17   "router."  And I know that Mr. Garsson said that, you know, the

18   router may be unnecessary for this transmit step or at least

19   typically unnecessary.  We'll talk about that in a second.  And

20   he had an issue with that in claim 12.  But he never says

21   anything about claim 1 because it does mirror claim 1 and had

22   the same requirement of claim 1.  So I don't really understand

23   the argument.

24           YSL acknowledges, and he mentioned this, that a

25   router typically has no problem sending data out of a network.

1   If a router is not always required to do something, it doesn't

2   mean it can be a limitation of a claim.  So I don't know what

3   the issue is here.  So it can sometimes potentially block data

4   coming out of a network.

5           YSL's other fix, which is where he said that you

6   could change "router" to be replaced with "firewall."  So

7   "firewall" is in the entire claim.  That goes back to the

8   original amendment where we changed all of them to "router."

9           Besides, when we made that amendment initially, we

10  added that independent claim.  So, now, if you have all the

11  routers in claim 12, the dependent claim would not -- I'm

12  sorry -- have "firewalls" in claim 12, the dependent claim, to

13  say wherein the router comprises firewall is not extensive

14  because that's in claim 12.  So, now, you just kind of switched

15  from claim 12 to claim 21 what the issue is.  So that fix

16  really doesn't solve the issue.

17          We believe there's really only one way to fix the

18  claim, and that's to change "firewall" to "router."  That

19  alternative fix is not reasonable, and I think the prosecution

20  history makes it clear that that was actually a typo, a

21  mistake.  That's all I have.

22          THE COURT:  Okay.

23          MR. MCDOUGAL:  Thank you, Your Honor.

24          THE COURT:  Yes.  Thank you.  Thank you, all.  I

25  think this has been helpful.  I learned another quirky thing

1    about patent lawyers today.  I had a few in mind before we

2    started.  Yes.  I'm sure we'll be able to get a ruling out to

3    you maybe in the next couple of days.

4             MR. MCDOUGAL:  Okay.

5             THE COURT:  Thank you.  Maybe give me just -- why

6    don't we take, like, five minutes, and let me talk to my clerks

7    and see if there's anything else that I need from you while I

8    have you in person.  And we'll be right back.

9         [Recess.]

10            THE COURT:  All right.  Well, thank you for your

11   patience.  I think we are good at this point.  So we'll take it

12   under submission, and I appreciate your time.

13        [Recess.]

14

15

16

17

18

19

20

21

22

23

24

25

```
1    STATE OF ALABAMA)
                      :
2    COUNTY OF MOBILE)

3                          BOXCAST, INC.
                              VS.
4                          YSL, L.L.C.
                        CASE NO. CV17-00547

5

6           I, Melanie Wilkins, do hereby certify that the above

7    and foregoing transcript of proceedings in the matter

8    aforementioned was taken by me in machine shorthand on

9    November 15, 2018, and the questions and answers thereto were

10   reduced to writing under my personal supervision using

11   computer-aided transcription, and that the foregoing represents

12   a true and correct transcript of the proceedings upon said

13   hearing.

14

15          I further certify that I am neither counsel nor

16   related to the parties to the action, nor am I in anywise

17   interested in the result of said cause.

18   Dated:  January 16, 2022
     Pages:  1 to 187, inclusive
19

20
                          _____
21                        Melanie Wilkins
                          Registered Merit Reporter
22                        Certified Realtime Reporter
                          Official Court Reporter
23                        United States District Court
                          Southern District of Alabama
24                        113 St. Joseph Street
                          Mobile, Alabama  36602
25                        (251) 690-3371
```